## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. | § § § § § § | |
| Plaintiff, | § § | Case No.: 3:10-cv-1973 |
| v. | § § | |
| DILLON GAGE INC. OF DALLAS and DILLON GAGE INC. | § § § | |
| Defendants. | § § | |

---

## RECEIVER'S ORIGINAL COMPLAINT AGAINST
## DILLON GAGE INC. OF DALLAS AND DILLON GAGE INC.

---

### SUMMARY

1.      The Court has ordered Receiver Ralph S. Janvey ("Receiver") to take control of all assets of the Receivership Estate in order to make an equitable distribution to claimants injured by a massive fraud orchestrated by Allen Stanford, James Davis, and others.

2.      The Receiver has identified payments totaling over $5 million (the "Payments") from the Stanford Parties to Dillon Gage Inc. of Dallas and Dillon Gage Inc. (collectively, "Dillon Gage") between January 20, 2009 and the date the Receiver was appointed.  Through this lawsuit, the Receiver seeks the return of these funds in order to make an equitable distribution to claimants.

3.      Dillon Gage did not provide reasonably equivalent value in exchange for the Payments it received from the Stanford Parties and/or did not receive those payments in good faith, all as described below.

4.      At all times relevant to this complaint, the Stanford Parties were insolvent, and Defendant Allen Stanford operated the Stanford entities in furtherance of his fraudulent scheme. The payments from the Stanford Parties to Dillon Gage were made with actual intent to hinder, delay, and defraud the Stanford Parties' creditors.

5.      The Receiver seeks an order that: (a) the Payments received directly or indirectly by Dillon Gage were fraudulent transfers under applicable law or, in the alternative, unjustly enriched Dillon Gage; (b) the Payments received directly or indirectly by Dillon Gage are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) Dillon Gage is liable to the Receivership Estate for an amount equaling the amount of Payments it received from the Stanford Parties; and (d) awards attorneys' fees, costs, and interest to the Receiver.

## JURISDICTION & VENUE

6.      This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754).

7.      Further, as the Court that appointed the Receiver, this Court has jurisdiction over any claim brought by the Receiver to execute his Receivership duties.

8.      Further, Dillon Gage's principal place of business is located within the Northern District of Texas, giving this Court *in rem* and *in personam* jurisdiction over Dillon Gage.

9.     This Court further has personal jurisdiction over Dillon Gage pursuant to FED. R. CIV. P. 4(k)(1)(C) and 15 U.S.C. §§ 754 and 1692.

## THE PARTIES

10.     Plaintiff Ralph S. Janvey has been appointed by this Court as the Receiver for the assets, monies, securities, properties, real and personal, tangible and intangible, of whatever kind and description, wherever located, and the legally recognized privileges (with regard to the entities) of Stanford International Bank, Ltd. ("SIBL"), Stanford Group Company, Stanford Capital Management, LLC, Robert Allen Stanford, James M. Davis, Laura Pendergest-Holt, Stanford Financial Group, the Stanford Financial Group Bldg., Inc., and all entities the foregoing persons and entities own or control, including, but not limited to Stanford Financial Group Global Management, LLC ("SFGGM"), Stanford Financial Group Company ("SFGC") and Stanford Coins & Bullion, Inc. ("SCB")[1] (collectively, the "Receivership Assets").  Plaintiff Janvey is asserting the claims contained herein in his capacity as Court-appointed Receiver.[2]

11.     Defendant Dillon Gage Inc. of Dallas is a Texas corporation with a principal office in Dallas, Texas.  Dillon Gage Inc. of Dallas will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

12.     Dillon Gage Inc. is a Texas corporation with a principal office in Dallas, Texas.  Dillon Gage Inc. will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

---

[1]     The owner and parent corporation of Stanford Coins & Bullion, Inc. is Stanford Group Holdings, Inc. Defendant R. Allen Stanford is the owner of Stanford Group Holdings, Inc.  Therefore, because Stanford Coins & Bullion, Inc. is owned or controlled by R. Allen Stanford, it is a part of the Receivership Estate.  *See* Second Amended Order Appointing Receiver (Doc. 1130), at ¶¶ 1-2.
[2]     The Receiver's claims in this Complaint are related to his claims on file in Case No. 03:09-CV-0559-N before this Court.  Pursuant to Local Rule 3.3(a), the Receiver has filed a notice of related case concurrently with this Complaint.

