# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. | § § § § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 03:10-CV-1973-N |
| | § | |
| DILLON GAGE INC. OF DALLAS and DILLON GAGE INC. | § § | |
| | § | |
| Defendants. | § | |

---

## BRIEF IN SUPPORT OF
## RECEIVER'S MOTION FOR SUMMARY JUDGMENT
## AGAINST DILLON GAGE INC. OF DALLAS AND DILLON GAGE INC.

---

BAKER BOTTS L.L.P.
Kevin M. Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
Robert I. Howell
Texas Bar No. 10107300
robert.howell@bakerbotts.com
David T. Arlington
Texas Bar No. 00790238
david.arlington@bakerbotts.com
1500 San Jacinto Center
98 San Jacinto Blvd.
Austin, Texas 78701-4039
(512) 322-2500
(512) 322-2501 (Facsimile)

Timothy S. Durst
Texas Bar No. 00786924
tim.durst@bakerbotts.com
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
(214) 953-6503 (Facsimile)

**ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

<h1 style="text-align:center">TABLE OF CONTENTS</h1>

Table of Authorities ......................................................................................................... ii

Summary ............................................................................................................................ 1

Arguments & Authorities ................................................................................................. 3

    I.     The summary judgment standard. ......................................................................... 3

    II.    The evidence conclusively establishes that SCB was part of the Stanford Ponzi scheme, that SCB was insolvent, and that Dillon Gage received over $5 million from SCB in the days immediately prior to the Receivership. .............. 4

        A.    SCB was a part of the Stanford Ponzi scheme and was insolvent itself. ......................................................................................................... 4

        B.    SCB was unable to pay its debts as they became due, including debts owed to Dillon Gage. ......................................................................... 8

        C.    SCB fraudulently transferred $3,002,639.10, which was related to an order for 101 gold bars, to Dillon Gage. ................................................. 9

        D.    SCB fraudulently transferred an additional $2,117,516.57 to Dillon Gage. ....................................................................................................... 11

    III.   As a matter of law, the Receiver is entitled under TUFTA to recover all payments made by SCB to Dillon Gage after January 22, 2009. ......................... 12

        A.    Actual intent is presumed in cases involving Ponzi scheme debtors. ........ 13

        B.    Actual intent must be presumed in this case because SCB was part of a Ponzi scheme and was insolvent. ........................................................ 14

        C.    Dillon Gage cannot establish the two-pronged affirmative defense of reasonably equivalent value *and* good faith. ........................................ 15

            1.    Dillon Gage admits it did not provide reasonably equivalent value for at least $1,069,562. ....................................................... 16

            2.    Dillon Gage cannot show it received any of the payments after January 22, 2009 in good faith. ............................................ 17

Conclusion & Prayer ........................................................................................................ 21

Certificate of Service ....................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Armstrong v. Collins,
   Nos. 01 Civ. 2437(PAC), 02 Civ. 2796(PAC), 02 Civ. 3620(PAC), 2010 WL
   1141158 (S.D.N.Y. Mar. 24, 2010) ...........................................................6, 13, 15, 16, 17

Banner v. Kassow,
   104 F.3d 352 (2d Cir. 1996)......................................................................................18

Barrington Grp. Ltd., Inc. v. Classic Cruise Holdings S. de R.L.,
   Civil Action No. 3:08-CV-1813-B, 2010 WL 184307 (N.D. Tex. Jan. 15, 2010) ..........3, 4

Bassett v. Am. Nat'l Bank,
   145 S.W.3d 692 (Tex. App.—Fort Worth 2004, no pet.) ...................................................4

Donell v. Kowell,
   533 F.3d 762 (9th Cir. 2008) ......................................................1, 4, 13, 14, 17

Drenis v. Haligiannis,
   452 F. Supp. 2d 418 (S.D.N.Y. 2006).......................................................................14

Duncan v. Cessna Aircraft Co.,
   665 S.W.2d 414 (Tex. 1984)......................................................................................12

Fid. Mortg. Co. v. Brand,
   371 B.R. 708 (Bankr. E.D. Pa. 2007) .......................................................................19

Gutierrez v. Collins,
   583 S.W.2d 312 (Tex. 1979).....................................................................................12

Herup v. First Boston Fin., LLC,
   162 P.3d 870 (Nev. 2007).........................................................................................16

In re Agric. Research & Tech. Grp.,
   916 F.2d 528 (9th Cir. 1990) ...............................................................................18, 19

In re Bonham,
   229 F.3d 750 (9th Cir. 2000) .....................................................................................4

In re Canyon Sys. Corp.,
   343 B.R. 615 (Bankr. S.D. Ohio 2006).......................................................................17

In re Grueneich,
   400 B.R. 688 (8th Cir. 2009) .....................................................................................18

*In re The Heritage Org., L.L.C.*,
    413 B.R. 438 (Bankr. N.D. Tex. 2009) ........................................................................12

*In re IFS Fin. Corp.*,
    417 B.R. 419 (Bankr. S.D. Tex. 2009) ....................................................................13, 14

*In re M & L Bus. Mach. Co., Inc.*,
    84 F.3d 1330 (10th Cir. 1996) ..................................................................................18

*In re Manhattan Inv. Fund Ltd.*,
    397 B.R. 1 (S.D.N.Y. 2007)..................................................................................6, 14

*In re Sherman*,
    67 F.3d 1348 (8th Cir. 1995) ....................................................................................18

*In re Slatkin*,
    525 F.3d 805 (9th Cir. 2008) ......................................................................................5

*In re United Energy Corp.*,
    944 F.2d 589 (9th Cir. 1991) ......................................................................................4

*In re Wiand*,
    No. 8:05-cv-1856-T-27MSS, et al., 2007 WL 963165 (M.D. Fla. Mar. 27, 2007) .............1

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ................................................................1, 4, 5, 13, 14

*Pendergest-Holt v. Certain Underwriters at Lloyd's of London*,
    751 F. Supp. 2d 876 (S.D. Tex. 2010) ....................................................................4, 5

*Quilling v. Cristell*,
    No. Civ. A. 304CV252, 2006 WL 316981 (W.D.N.C. Feb. 9, 2006) ................................1

*Quilling v. Schonsky*,
    247 F. App'x 583 (5th Cir. 2007) ..............................................................................13

*Scholes v. Lehmann*,
    56 F.3d 750 (7th Cir. 1995) ....................................................................................5, 6

*SEC v. Res. Dev. Int'l, LLC*,
    487 F.3d 295 (5th Cir. 2007) ...............................................................................13, 15

*Slone v. Lassiter*,
    406 B.R. 778 (Bankr. S.D. Ohio 2009)........................................................................15

*Terry v. June*,
    432 F. Supp. 2d 635 (W.D. Va. 2006) ........................................................................19

*Warfield v. Byron*,
     436 F.3d 551 (5th Cir. 2006) .........................................................................13, 15, 16, 17

*Warfield v. Carnie*,
     Civil Action No. 3:04-cv-633-R, 2007 WL 1112591 (N.D. Tex. Apr. 13, 2007) ...1, 12, 16

STATUTES

TEX. BUS. & COM. CODE ANN. §§ 24.001-.013 (West 2009) .........................................................1

TEX. BUS. & COM. CODE ANN. § 24.005(a) ...................................................1, 12, 13, 15, 16, 17, 21

TEX. BUS. & COM. CODE ANN. § 24.008(a)(1) ...............................................................................13

TEX. BUS. & COM. CODE ANN. § 24.009(a) ...............................................................................15, 16

TEX. BUS. & COM. CODE ANN. § 24.009(b) ...................................................................................13

TEX. BUS. & COM. CODE ANN. § 24.013 .......................................................................................21

OTHER AUTHORITIES

FED. R. CIV. P. 56(c)(2) ..................................................................................................................3

FED. R. EVID. 807 ..........................................................................................................................5

Restatement (Second) of Conflict of Laws § 145 .......................................................................12

Cook, Michael L. & Richard E. Mendales, *The Uniform Fraudulent Transfer Act:  An
     Introductory Critique*,
     62 Amer. Bankr. L.J. 87 (1988) ........................................................................................19

Ralph S. Janvey, in his capacity as Receiver for Stanford Coins & Bullion, Inc.