## STATEMENT OF FACTS

13.     On February 16, 2009, the Securities and Exchange Commission commenced a lawsuit in this Court against R. Allen Stanford, two associates, James M. Davis and Laura Pendergest-Holt, and three of Mr. Stanford's companies, SIBL, Stanford Group Company, and Stanford Capital Management, LLC (collectively the "Stanford Defendants").  On the same date, the Court signed an Order appointing a Receiver, Ralph S. Janvey, over all property, assets, and records of the Stanford Defendants, and all entities they own or control.

### I.     *Stanford Defendants Operated a Ponzi Scheme.*

14.     As alleged by the SEC, the Stanford Defendants marketed fraudulent SIB CDs to investors exclusively through SGC financial advisors pursuant to a Regulation D private placement.  SEC's Second Amended Complaint (Doc. 952), ¶ 27.[3]  The CDs were sold by Stanford International Bank, Ltd.  *Id*.

15.     The Stanford Defendants orchestrated and operated a wide-ranging Ponzi scheme. Stanford Defendant James M. Davis has admitted that the Stanford fraud was a Ponzi scheme from the beginning.  Doc. 771 (Davis Plea Agreement) at ¶ 17(n) (Stanford, Davis, and other conspirators created a "massive Ponzi scheme"); Doc. 807 (Davis Tr. of Rearraignment) at 16:16-17, 21:6-8, 21:15-17 (admitting the Stanford Ponzi fraud was a "massive Ponzi scheme ab initio").  In fact, this Court recently found that the Stanford fraud was indeed a Ponzi scheme. *See* Case No. 3:09-CV-0724-N, Doc. 456 at 2 ("The Stanford scheme operated as a classic Ponzi scheme, paying dividends to early investors with funds brought in from later investors."), at 11 ("[T]he Receiver presents ample evidence that the Stanford scheme . . . was a Ponzi scheme."), and at 13 ("The Court finds that the Stanford enterprise operated as a Ponzi scheme . . . .").

---

[3]     Unless otherwise stated, citations to Court records herein are from the case styled *SEC v. Stanford Int'l Bank, Ltd., et al.,* Civil Action No. 3-09-CV-0298-N.

16.     In marketing, selling, and issuing CDs to investors, the Stanford Defendants repeatedly touted the CDs' safety and security and SIB's consistent, double-digit returns on its investment portfolio.  SEC's Second Amended Complaint (Doc. 952), ¶¶ 32-33.

17.     In its brochure, SIB told investors, under the heading "Depositor Security," that its investment philosophy is "anchored in time-proven conservative criteria, promoting stability in [the Bank's] certificate of deposit."   SIB also emphasized that its "prudent approach and methodology translate into deposit security for our customers."  *Id*. ¶ 34.  Further, SIB stressed the importance of investing in "marketable" securities, saying that "maintaining the highest degree of liquidity" was a "protective factor for our depositors."  *Id.*

18.     In its 2006 and 2007 Annual Reports, SIB told investors that the Bank's assets were invested in a "well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements."  *Id*. ¶ 35.  More specifically, SIB represented that its 2007 portfolio allocation was 58.6% equity, 18.6% fixed income, 7.2% precious metals and 15.6% alternative investments.  *Id.*

19.     Consistent with its Annual Reports and brochures, SIB trained SGC financial advisors, in February 2008, that "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients."  *Id*. ¶ 36.  In training materials, the Stanford Defendants also claimed that SIB had earned consistently high returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993).  *Id.* ¶ 49.

20.     Contrary to the Stanford Defendants' representations regarding the liquidity of SIB's portfolio, SIB did not invest in a "well-diversified portfolio of highly marketable securities."   Instead, significant portions of the Bank's portfolio were misappropriated by the Stanford Defendants and were either placed in speculative investments (many of them illiquid,

such as private equity deals), diverted to other Stanford Entities "on behalf of shareholder" – *i.e.*, for the benefit of Allen Stanford, or used to finance Allen Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit cards, etc.).  In fact, at year-end 2008, the largest segments of the Bank's portfolio were private equity; over-valued real estate; and at least $1.6 billion in undocumented "loans" to Defendant Allen Stanford.  *See id*. ¶¶ 39-40.