("SCB"),[1] Stanford International Bank, Ltd. ("SIB" or "SIBL"), and other Stanford entities,

hereby submits this Brief in Support of his Motion for Summary Judgment Against Dillon Gage

Inc. of Dallas and Dillon Gage Inc. (collectively, "Dillon Gage"), respectfully stating as follows:

## SUMMARY

The Receiver moves for summary judgment against Dillon Gage for recovery of

$5,120,155.67 that Dillon Gage received from SCB between January 23, 2009 and February 13,

2009 — just days before the Receiver was appointed.[2]  As a matter of law, such payments are

voidable fraudulent transfers under the Texas Uniform Fraudulent Transfer Act ("TUFTA"),

TEX. BUS. & COM. CODE ANN. §§ 24.001-.013 (West 2009).[3]  A debtor engaged in a Ponzi

scheme is conclusively presumed to have made the payments "with actual intent to hinder, delay,

or defraud . . . creditor[s] of the debtor" (see TEX. BUS. & COM. CODE ANN. § 24.005(a)(1)), and

it is conclusively presumed that such a debtor has unreasonably small capital or is incurring

debts it will be unable to pay (see id. at § 24.005(a)(2)(A) and (B)).  The evidence, independent

of these presumptions, likewise establishes these elements.  In addition, the evidence establishes

that the payments to Dillon Gage were not in exchange for reasonably equivalent value and/or

---

[1]     Because SCB is wholly owned by Stanford Group Holdings, Inc., which in turn is wholly owned by R. Allen Stanford, SCB is part of the Receivership Estate pursuant to the terms of the Receivership Order.  [See Case No. 3:09-CV-0298-N, Doc. 1130.]

[2]     The Receiver also seeks recovery of attorneys' fees and costs from Dillon Gage.  The amount of the Receiver's claim for attorneys' fees and costs will be determined at a later date.

[3]     "Courts have routinely applied UFTA to allow receivers or trustees in bankruptcy to recover monies lost by Ponzi-scheme investors."  Donell v. Kowell, 533 F.3d 762, 767 (9th Cir. 2008); see also Janvey v. Alguire, 647 F.3d 585, 601 (5th Cir. 2011) (noting that the Receiver represents the interest of creditors); Warfield v. Carnie, Civil Action No. 3:04-cv-633-R, 2007 WL 1112591, at *9 (N.D. Tex. Apr. 13, 2007) ("A receiver of an alleged Ponzi scheme may sue under the UFTA to recover funds paid from the entity in receivership."); In re Wiand, No. 8:05-cv-1856-T-27MSS, et. al., 2007 WL 963165, at *2 (M.D. Fla. Mar. 27, 2007) (receiver has standing under the Florida UFTA); Quilling v. Cristell, No. Civ. A. 304CV252, 2006 WL 316981, at *5-6 (W.D.N.C. Feb. 9, 2006) (receiver has standing under either North Carolina or Florida's UFTA).  The Court has affirmed this principle in a recent decision in a related case.  [See Case No. 3:09-CV-0724-N, Doc. 688 at 3-7.]

were not received by Dillon Gage in good faith.  Dillon Gage has no evidence to establish otherwise.

SCB purported to be a legitimate coins and bullion retail house.  The Receiver's investigation, however, has revealed it was just one of over a hundred companies used by R. Allen Stanford to help orchestrate his Ponzi scheme and lend an appearance of legitimacy to his fraudulent operations.  SCB was insolvent and was only able to keep its doors open because it received millions of dollars in loans from SIBL, the entity that sold the fraudulent certificates of deposits at the epicenter of the Ponzi scheme.  SCB's primary purpose was to sell coins and bullion to customers who had already invested in the Ponzi scheme.

When SCB did not have inventory that a customer wanted, it would turn to wholesale vendors such as Dillon Gage to purchase the product.  That is exactly what happened when Gagosian Gallery (the "Gallery") ordered 101 gold bars from SCB.  Unfortunately, when SCB paid Dillon Gage approximately $3 million for the gold bars, Dillon Gage was aware that SCB was insolvent and took the money and applied it against other outstanding orders that had been placed by SCB and for which payment to Dillon Gage was long overdue.  Dillon Gage then informed SCB that it would require all debts to be paid off — to the tune of another $1.9 million — before Dillon Gage would release the gold bars to SCB or the Gallery.  When the Receiver was appointed a few days later, he demanded return of the $3 million, and Dillon Gage refused.

Through his motion for summary judgment against Dillon Gage, the Receiver seeks return of the $3 million that SCB paid to Dillon Gage for the 101 gold bars, as well as over $2 million in additional payments made by SCB to Dillon Gage in the final days before the Receiver was appointed, so that those funds may be equitably distributed among the victims of

the Stanford Ponzi scheme.[4]  These payments were fraudulent transfers for which Dillon Gage

did not provide reasonably equivalent value, that Dillon Gage did not receive in good faith, or

both.

ARGUMENTS & AUTHORITIES

**I.     The summary judgment standard.**

Summary judgment "should be rendered if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(c)(2).  Therefore, a plaintiff is entitled to summary judgment as to any claim he can establish

as a matter of law.  As this Court has held,

> [a] plaintiff is entitled to judgment as a matter of law where it
> present[s] sufficient summary judgment evidence to establish each
> element of its cause of action.  Once the movant has met its
> burden, the non-movant must show that summary judgment is not
> appropriate.  This burden is not satisfied with some metaphysical
> doubt as to material facts, by conclusory allegations, by
> unsubstantiated assertions, or by only a scintilla of evidence.
> Instead, the non-moving party must come forward with specific
> facts showing that there is a *genuine issue for trial*.

*Barrington Grp. Ltd., Inc. v. Classic Cruise Holdings S. de R.L.,* Civil Action No. 3:08-CV-

1813-B, 2010 WL 184307, at *5 (N.D. Tex. Jan. 15, 2010) (emphasis in original; internal

citations and quotation marks omitted).  If a defendant seeks to defeat summary judgment by

relying on an affirmative defense, to succeed, the defendant must "'come forward with summary

judgment evidence sufficient to raise an issue of material fact on each element of the defense.'"