21.     In an effort to conceal their fraud and ensure that investors continued to purchase the CD, the Stanford Defendants fabricated the performance of SIB's investment portfolio.  *Id*. ¶ 4.

22.     SIB's financial statements, including its investment income, were fictional.  *Id*. ¶¶ 4, 53.  In calculating SIB's investment income, Stanford Defendants Allen Stanford and James Davis provided to SIB's internal accountants a pre-determined return on investment for the Bank's portfolio.    *Id*.    Using this pre-determined number, SIB's accountants reverse-engineered the Bank's financial statements to reflect investment income that SIB did not actually earn.  *Id*.

23.     For a time, the Stanford Defendants were able to keep the fraud going by using funds from current sales of SIB CDs to make interest and redemption payments on pre-existing CDs.  *See id*. ¶ 1.  However, in late 2008 and early 2009, CD redemptions increased to the point that new CD sales were inadequate to cover redemptions and normal operating expenses.  As the depletion of liquid assets accelerated, this fraudulent Ponzi scheme collapsed.

24.     Most of the above facts discovered from Stanford's records have since been confirmed by Stanford's Chief Financial Officer, James Davis, who has pleaded guilty to his role in running the Stanford Ponzi scheme.

25.     SCB was one of many companies affiliated with and owned and controlled by R. Allen Stanford, the purpose of which was to give the appearance of legitimacy to the Stanford Ponzi scheme operations.  As described in more detail below, however, SCB was not a self-sustaining business and in fact relied heavily on financial support from SIBL which came in the form of proceeds from the sale of fraudulent CDs.  At the time the Payments were made to Dillon Gage by SCB, the financial assistance from SIBL to SCB had been suspended and SCB was on the verge of financial collapse along with the entire Ponzi scheme.

## II.     *Stanford Transferred Funds from the Ponzi Scheme to Dillon Gage.*

26.     Between January 23, 2009 and February 16, 2009, over $5 million were transferred from the Stanford Defendants to Dillon Gage.  Specifically, the following Payments were made to Dillon Gage during that time period:

- January 23, 2009 - $501,326.30

- January 27, 2009 - $394,567.40

- January 30, 2009 - $368,491.51

- February 2, 2009 - $3,002,639.10

- February 6, 2009 - $366,171.50

- February 13, 2009 - $486,959.86

- February 16, 2009 - $4,270.00

27.     At the time of each of the above-referenced Payments to Dillon Gage, the Stanford entity that transferred the payments, SCB, was insolvent.  It was unable to pay its debts as they became due.  Moreover, SCB's debts exceeded the value of its assets, and this had been the case — according to its former Vice-President of Finance and Operations, Scott Terry — for the majority of the time since September 2006, when he started with the company.  SCB relied

heavily over the years on financial support from SIBL, which consisted of CD sale proceeds, to meet its financial obligations.

28.     Dillon Gage was aware of SCB's insolvency and reliance on SIBL at the time the above Payments were made.  Indeed, Dillon Gage's concerns over the amount of SCB's total outstanding invoices and its ever increasing delay in making payments to Dillon Gage led the President of Dillon Gage, Terrence "Terry" Hanlon, to travel to Houston for a face-to-face meeting with SCB on January 20, 2009.  On January 22, 2009, Hanlon called Scott Terry, and in a recorded phone call, explained in detail his concerns regarding SCB's insolvency.  He specifically asked how it was that SCB was being paid by its customers but did not have the funds to pay Dillon Gage and even accused SCB of "robbing Peter to pay Paul."  In that same conversation, Scott Terry informed Hanlon that SCB no longer had access to funds from SIBL to cover SCB's financial short falls.  Dillon Gage also suspended all shipments to SCB or its customers.

29.     Between January 23, 2009 and January 30, 2009, after Dillon Gage was fully aware of SCB's financial difficulties and insolvency, SCB transferred over $1.2 million to Dillon Gage.

30.     On February 2, 2009, SCB transferred another $3,002,639.10 to Dillon Gage as payment for 101 gold bars.  Gagosian Gallery, Inc. of New York ordered the bars from SCB, which in turn ordered the bars from Dillon Gage.  Dillon Gage's knowledge of SCB's insolvency and financial status is further illustrated by Dillon Gage's actions surrounding and following receipt of that payment.