---

[4]      Furthermore, Dillon Gage admits that, as of the date the Receiver was appointed, it had a credit balance in
SCB's favor of $1,069,562 — a balance against which Dillon Gage shipped no product.  Such funds were
transferred to the Receiver and are being held in a restricted account pending the result of this case pursuant to the
Court's July 15, 2011 Order [*see* Case No. 3:09-CV-0559-N, Doc. 75.]

*Id.* (quoting *Bassett v. Am. Nat'l Bank*, 145 S.W.3d 692, 696 (Tex. App.—Fort Worth 2004, no

pet.)).

>    **II.    The evidence conclusively establishes that SCB was part of the Stanford Ponzi scheme, that SCB was insolvent, and that Dillon Gage received over $5 million from SCB in the days immediately prior to the Receivership.**

>    **A.    SCB was a part of the Stanford Ponzi scheme and was insolvent itself.**

The summary judgment evidence conclusively establishes that the Stanford

enterprise, of which SIB and SCB were integral components, was a Ponzi scheme and was

insolvent from its inception, and both this Court and the Fifth Circuit Court of Appeals have held

that it was a Ponzi scheme. *See Alguire*, 647 F.3d at 589, 596-599, 601; [Case No. 03:09-CV-

0298-N, Doc. 1315 at 10-11, 14]; [Case No. 03:09-CV-0724-N, Doc. 456 at 2, 11, and 13]; [Case

No. 03:10-CV-0346-N, Doc. 109 at 14-16].  In addition, SCB was itself insolvent.

"Generically, a Ponzi scheme is a phony investment plan in which monies paid by

later investors are used to pay artificially high returns to the initial investors, with the goal of

attracting more investors."  *In re Bonham*, 229 F.3d 750, 759 n.1 (9th Cir. 2000).  "The fraud

consists of funneling proceeds received from new investors to previous investors in the guise of

profits from the alleged business venture, thereby cultivating an illusion that a legitimate

profit-making business opportunity exists and inducing further investment."  *Donell,* 533 F.3d at

767 n.2 (quoting *In re United Energy Corp.*, 944 F.2d 589, 590 n.1 (9th Cir. 1991)).

The evidence conclusively establishes that the Stanford enterprise was a Ponzi

scheme from the beginning.  The declarations[5] of the Receiver's expert in this matter, Karyl Van

---

[5]     The Fifth Circuit recently noted that Ms. Van Tassel's declaration in the litigation surrounding the preliminary injunction issued against certain former Stanford employees "provide[s] clear, numerical support for the creative reverse engineering undertaken by Stanford executives to accomplish the Ponzi scheme[.]"  *Alguire*, 647 F.3d at 597.  Likewise, in an order concerning a preliminary injunction regarding insurance coverage for the related criminal cases, Judge Atlas credited the reliability of Ms. Van Tassel's testimony concerning the existence of the Ponzi scheme: "The Court receives in evidence and credits Van Tassel's conclusions based on detailed analysis of

Tassel, show that the entire Stanford enterprise operated as a Ponzi scheme.[6]  As this Court and the Fifth Circuit have made clear, the Stanford Ponzi scheme was comprised of over 100 Stanford entities.  *See Alguire*, 647 F.3d at 589 n.2; [Case No. 3:09-CV-0298-N, Doc. 1030 at 7]; [Case No. 3:09-CV-0724-N, Doc 456 at 2]; [Case No. 3:10-CV-0346-N, Doc. 109 at 56].  Specifically, Ms. Van Tassel's declarations demonstrate that the Stanford enterprise comprised over 130 separate Stanford Entities, each of which was part of the scheme.[7]  The evidence further shows that CD Proceeds stolen from defrauded investors in the SIB CDs were transferred between and amongst the numerous Stanford Entities, as well as R. Allen Stanford, and that such Entities were primarily funded by the proceeds from the sale of SIB CDs.[8]  The evidence, therefore, clearly shows that the Stanford Entities were operating as a Ponzi scheme from at least 1999 forward.[9]  Ms. Van Tassel's findings are corroborated by James Davis's guilty plea[10] to

---

documentary evidence, augmented by interviews of persons with firsthand knowledge, concerning the source and use of [SIB] funds, [SIB]'s financial condition at various points in time, the timing and cost of assets acquired by various Stanford entities (*e.g.*, real estate and private equity investments), and the compensation of financial advisors who sold [SIB] CDs. . . . The Court finds the Van Tassel Declarations, to the extent received in evidence, have strong 'circumstantial guarantees' of their trustworthiness.  Van Tassel and FTI performed extraordinarily detailed analysis, as described in the Declarations and summarized above."  *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 751 F. Supp. 2d 876, 880-81, 881 n.10 (S.D. Tex. 2010).  Judge Atlas also pointed out that "Van Tassel's findings dovetail with statements given by Davis in his plea agreement."  *Id.* at 889.

[6]     *See* Receiver Appendix at 1-67 (Exhibit 1: July 27, 2009 Declaration of Karyl Van Tassel); at 68-80 (Exhibit 2: June 7, 2011 Supplemental Declaration of Karyl Van Tassel); at 81-135 (Exhibit 3: June 1, 2011 Declaration of Karyl Van Tassel); and at 136-1024 (Exhibit 4: June 2, 2011 Supplemental Declaration of Karyl Van Tassel).

[7]     *See* Receiver Appendix at 3-6 (Exhibit 1); at 86-89, 91-96 (Exhibit 3); and at 143-149, 158-161, 163-167 (Exhibit 4).

[8]     *See* Receiver Appendix at 3-7, 9-17, 23 (Exhibit 1); at 73-80 (Exhibit 2); at 86-87, 91-96 (Exhibit 3); and at 143-144, 158-161, 163-167 (Exhibit 4).

[9]     *See* Receiver Appendix at 79-80 (Exhibit 2); and at 143-144 (Exhibit 4).

[10]     In fraudulent transfer suits arising from a Ponzi scheme, guilty pleas are competent summary judgment evidence for the existence of the Ponzi scheme. This was the holding of the Ninth Circuit in *In re Slatkin*, 525 F.3d 805, 811-12 (9th Cir. 2008), an appeal from a summary judgment granted in favor of a bankruptcy trustee for recovery of profit payments made to investors of a failed investment company. The investors argued on appeal that the trial court improperly considered the guilty plea of the investment firm's owner, in which he conceded that he and the firm had been involved in a Ponzi scheme. *Id.* The Ninth Circuit affirmed the summary judgment, holding that "the plea agreement is admissible under Federal Rule of Evidence 807, and . . . the bankruptcy court did not, therefore, abuse its discretion when it considered the plea agreement in granting summary judgment." *Id.* at 812; s*ee also Scholes v. Lehmann,* 56 F.3d 750, 762 (7th Cir. 1995) (the trial court properly admitted a Ponzi fraudster's plea

charges that he conspired with Allen Stanford and others to orchestrate a Ponzi scheme in violation of federal securities laws.  Davis, in fact, states that the Stanford enterprise was a Ponzi scheme from the beginning.[11]

The undisputed evidence shows that SCB was a part of the Stanford Ponzi scheme.  Moreover, the evidence shows that SCB itself was insolvent when Dillon Gage received the payments from SCB.  As a result, the payments totaling $5,120,155.67 that Dillon Gage received from SCB are, as a matter of law, voidable fraudulent transfers under TUFTA.