31.     Joe Frisard, President of SCB, explicitly told Dillon Gage to apply the $3,002,639.10 payment to the orders for 101 gold bars.  Moreover, on February 2, 2009, Frisard

emailed Ira Fritz with Dillon Gage, requesting the invoices for the gold bars. Within minutes, Fritz responded to Frisard's request, copying Hanlon, the President of Dillon Gage. Frisard immediately forwarded the Dillon Gage invoices for gold bars to SCB's accounting department, copying Fritz on the transmission. Fritz was also copied on Frisard's directions to SCB's accounting department to wire the amount of those invoices to Dillon Gage. That same day, the total amount of the two Dillon Gage invoices for the gold bars — $3,002,639.10 — was wired by SCB to Dillon Gage. Wire instructions indicated that the payment was for the 101 gold bars. Emails and other internal Dillon Gage documents show that Dillon Gage knew that the $3,002,639.10 payment was for the gold bars.

32.     Despite the express instructions from SCB and Dillon Gage's own acknowledgement that the $3,002,639.10 payment was for the gold bars, Dillon Gage instead applied the majority of that payment to prior orders from SCB for other SCB customers. According to Dillon Gage, it applied the payment to orders for which it had already shipped product and also began shipping additional product to SCB customers against the $3,002,639.10 payment. Although Dillon Gage did ship one of the gold bars to Gagosian Gallery as a sample, Dillon Gage later informed SCB that it would need an additional payment of $1.9 million before the remaining 100 gold bars could be shipped.

33.     When the Receiver discovered records of the $3,002,639.10 transaction between SCB and Dillon Gage for 101 gold bars, he immediately notified Dillon Gage by letter of the SEC lawsuit and served Dillon Gage with the Receivership Order. The letter asked Dillon Gage to immediately contact the Receiver's counsel to discuss return of property belonging to the Receivership Estate. In a letter dated February 28, 2009, Dillon Gage acknowledged that: (1) Dillon Gage had received the payment from SCB on February 2, 2009; (2) that Dillon Gage

received additional payments from SCB after February 2nd (and before the Receiver was appointed) totaling over $850,000; and (3) that Dillon Gage currently had a credit balance for SCB of $1,066,000.  Despite demands for return of the $3,002,639.10, or at a minimum the $1,066,000 for which Dillon Gage concedes no product was ever shipped, Dillon Gage has refused to return any funds to the Receiver.

## REQUESTED RELIEF

34.     This Court appointed Ralph S. Janvey as Receiver for the Receivership Assets. Order Appointing Receiver (Doc. 10) at ¶¶ 1-2; Amended Order Appointing Receiver (Doc. 157) at ¶¶ 1-2; Second Amended Order Appointing Receiver (Doc. 1130) at ¶¶ 1-2.  The Receiver seeks the relief described herein in this capacity.

35.     Paragraph 4 of the Order Appointing Receiver, signed by the Court on February 16, 2009, authorizes the Receiver "to immediately take and have complete and exclusive control, possession, and custody of the Receivership Estate and to any assets traceable to assets owned by the Receivership Estate."   Order Appointing Receiver (Doc. 10) at ¶ 4; Amended Order Appointing Receiver (Doc. 157) at ¶ 4; Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 4.  Paragraph 5(c) of the Order specifically authorizes the Receiver to "[i]nstitute such actions or proceedings [in this Court] to impose a constructive trust, obtain possession, and/or recover judgment with respect to persons or entities who received assets or records traceable to the Receivership Estate."   Order Appointing Receiver (Doc. 10) at ¶ 5(c); Amended Order Appointing Receiver (Doc. 157) at ¶ 5(c); Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 5(c).

36.     One of the Receiver's key duties is to maximize distributions to defrauded investors and other claimants.  *See* Second Amended Order Appointing Receiver (Doc. 1130) at

¶ 5(g), (j) (ordering the Receiver to "[p]reserve the Receivership Estate and minimize expenses in furtherance of maximum and timely disbursement thereof to claimants"); *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995) (receiver's "only object is to maximize the value of the [estate assets] for the benefit of their investors and any creditors"); *SEC v. TLC Invs. & Trade Co.*, 147 F. Supp. 2d 1031, 1042 (C.D. Cal. 2001); *SEC v. Kings Real Estate Inv. Trust*, 222 F.R.D. 660, 669 (D. Kan. 2004). But before the Receiver can attempt to make victims whole, he must locate and take exclusive control and possession of assets of the Estate or assets traceable to the Estate. *See* Second Amended Order Appointing Receiver (Doc. 1130) at ¶ 5(b).