Although SCB purported to be a legitimate coins and bullion retail house, the Receiver's investigation has revealed that it was just one of over a hundred companies owned and controlled by R. Allen Stanford that were used to help orchestrate the Ponzi scheme and lend an appearance of legitimacy to the Stanford enterprise's fraudulent operations.[12]  Even though the operations of some Stanford Entities, such as SCB, may have resulted in some revenue, Ms. Van Tassel has testified that they, nonetheless, "require[d] the capital contributions from Mr. Stanford to remain solvent."[13]  This was certainly true as to SCB.

---

agreement as evidence that the entity in receivership had been operated as a Ponzi scheme.); *Armstrong v. Collins*, Nos. 01 Civ. 2437(PAC), 02 Civ. 2796(PAC), 02 Civ. 3620(PAC), 2010 WL 1141158, at *24 (S.D.N.Y. Mar. 24, 2010) ("Yagalla's testimony that he ran a Ponzi scheme, *the fact he pled guilty to conduct amounting to a Ponzi scheme*, that he did not contest the SEC's allegations that he ran a Ponzi scheme, and Fleisher's conclusion that Yagalla indeed ran a Ponzi scheme, lead to the inevitable conclusion that Yagalla did, in fact, run a Ponzi scheme . . .") (emphasis added); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 12 (S.D.N.Y. 2007) ("There is ample support in the record for [the existence of a Ponzi scheme]. For example, the criminal information to which Berger pled guilty set forth that Berger continuously falsified the Fund's performance, sent account statements to current investors that reflected significant gains, concealed the Fund's true state from its auditors, and used his falsified records to attract new investors.").

[11]     *See* Receiver Appendix at 1074-1079, 1081 (Exhibit 11: James M. Davis's Plea Agreement in Criminal No. H-09-335 (S.D. Tex.—Houston Division)); and at 1111, 1116 (Exhibit 12: Transcript of Rearraignment of James M. Davis in Criminal No. 4:09-CR-00335-1 (S.D. Tex. —Houston Division)); *see also* Receiver Appendix at 88 (Exhibit 3) ("James Davis admitted in his rearraignment that the Stanford enterprise was a Ponzi scheme from the beginning, and I have not seen anything in the records I have reviewed to indicate otherwise."); and at 143 (Exhibit 4) ("The Stanford Entities were operating as a Ponzi scheme from at least 1999 forward[.]").

[12]     *See* Receiver Appendix at 1178 (Exhibit 23: February 10, 2012 Declaration of Karyl Van Tassel).

[13]     *See* Receiver Appendix at 1029 (Exhibit 5: Excerpts from August 2-3, 2011 Deposition of Karyl Van Tassel, deposition lines 211:8-25, 212:1-15).

SCB was, in fact, insolvent and only able to keep its doors open because it received millions of dollars in CD Proceeds from SIBL, which were taken from defrauded CD investors.  According to SCB's Vice-President of Finance and Operations, Scott Terry, SCB had been insolvent under the negative equity test — meaning its liabilities exceeded its assets — since at least 2006 when he started with the company.[14]  Ms. Van Tassel has testified that SCB was one of the Stanford Entities that was owned by R. Allen Stanford and that received money diverted from the scheme,[15] and she has confirmed that SCB was insolvent since at least 2006.[16] Furthermore, SIBL maintained a portfolio account at SCB consisting of coins, metals, and cash, and SCB periodically took out promissory notes against the account in exchange for the cash in the account.[17]  This arrangement operated as a credit facility for SCB, which at any given time had outstanding notes payable to SIBL between $200,000 and $1,500,000 or more.[18]

In January 2009, SCB already owed $500,000 to SIBL but needed additional cash because it could not pay its bills.[19]  When SCB requested additional cash from the SIBL account, Laura Pendergest-Holt denied that request; as a result, SCB was no longer able to pay its bills.[20] Later that month, due to the financial strain caused by the inevitable collapse of the Ponzi

---

[14]     *See* Receiver Appendix at 1033-1034, 1037 (Exhibit 6: Excerpts from January 27, 2010 Deposition of Timothy Scott Terry, deposition pages 8, 15-16, 124-125.)

[15]     *See* Receiver Appendix at 1027-1028 (Exhibit 5, transcript lines 49:7-25, 50:1-14).

[16]     *See* Receiver Appendix at 1178-1180 (Exhibit 23).

[17]     *See* Receiver Appendix at 1038 (Exhibit 6, deposition pages 128-129); *see also* Receiver Appendix at 1179 (Exhibit 23).

[18]     *See* Receiver Appendix at 1035 (Exhibit 6, deposition pages 88-89); and at 1043 (Exhibit 7: Transcript of January 22, 2009 call); *see also* Receiver Appendix at 1179-1180 (Exhibit 23).

[19]     *See* Receiver Appendix at 1035-1036 (Exhibit 6, deposition pages 88-90); *see also* Receiver Appendix at 1180 (Exhibit 23).

[20]     *See* Receiver Appendix at 1037-1039 (Exhibit 6, deposition pages 124-126, 129-131); and at 1041-1044 (Exhibit 7).

scheme, SIBL removed all cash out of the SCB account.[21]   As the events described below

demonstrate, SCB was unable to stay afloat without SIB CD money from defrauded investors.

> **B.     SCB was unable to pay its debts as they became due, including debts owed to Dillon Gage.**

Dillon Gage is a precious metals, bullion and rare coin wholesaler that served as

SCB's primary supplier over the years.  When SCB received orders from its own customers and

did not have the product in inventory, SCB would order it from Dillon Gage.  SCB had a history

of delinquent payments to Dillon Gage, which according to Dillon Gage reached a critical point

in January 2009.  Indeed, Dillon Gage claims to have ceased shipments of products to SCB and

its customers in January 2009 as a result of such delinquent payments

In late 2008 and early 2009, Dillon Gage became very concerned about the

amount of SCB's outstanding receivables to Dillon Gage — which totaled over $2.3 million, and

with the length of time it was taking SCB to pay its obligations to Dillon Gage.[22]   Indeed, Dillon

Gage's concerns over the amount of SCB's total outstanding invoices and its ever increasing

delay in making payments to Dillon Gage led the President of Dillon Gage, Terrence "Terry"

Hanlon, to travel to Houston for a face-to-face meeting with the President of SCB, Joe Frisard,

on January 20, 2009.[23]   He had never done this before.[24]   On January 22, 2009, because he

remained concerned despite the face to face meeting with Joe Frisard, Hanlon had a follow-up

call with Scott Terry.  During that call, Hanlon explained in detail his concerns regarding SCB's

insolvency and payment problems, and Terry explained to Hanlon how SCB had always relied

on SIBL for infusions of cash and the fact that SIBL recently had cut-off SCB's access to those

---

[21]       *See* Receiver Appendix at 1043 (Exhibit 7).

[22]       *See* Receiver Appendix at 1133, 1136 (Exhibit 14: Excerpts from February 18, 2010 Deposition of Terry Hanlon, deposition pages 20-22, 100); and at 1140 (Exhibit 15: April 14, 2009 Declaration of Terry Hanlon, ¶ 5).

[23]       *See* Receiver Appendix at 1140 (Exhibit 15, ¶ 5).