## I.     *The Receiver is Entitled to Disgorgement of Assets Fraudulently Transferred to Dillon Gage.*

37.     The Receiver is entitled to disgorgement of the funds transferred from the Stanford Parties to Dillon Gage because such Payments constitute fraudulent transfers under applicable law. The Stanford Parties transferred the Payments to Dillon Gage with actual intent to hinder, delay, or defraud Stanford's creditors; as a result, the Receiver is entitled to the disgorgement of those payments. Additionally, the Stanford Parties transferred the funds to Dillon Gage at a time when the Stanford Parties were insolvent, and the Stanford Parties did not receive reasonably equivalent value in exchange for the transfers.

38.     The Receiver may avoid transfers made with the actual intent to hinder, delay, or defraud creditors. *See* Tex. Bus. & Com. Code Ann. § 24.005(a)(1) (Vernon 2009). "[T]ransfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception." *Quilling v. Schonsky*, No. 07-10093, 2007 WL 2710703, at *2 (5th Cir. Sept. 18, 2007); *see also Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (". . . [the debtor] was a Ponzi scheme, which is, as a matter of law, insolvent from its inception. . . . The Receiver's proof that [the debtor] operated as a Ponzi

scheme established the fraudulent intent behind transfers made by [the debtor].").   Because payments from a Ponzi scheme are presumptively made with an actual intent to defraud creditors, it makes no difference whether such payments were made pursuant to contracts entered into by the Stanford Defendants.

39.   The Stanford Parties were running a Ponzi scheme.   The Receiver is, therefore, entitled to disgorgement of the funds the Stanford Parties fraudulently transferred to Dillon Gage.

40.   Consequently, the burden is on Dillon Gage to establish an affirmative defense, if any, of good faith and provision of reasonably equivalent value.   *See* Case No. 3:09-CV-0724-N, Doc. 456 at 13 (citing *Hahn v. Love*, No. 01-07-00096-CV, 2009 WL 793637, at *6 (Tex. App.—Houston [1st Dist.] Mar. 26, 2009, pet. denied)); *see also, Scholes*, 56 F.3d at 756-57 ("If the plaintiff proves fraudulent intent, the burden is on the defendant to show that the fraud was harmless because the debtor's assets were not depleted even slightly.").   The Receiver is, therefore, entitled to recover the full amount of the payments that Dillon Gage received, unless Dillon Gage proves *both* objective good faith *and* reasonably equivalent value.

41.   The good-faith element of this affirmative defense requires that Dillon Gage prove objective — not subjective — good faith.   *Warfield*, 436 F.3d at 559-560 (good faith is determined under an "objectively knew or should have known" standard); *In re IFS Fin. Corp.*, Bankr. No. 02-39553, 2009 WL 2986928, at *15 (Bankr. S.D. Tex. Sept. 9, 2009) (objective standard is applied to determine good faith); *Quilling v. Stark*, No. 3-05-CV-1976-BD, 2007 WL 415351, at *3 (N.D. Tex. Feb. 7, 2007) (good faith "must be analyzed under an objective, rather than a subjective, standard.   The relevant inquiry is what the transferee objectively knew or

should have known instead of examining the transferee's actual knowledge from a subjective standpoint.") (internal citations and quotation marks omitted).

42.     Dillon Gage cannot meet its burden to establish both that it provided reasonably equivalent value for the Payments received from the Stanford Parties and that it received such payments in good faith.  Accordingly, the Receiver is entitled to the disgorgement of those funds.

43.     In the alternative, the Receiver may avoid transfers of the Payments to Dillon Gage because they were made without receiving reasonably equivalent value and the Stanford Parties either (a) were engaged or about to engage in a business or transaction for which the remaining assets of the Stanford Parties were unreasonably small in relation to the business or transaction or (b) intended to incur, or believed or reasonably should have believed that the Stanford Parties would incur, debts beyond the Stanford Parties' ability to pay as they became due.  *See* TEX. BUS. & COM. CODE ANN.  § 24.005(a)(2).