[24]       *See* Receiver Appendix at 1137 (Exhibit 14, deposition pages 119-20).

funds.[25]   During that same call, Hanlon also informed Terry that Dillon Gage was going to suspend all shipments of product until the payment issue was cleared up.[26]

### C.   SCB fraudulently transferred $3,002,639.10, which was related to an order for 101 gold bars, to Dillon Gage.

In late January 2009, Gagosian Gallery ordered 101 (32 oz. each) gold bars from SCB.[27]   The Gallery wired $3,028,613, the negotiated purchase price, to SCB for the gold bars on February 2, 2009 and requested that one example bar be sent to the Gallery in New York and the remaining 100 bars be delivered to an art show in Los Angeles on March 4, 2009.[28]   SCB, in turn, placed an order for the gold bars with Dillon Gage[29] and wired $3,002,639.10, the price charged by Dillon Gage, to Dillon Gage on February 2, 2009.[30]

Joe Frisard, President of SCB, testified that he instructed Dillon Gage to apply the $3,002,639.10 payment to the orders for 101 gold bars.[31]   Moreover, on February 2, 2009, Frisard emailed Ira Fritz with Dillon Gage, requesting the invoices for the gold bars.[32]   Within minutes, Fritz responded to Frisard's request, copying Hanlon, the President of Dillon Gage.[33] Frisard immediately forwarded the Dillon Gage invoices for gold bars to SCB's accounting department, copying Fritz on the transmission.[34]   Fritz was also copied on Frisard's directions to

---

[25]      *See* Receiver Appendix at 1041-1044 (Exhibit 7).

[26]      *See* Receiver Appendix at 1048 (Exhibit 7).

[27]      *See* Receiver Appendix at 1053-1054 (Exhibit 8: Sales Orders between SCB and the Gallery).

[28]      *See* Receiver Appendix at 1053-1054 (Exhibit 8); and at 1056-1059 (Exhibit 9: Confirmations of the Wires from the Gallery to SCB).

[29]      *See* Receiver Appendix at 1060-1062 (Exhibit 10: Invoices between SCB and Dillon Gage).

[30]      *See* Receiver Appendix at 1146-1151 (Exhibit 16: Confirmation of Wire from SCB to Dillon Gage).

[31]      *See* Receiver Appendix at 1155 (Exhibit 17: Excerpts from January 26, 2010 Deposition of Joseph A. Frisard, deposition page 129).

[32]      *See* Receiver Appendix at 1126, 1129 (Exhibit 13: April 14, 2009 Declaration of Ira Fritz, ¶ 7 & attachment).

[33]      *See* Receiver Appendix at 1126, 1129 (Exhibit 13, ¶¶ 7-8 & attachment).

[34]      *See* Receiver Appendix at 1126, 1129 (Exhibit 13, ¶ 8 & attachment).

SCB's accounting department to wire the amount of those invoices to Dillon Gage.[35]  That same day, the total amount of the two Dillon Gage invoices for the gold bars — $3,002,639.10 — was wired by SCB to Dillon Gage.[36]  Wire instructions indicated that the payment was for the 101 gold bars.[37]  E-mails and other internal Dillon Gage documents show that Dillon Gage knew that the $3,002,639.10 payment was for the gold bars.[38]

Despite the express instructions from SCB and Dillon Gage's own acknowledgement that the $3,002,639.10 payment was for the gold bars, Dillon Gage instead applied the majority of that payment to prior orders from SCB for other SCB customers.[39] According to Dillon Gage, it applied the payment to orders for which it had already shipped product and also began shipping additional product to SCB customers against the $3,002,639.10 payment.  Although Dillon Gage did ship one of the gold bars to Gagosian Gallery as a sample, Dillon Gage later informed SCB that it would need an additional payment of $1.9 million before the remaining 100 gold bars could be shipped.[40]

When the Receiver discovered records of the $3,002,639.10 transaction between SCB and Dillon Gage for 101 gold bars, he immediately notified Dillon Gage of the SEC lawsuit and served Dillon Gage with the Receivership Order.[41]   The letter asked Dillon Gage to

---

[35]    *See* Receiver Appendix at 1126, 1129 (Exhibit 13 ¶ 8 & attachment).

[36]    *See* Receiver Appendix at 1146-1151 (Exhibit 16).

[37]    *See* Receiver Appendix at 1146-1151 (Exhibit 16).

[38]    *See* Receiver Appendix at 1157-1159 (Exhibit 18: February 2, 2009 e-mail string).  This exhibit consists of (a) an email between Hanlon and Dillon Gage's controller acknowledging that Dillon Gage had received payment *for the gold bars*; and (b) an internal ledger showing the payment from SCB along with handwritten notes indicating the payment was for invoice nos. 162205 and 162206, which are the invoices for the gold bars.  *See also* Receiver Appendix at 1061-1062 (Exhibit 10).

[39]    *See* Receiver Appendix at 1141 (Exhibit 15, ¶ 13).

[40]    *See* Receiver Appendix at 1142 (Exhibit 15, ¶ 15).

[41]    *See* Receiver Appendix at 1161-1162 (Exhibit 19: February 24, 2009 Letter to Dillon Gage from Counsel for Receiver).

immediately contact the Receiver's counsel to discuss return of property belonging to the Receivership Estate.[42]  And in a letter dated February 28, 2009, Dillon Gage acknowledged that: (1) Dillon Gage had received the payment from SCB on February 2, 2009; (2) that Dillon Gage received additional payments from SCB after February 2nd (and before the Receiver was appointed) totaling over $850,000; and (3) that Dillon Gage then had a credit balance for SCB of $1,066,000.[43]  The letter claimed, however, that Frisard had instructed Dillon Gage to apply the funds to other outstanding orders and to ship product against any remaining balance to other SCB customers.[44]  Despite demands for return of the $3,002,639.10, or at a minimum the credit against which Dillon Gage concedes no product was ever shipped, Dillon Gage refused[45] to return any funds to the Receiver.[46]

### D.    SCB fraudulently transferred an additional $2,117,516.57 to Dillon Gage.

In addition to the $3,002,639.10 payment on February 2, 2009, SCB made multiple other payments to Dillon Gage in late January, after Dillon Gage had learned of SCB's insolvency and had cut off shipping to protect itself against loss.  Those additional payments, which totaled $2,117,516.57, were as follows: $501,326.30 on January 23, 2009; $394,567.40 on January 27, 2009; $368,491.51 on January 30, 2009; $366,171.50 on February 6, 2009; $486,959.86 on February 13, 2009.[47]  Thus, in total SCB made fraudulent transfers of

---

[42]       *See* Receiver Appendix at 1161-1162 (Exhibit 19).

[43]       *See* Receiver Appendix at 1164-1166 (Exhibit 20: February 28, 2009 Letter to Counsel for Receiver from Counsel for Dillon Gage).

[44]       *See* Receiver Appendix at 1164-1166 (Exhibit 20); and at 1141 (Exhibit 15, ¶ 13).

[45]       Dillon Gage finally transferred the credit balance to the Receiver's restricted account in mid-2011.  *See supra* note 4.

[46]       *See* Receiver Appendix at 1168-1169 (Exhibit 21: March 2, 2009 Letter to Counsel for Dillon Gage from Counsel for Receiver).

[47]       *See* Receiver Appendix at 1171-1175 (Exhibit 22: Payment Vouchers from SCB to Dillon Gage).