44.     Moreover, under applicable fraudulent transfer law, the Receiver is entitled to attorney's fees and costs for his claims against Dillon Gage.  *See* TEX. BUS. & COM. CODE ANN. § 24.013 ("[T]he court may award costs and reasonable attorney's fees as are equitable and just.").  As a result, the Receiver requests reasonable attorney's fees and costs for prosecuting his fraudulent-transfer claims against Dillon Gage.

45.     In order to carry out the duties delegated to him by this Court, the Receiver seeks complete and exclusive control, possession, and custody of the Payments received by Dillon Gage.

46.     The Stanford Parties, who orchestrated the Ponzi scheme, transferred the Payments to Dillon Gage with actual intent to hinder, delay, or defraud their creditors or, in the alternative, transferred the funds to Dillon Gage at a time when the Stanford Parties were

insolvent, and the Stanford Parties did not receive reasonably equivalent value in exchange for the transfers.  The Receiver is, therefore, entitled to disgorgement of all Payments fraudulently transferred to Dillon Gage.  Pursuant to the equity powers of this Court, the Receiver seeks an order that (a) the Payments received directly or indirectly by Dillon Gage were fraudulent transfers under applicable law; (b) the Payments received directly or indirectly by Dillon Gage are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) Dillon Gage is liable to the Receivership Estate for an amount equaling the amount of Payments it received from the Stanford Parties; and (d) awards attorneys' fees, costs, and interest to the Receiver.

## II.     The Receiver is Entitled to Disgorgement of Assets from Dillon Gage under the Doctrine of Unjust Enrichment.

47.     In the alternative, the Receiver is entitled to disgorgement of the Payments made to Dillon Gage pursuant to the doctrine of unjust enrichment under applicable law.  Dillon Gage holds funds that in equity and good conscience belong to the Receivership for ultimate distribution to the defrauded investors.  Dillon Gage has been unjustly enriched by such funds, and it would be unconscionable for it to retain the funds.

48.     In order to carry out the duties delegated to him by this Court, the Receiver seeks complete and exclusive control, possession, and custody of the Payments received by Dillon Gage.

49.     Dillon Gage has been unjustly enriched by its receipt of the Payments from the Stanford Parties.  Pursuant to the equity powers of this Court, the Receiver therefore seeks an order that (a) the Payments received directly or indirectly by Dillon Gage unjustly enriched Dillon Gage; (b) the Payments received directly or indirectly by Dillon Gage are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership

Estate; (c) Dillon Gage is liable to the Receivership Estate for an amount equaling the amount of Payments it received from the Stanford Parties; and (d) awards attorneys' fees, costs, and interest to the Receiver.

## PRAYER

50. The Receiver respectfully requests an Order providing that:

(a)   the Payments received directly or indirectly by Dillon Gage were fraudulent transfers under applicable law or, in the alternative, unjustly enriched Dillon Gage;

(b)   the Payments received directly or indirectly by Dillon Gage are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate;

(c)   Dillon Gage is liable to the Receivership Estate for an amount equaling the amount of Payments it received from the Stanford Parties; and

(d)   the Receiver is entitled to an award of reasonable attorneys' fees, costs, and interest.

Dated:  September 30, 2010

Respectfully submitted,

**BAKER BOTTS L.L.P.**

By:  /s/ Kevin M. Sadler_____
    Kevin M. Sadler
    Texas Bar No. 17512450
    kevin.sadler@bakerbotts.com
    Robert I. Howell
    Texas Bar No. 10107300
    robert.howell@bakerbotts.com
    David T. Arlington
    Texas Bar No. 00790238
    david.arlington@bakerbotts.com
    1500 San Jacinto Center
    98 San Jacinto Blvd.
    Austin, Texas 78701-4039
    (512) 322-2500
    (512) 322-2501 (Facsimile)

    Timothy S. Durst
    Texas Bar No. 00786924
    tim.durst@bakerbotts.com
    2001 Ross Avenue
    Dallas, Texas 75201
    (214) 953-6500
    (214) 953-6503 (Facsimile)

**ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

RECEIVER'S ORIGINAL COMPLAINT
AGAINST DILLON GAGE INC. OF DALLAS
AND DILLON GAGE INC.

16

## CERTIFICATE OF SERVICE

On September 30, 2010, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I will serve Dillon Gage Inc. and Dillon Gage Inc. of Dallas individually or through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

/s/ Kevin M. Sadler
Kevin M. Sadler