$5,120,155.67 to Dillon Gage after January 22, 2009, and the Receiver is entitled to recover all such payments.

### III.    As a matter of law, the Receiver is entitled under TUFTA to recover all payments made by SCB to Dillon Gage after January 22, 2009.

As a matter of law, the payments made by SCB to Dillon Gage after January 22, 2009 — totaling $5,120,155.67 — were fraudulent transfers under TUFTA and, therefore, are subject to recovery by the Receiver.  Section 24.005(a) of TUFTA[48] specifies when a transfer is fraudulent:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> > (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> >
> > (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

---

[48]    The Texas Uniform Fraudulent Transfer Act applies.  A federal court exercising pendent jurisdiction over a state law claim applies the choice of law rule of the state in which it sits.  *Carnie*, 2007 WL 1112591, at \*7.  A fraudulent transfer suit sounds in tort.  *Id.*; *In re The Heritage Org., L.L.C.*, 413 B.R. 438, 462 (Bankr. N.D. Tex. 2009).  In tort actions, Texas courts apply the "most significant relationship to the occurrence and the parties" test set out in Section 145 of the Restatement (Second) of Conflict of Laws.  *Gutierrez v. Collins*, 583 S.W.2d 312, 318-9 (Tex. 1979); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420-21 (Tex. 1984).  Texas is the state with the most significant relationship to the occurrences and parties of this case.  It is where Stanford's global empire, including SCB, was headquartered.  *See, e.g.*, Exhibit 3 at ¶ 7 (App. at  66).  Moreover, it is the state where Dillon Gage Inc. of Dallas and Dillon Gage Inc. are headquartered and regularly conduct business.  The Receiver resides in and conducts the Receivership's business from Texas.  Importantly, Texas is the venue of this Receivership. Furthermore, this Court has held that Texas law is the law of the case.  [*See* Case No. 3:09-CV-0724-N, Doc. 765 at 8-9 ("[T]he Court looks to Texas law because at this juncture TUFTA effectively has become law of the case.").]

TEX. BUS. & COM. CODE ANN. §§ 24.005(a)(1)-(2).  Subsection (a)(1) is referred to as the "actual fraud" ground, and Subsection (a)(2) is referred to as the "constructive fraud" ground.  *Donell*, 533 F.3d at 770; *Armstrong*, 2010 WL 1141158, at *19-22.  If either the (a)(1) or (a)(2) ground is proven, then the Receiver is entitled to a judgment against the transferee "for the value of the asset transferred."  TEX. BUS. & COM. CODE ANN. §§ 24.008(a)(1), 24.009(b).  In this case, the summary judgment evidence conclusively proves both grounds.

### A.     Actual intent is presumed in cases involving Ponzi scheme debtors.

The intent at issue in Subsection 24.005(a)(1) is that of the "debtor" — in this case, SCB — and not that of the party who received the transfer.  "The statute focuses on the intent of the transferor rather than the transferee."  *In re IFS Fin. Corp.*, 417 B.R. 419, 438 (Bankr. S.D. Tex. 2009). In fact, "'the transferees' knowing participation is irrelevant under [UFTA]' for purposes of establishing the [actual fraud] premise …."  *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) (quoting *Warfield v. Byron*, 436 F.3d 551, 559 (5th Cir. 2006)).

Moreover, if, as in this case, the transferor was engaged in a Ponzi scheme or similar fraud, then actual intent is conclusively presumed.  "Under the UFTA, transfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception."  *Quilling v. Schonsky*, 247 F. App'x 583, 586 (5th Cir. 2007); *see also Alguire*, 647 F.3d at 597 ("[A] Ponzi scheme 'is, as a matter of law, insolvent from its inception.'") (quoting *Byron,* 436 F.3d at 558).  "In [the Fifth] circuit, proving that [the debtor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made."  *Res. Dev. Int'l, LLC*, 487 F.3d at 301.[49]  The Fifth Circuit reaffirmed this principle in

---

[49]     "The Fifth Circuit's reasoning applies whether the organization neatly fits within a judicially constructed definition of Ponzi scheme or was a fraudulent scheme that had some, but perhaps not all, attributes of the traditional

the related litigation involving the preliminary injunction issued against certain former Stanford

employees. *See Alguire*, 647 F.3d at 599 ("The Receiver carried his burden of proving that he is

likely to succeed in his prima facie case by providing sufficient evidence that a Ponzi scheme

existed—thereby obviating the need to prove fraudulent intent of the *transferees*[.]") (emphasis

in original).

The Ponzi fraudster makes payments to prior investors "to keep the fraud going

by giving the false impression that the scheme is a profitable, legitimate business." *Donell*, 533

F.3d at 777. Therefore, "transfers made in the course of a Ponzi scheme could have been made

for no purpose other than to hinder, delay or defraud creditors." *In re Manhattan Inv. Fund Ltd.*,

397 B.R. at 8 (citation omitted); *see also Drenis v. Haligiannis,* 452 F. Supp. 2d 418, 429

(S.D.N.Y. 2006) ("Plaintiffs' complaint adequately pleads fraudulent intent on the part of the

transferor—namely, the defrauding defendants—who are alleged elsewhere in the complaint to

be perpetrators of a Ponzi scheme. In such cases, courts have found that the debtor's intent to

hinder, delay or defraud is presumed to be established.").

## B. Actual intent must be presumed in this case because SCB was part of a Ponzi scheme and was insolvent.

As explained in Section II(A) *supra*, SCB was one of over a hundred companies

through which R. Allen Stanford perpetrated his elaborate Ponzi scheme. Both this Court and

the Fifth Circuit Court of Appeals have held that the Stanford enterprise was a Ponzi scheme.

*See Alguire*, 647 F.3d at 589, 596-599, 601; [Case No. 03:09-CV-0298-N, Doc. 1315 at 10-11,

14]; [Case No. 03:09-CV-0724-N, Doc. 456 at 2, 11, and 13]; [Case No. 03:10-CV-0346-N, Doc.

---

Ponzi scheme. When an organization perpetuating a fraud makes a transfer necessary for continuation of the fraud, the transfer is made with actual intent to defraud." *In re IFS Fin. Corp.*, 417 B.R. at 439 n.15. For example, "[t]he fact that the scheme may have contained some revenue-generating businesses is not sufficient to defeat a finding of fraudulent intent where the revenue-generating businesses could not have reasonably been expected to fund the operations. " *Id.* at 440.

109 at 14-16].  SCB's Vice President of Finance and Operations testified that SCB had been insolvent for years and that at any given time it owed between $200,000 and $1,500,000 to SIBL.[50]  Not surprisingly, when the Ponzi scheme began to collapse in late 2008 and early 2009 — which resulted in SIBL refusing SCB further access to Ponzi scheme funds — SCB was no longer able to pay its bills.[51]

Because SCB was part of a massive Ponzi scheme, and because SCB was itself insolvent, actual intent in regard to the transfers from SCB to Dillon Gage is presumed under TUFTA Section 24.005(a)(1).

### C. Dillon Gage cannot establish the two-pronged affirmative defense of reasonably equivalent value *and* good faith.

Section 24.009(a) of TUFTA provides a defense to transferees "who took in good faith and for a reasonably equivalent value."  As this Court has held, "[a] defendant invoking this defense has the burden to show *both* objective good faith and reasonable equivalence of consideration."  [*See* Case No. 03:09-CV-0724-N, Doc. 456 at 13 (emphasis in original).]  The "good faith" element requires the transferee to establish *objective* good faith; the relevant inquiry is whether the transferee "objectively knew or should have known" that the transfer was fraudulent as to other creditors.  *Byron*, 436 F.3d at 559-60.  The "reasonably equivalent value" element requires the transferee to show that he exchanged reasonably equivalent value for what he received.  *Res. Dev. Int'l, LLC,* 487 F.3d at 302.  Both elements are assessed as of the time of the transfer.  *See Slone v. Lassiter,* 406 B.R. 778, 805 (Bankr. S.D. Ohio 2009) ("The critical time to determine whether a debtor receives reasonably equivalent value is the time of the transfer."); *Armstrong*, 2010 WL 1141158, at *19 (Objective good faith does not exist if "the

---

[50]       *See* Receiver Appendix at 1035, 1037 (Exhibit 6, deposition pages 88-89, 124-25); and at 1044 (Exhibit 7).

[51]       *See* Receiver Appendix at 1037-1039 (Exhibit 6, deposition pages 124-26, 130-31); and at 1041-1044 (Exhibit 7).

facts would have caused a reasonable transferee to inquire into whether the transferor's purpose in effectuating the transfer was to delay, hinder, or defraud the transferor's creditors.") (quoting *Herup v. First Boston Fin., LLC*, 162 P.3d 870, 875 (Nev. 2007)).

### 1.   Dillon Gage admits it did not provide reasonably equivalent value for at least $1,069,562.

As to $1,069,562, the Court need not even consider the good faith element of TUFTA Section 24.009(a) because Dillon Gage admits that this amount is a credit in favor of SCB and that it did not provide reasonably equivalent value for — *i.e.* ship any product against — that amount.[52]  Because the reasonably equivalent value element of the Section 24.009(a) defense is absent as a matter of law, it would not matter if Dillon Gage had received SCB's payments in objective good faith (which, as established below, it did not).  Dillon Gage still would have no defense.  *Byron*, 436 F.3d at 560 ("We need not draw a conclusion on good faith, however, as his defense would still fail because he did not receive the transfers from RDI in exchange for reasonably equivalent value."); *Carnie*, 2007 WL 1112591, at *12 ("[T]he mere fact that the transferee acted in good faith, without any intent to assist the debtor to defraud or evade creditors, is insufficient to relieve the transferee of liability if the transfer was exchanged for less than reasonably equivalent value.").  Accordingly, there is no dispute as to Dillon Gage's liability to the Receiver for at least $1,069,562.[53]  As for the remaining amounts at issue in this

---

[52]     On July 15, 2011, the Court entered an agreed order directing Dillon Gage to wire $1,069,562 to the Receiver to hold in a segregated account until further order of the Court.  [*See* Case No. 3:09-CV-0559-N, Doc. 75.] Because Dillon Gage is liable, as a matter of law, to the Receiver for this amount, the Receiver requests that as part of its Order on this motion, the Court order that the Receiver is entitled to such funds without restriction.

[53]     As discussed below, Dillon Gage is also liable for this amount under Section 24.005(a)(2) of TUFTA, the constructive fraud provision.  Under this provision, a transfer is deemed fraudulent in law if the debtor — SCB, in this instance — (1) made it "without receiving a reasonably equivalent value in exchange"; and (2) "was engaged in or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."  TEX. BUS. & COM. CODE ANN. § 24.005(a)(2).

lawsuit, Dillon Gage has not attempted to provide an accounting showing any value, let alone reasonably equivalent value, that was provided to SCB in exchange for the payments to Dillon Gage.[54]  Under applicable law, the burden is on Dillon Gage to prove that it provided reasonably equivalent value, and it has not done so.

### 2.      Dillon Gage cannot show it received any of the payments after January 22, 2009 in good faith.

Although Dillon Gage claims it shipped product and therefore provided reasonably equivalent value for all of the post-January 22nd payments other than the $1,069,562 credit discussed above, Dillon Gage is still liable to the Receiver for all such payments because it did not receive them in good faith.  In particular, Dillon Gage was aware of SCB's insolvency and reliance on infusions of money from SIB from at least January 22, 2009 forward.  All payments from SCB to Dillon Gage that are the subject of the instant lawsuit occurred after January 22, 2009.  At least as of that date, Dillon Gage knew that SCB was having trouble paying its debts and that SCB's source of funding had been cut off.  Dillon Gage knew that SCB

---

The first element is conclusively established because, as discussed in this section, Dillon Gage admits that $1,069,562 is a credit for SCB and, therefore, did not provide reasonably equivalent value for that amount.

The second element is also conclusively proven because it is presumed, as a matter of law, that a debtor engaged in a Ponzi scheme has unreasonably small capital or is incurring debts he will be unable to pay.  "[A] Ponzi scheme … is, as a matter of law, insolvent from its inception."  *Byron*, 436 F.3d at 559.  A finding that the debtor "was engaged in a Ponzi scheme—and thus was insolvent from the inception of its business [and therefore unable to pay its debts]—likewise compels the conclusion that the [d]ebtor was operating with unreasonably small capital at the time the transfers in question were made."  *In re Canyon Sys. Corp*., 343 B.R. 615, 650 (Bankr. S.D. Ohio 2006).  Stating the presumption in the language of UFTA,

> [p]roof that transfers were made pursuant to a Ponzi scheme generally establishes that the scheme operator "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," . . . or "[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due."

*Donell*, 533 F.3d at 770-71; *see also Armstrong*, 2010 WL 1141158, at *21 (collecting authorities).  The second element is also established by the evidence of SCB's insolvency, as discussed herein.

[54]     Moreover, if there is no evidence that SCB received reasonably equivalent value for any of the transfers to Dillon Gage, Dillon Gage would also be liable for all payments it received under the constructive fraud prong of TUFTA.  *See* TEX. BUS. & COM. CODE ANN. § 24.005(a)(2).

was insolvent and that customer money was being diverted before being sent to Dillon Gage.  In fact, the situation was so dire that Dillon Gage stopped making product shipments to SCB and its customers.

"[I]nsistence on . . . payment in view of [the debtor's] imminent insolvency is further support of [the defendant's] bad faith.  Likewise, [the debtor's] willingness to make this payment buttresses [the] contentions that [the debtor] actually intended to defraud, delay or hinder its creditors by transferring the monies."  *In re Agric. Research & Tech. Grp.*, 916 F.2d 528, 540 (9th Cir. 1990)  "A transferee does not act in good faith if he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency.  Whether a transferee has such knowledge is determined objectively, with a focus on what a transferee knew or should have known, not on the transferee's actual knowledge."  *In re Grueneich*, 400 B.R. 688, 693 (8th Cir. 2009); *see also In re Sherman,* 67 F.3d 1348, 1355 (8th Cir. 1995) (good faith is determined by looking at what the transferee "objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint" and "a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency"); *Banner v. Kassow*, 104 F.3d 352 (2d Cir. 1996) ("transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency") (quoting *In re Sherman*, 67 F.3d at 1355); *In re M & L Bus. Mach. Co., Inc.,* 84 F.3d 1330 (10th Cir. 1996) ("the majority of bankruptcy courts construing 'good faith,' as it is used in § 548(c), have followed the Eighth and Ninth Circuits, holding that a transferee who reasonably should have known of a debtor's insolvency *or* of the fraudulent intent underlying the transfer is not entitled to the § 548(c) good faith defense").[55]

---

[55]     Although the vast majority of cases addressing whether knowledge or notice of insolvency vitiates the "good faith" of a transferee are in the context of bankruptcy law rather than UFTA, the "good faith" standard is

Under this standard, there is no reasonable basis for Dillon Gage even to argue that it received any post-January 22nd payments from SCB in good faith. Dillon Gage not only knew SCB was having trouble paying its debts — to the tune of $2.3 million just in what it owed to Dillon Gage — but Scott Terry told Terry Hanlon that SCB's source of funding had been cut off.[56] That Dillon Gage understood the gravity of the situation is evidenced not only by Hanlon's trip to Houston to meet with SCB in person — the first trip he ever made to SCB in at least a four-year-long business relationship — but also by the concerns he raised in the January 22, 2009 phone call with Scott Terry.[57] Hanlon not only wanted to know how SCB was going to meet its financial obligations to Dillon Gage, but he questioned how it was that a company like SCB — one that required up front payments for product from its own customers — was unable to pay Dillon Gage for that very product.[58] Hanlon certainly knew that SCB was insolvent and that customer money was being diverted before it made its way to Dillon Gage. In fact, Hanlon observed that it was "a case of . . . robbing Peter to pay Paul," and he questioned "at some point how does that get itself evened out?"[59] Moreover, in response to his concerns, SCB offered no

---

generally considered to be equivalent in both systems. *See, e.g.*, *Fid. Mortg. Co. v. Brand*, 371 B.R. 708, 719 (Bankr. E.D. Pa. 2007) (explaining that when drafting UFTA, authors looked to the Bankruptcy Code and modeled provisions thereon, including when good faith defenses apply) (citing Michael L. Cook & Richard E. Mendales, *The Uniform Fraudulent Transfer Act: An Introductory Critique*, 62 Amer. Bankr. L.J. 87 (1988)); *In re Agric. Research & Tech. Grp.*, 916 F.2d at 535-36 (recognizing that UFTA good faith affirmative defense provision is interpreted the same as that under the Bankruptcy Code, and holding that cases construing Bankruptcy Code counterparts to applicable state law governing fraudulent conveyances were persuasive authority); *Terry v. June*, 432 F. Supp. 2d 635, 641 (W.D. Va. 2006) (noting that UFTA and Section 548 of the Bankruptcy Code are "nearly identical . . . and subject to the same analysis) (citations omitted).

[56]     *See* Receiver Appendix at 1041-1044 (Exhibit 7); and at 1133 (Exhibit 14, deposition page 20).

[57]     *See* Receiver Appendix at 1041-1051 (Exhibit 7); and at 1137 (Exhibit 14, deposition page 119-120).

[58]     "I don't understand how the payment to us is infused into your operating account when your customers are paying for product that we are delivering over night to you after you got their money. Why do you let whatever it is interrupt?" *See* Receiver Appendix at 1044 (Exhibit 7).

[59]     *See* Receiver Appendix at 1044 (Exhibit 7).

realistic plan to meet its payment obligations.  The situation was so dire that Dillon Gage stopped making product shipments to SCB and its customers.[60]

Dillon Gage's conduct as it relates to the $3,002,639 payment further demonstrates its knowledge of SCB's insolvency and lack of good faith.  Though Dillon Gage knew that SCB's February 2, 2009 payment was specifically for the 101 gold bars, it decided to take that money and apply it to other invoices and orders that were long outstanding and only shipped additional product to the extent there was money left over.  It then told SCB that another payment of $1.9 million was required before the gold bars — the ones for which SCB had already paid — could be shipped to the Gallery.[61]  Dillon Gage's self-protective measures destroys any claim of good faith it may have.

Dillon Gage's lack of good faith is further evidenced by its own contrary version of events surrounding the $3,002,639 payment.  Although Joe Frisard testified that he told Dillon Gage to apply the $3,002,639 payment to the order for 101 gold bars, Dillon Gage disputes this claim and instead argues that use of money from the Gallery to pay down SCB's other debts to Dillon Gage was SCB's plan to which Dillon Gage agreed.  In other words, Dillon Gage agreed to take money that it knew was for the purchase of the gold bars and then use that money to pay for other customers' orders.[62]  If this version of events is in fact true, then Dillon Gage not only lacked good faith with respect to the $3,002,639 payment, but its conduct is tantamount to fraud

---

[60]     *See* Receiver Appendix at 1140 (Exhibit 15, ¶ 7).

[61]     *See* Receiver Appendix at 1141 (Exhibit 15, ¶ 13).

[62]     *See* Receiver Appendix at 1140 (Exhibit 15, ¶ 6 ("I informed Stanford Coins that the balance on its open account was too high, and I wanted to know what Stanford Coins was going to do to bring its account current. Frisard indicated to me that he was working on a deal that would bring the account current.") and ¶ 7 ("Stanford Coins, through Scott Terry, informed me that Stanford Coins was working on a deal that would 'get some cash in and we would use that to get you guys square.'  Stanford Coins, through Scott Terry, also acknowledged to me that if the cash generated from this 'deal' was used to reduce Stanford Coins' outstanding balance, Stanford Coins 'will still owe [Dillon Gage] for that order when the product arrives, but that will give us some time.'")) and at 1141 (Exhibit 15, ¶ 13 ("Once the wires were received, Dillon Gage applied the funds to Stanford Coins' account, which created a credit balance in Stanford Coins' favor.")).

and/or conspiracy to commit fraud.  Dillon Gage's version is also evidence of SCB's actual intent to defraud its creditors under Section 24.005(a)(1) of TUFTA.

Because Dillon Gage did not receive any of SCB's post-January 22nd payments in good faith, the Receiver is entitled to recover all of those payments — totaling $5,120,155.67.

## CONCLUSION & PRAYER

For the foregoing reasons, the Receiver requests that the Court grant summary judgment that the Receiver recover from Dillon Gage the $5,120,155.67 that Dillon Gage received from SCB; prejudgment and post-judgment interest thereon; and costs and attorneys' fees, as permitted by Section 24.013 of TUFTA, in an amount to be determined at a later date. The Receiver also requests such other and further relief to which he may be justly entitled.

Dated: February 10, 2012

Respectfully submitted,

**BAKER BOTTS L.L.P.**

By: /s/ Kevin M. Sadler

Kevin M. Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
Robert I. Howell
Texas Bar No. 10107300
robert.howell@bakerbotts.com
David T. Arlington
Texas Bar No. 00790238
david.arlington@bakerbotts.com
1500 San Jacinto Center
98 San Jacinto Blvd.
Austin, Texas 78701-4039
(512) 322-2500
(512) 322-2501 (Facsimile)

Timothy S. Durst
Texas Bar No. 00786924
tim.durst@bakerbotts.com
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
(214) 953-6503 (Facsimile)

**ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

## CERTIFICATE OF SERVICE

On February 10, 2012, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I have served Dillon Gage Inc. of Dallas, Dillon Gage Inc., and the Court-appointed Examiner electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Kevin M. Sadler
Kevin M. Sadler