**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL, | § § § § | |
| Plaintiff, | § § | |
| v. | § § | |
| DILLON GAGE INCORPORATED OF DALLAS and DILLON GAGE INC., | § § § | |
| Defendants, | § § | |
| | § | Civil Action No. 3:10:-cv-1973 |
| DILLON GAGE INCORPORATED OF DALLAS, | § § | |
| Counter-Plaintiff, | § § | |
| v. | § § | |
| STANFORD COINS & BULLION, INC., TIMOTHY SCOTT TERRY, and JOSEPH A. FRISARD, | § § § § | |
| Third-Party/Counter-Defendants. | § § | |

**BRIEF IN SUPPORT OF DEFENDANT DILLON GAGE, INC. OF DALLAS' RESPONSE
TO RECEIVER'S MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.    **SUMMARY** .................................................................................................................... 1

II.   **SUMMARY JUDGMENT STANDARD** ................................................................... 3

III.  **ARGUMENTS AND AUTHORITY** ......................................................................... 4

     A.    The $5,120,155.67 worth of transactions between Dillon Gage and SCB for the period January 22, 2009 through February 17, 2009 were arms-length transactions outside the purview of TUFTA. ........................................................................................... 4

          *1.   The Receiver has the burden of proof to establish its TUFTA claims.* ........................... 4

          *2.   The Receiver is attempting to short-circuit its actual intent burden of proof by asserting the SCB was part of a Ponzi scheme.* .................................................................. 7

          *3.   The evidence shows that SCB was not a Ponzi scheme or a part of the alleged Stanford Ponzi scheme.* ............................................................................................................ 9

          *4.   The Receiver has not established that SCB was part of a Ponzi scheme.* ................. 12

          *5.   SCB was solvent between January 22, 2009 and February 17, 2009 and the Receiver has failed to establish that SCB was insolvent during that time.* ................................ 14

     B.    The Summary Judgment Evidence establishes that Dillon Gage acted in good faith and provided reasonably equivalent value for the $5,120,155.67 worth of transactions at issue. .................................................................................................................... 17

          *1.   Dillon Gage has the burden to establish its TUFTA affirmative defense.* ................... 18

          *2.   The summary judgment evidence shows that Dillon Gage acted in good faith.* ........... 20

              a.     Well before the transactions at issue, Dillon Gage and SCB had conducted numerous transactions and had an arms-length business relationship. .......... 20

             b.     Based on this relationship, Dillon Gage did not know, nor could it have known of SCB's alleged connection with a Ponzi scheme. ........................... 22

             c.     Dillon Gage followed up on January 22, 2009 after receiving a smaller than anticipated payment from SCB.   SCB informed Dillon Gage that it was having cash flow issues but had several possible solutions to the problem. .. 24

             d.     Dillon Gage did not know, nor should it have known that SCB was purportedly insolvent. .................................................................................... 26

          *3.   The summary judgment evidence conclusively establishes that Dillon Gage delivered reasonably equivalent value for the funds it received from SCB.* ................................. 28

     C.    The Receiver is unable to establish its TUFTA claim for constructive fraud. .................. 30

     D.    The Receiver's Summary Judgment Evidence is Objectionable and Should be Stricken ... 31

          *1.   Karyl Van Tassel ("Van Tassel") Declarations & Supplemental Declarations:* .......... 31

        2. *James M. Davis documents:* ........................................................................................ 31

        3. *Other Documents:* ....................................................................................................... 31

IV. **ARGUMENTS AND AUTHORITIES** .................................................................................. **33**

    A. The Court should strike the Van Tassel Declarations ........................................................ 35

        1. *Van Tassel's Declarations and statements regarding business valuation of various Stanford Entities, and SCB, are unreliable and are therefore inadmissible.* ............... 35

        2. *Van Tassel's tracing methodology is flawed and does not display an accepted methodology and/or fails to describe sufficiently what methodology was used.* .......... 39

        3. *Van Tassel does not hold the necessary qualifications to offer an opinion on valuation.* ................................................................................................................ 40

    B. This Court should strike James M. Davis's Plea Agreement and the Transcript of his Rearraignment because they are hearsay, irrelevant, and their probative value are outweighed by their prejudicial effect. .............................................................................. 41

        1. *Davis's plea agreement constitutes inadmissible hearsay.* ......................................... 41

        2. *Davis's plea agreement and rearraignment transcript are irrelevant and the Court should strike them.  Alternatively, if the Court finds them to be relevant, their probative value is outweighed by their prejudicial effect and therefore this Court should strike them.* ....................................................................................................... 42

    C. Because the Telephone Transcript relied upon by Plaintiff is not properly authenticated and contains some 27 errors, it is inadmissible and this Court should strike it from the record. ................................................................................................................................. 45

V. **CONCLUSION** ..................................................................................................................... **46**

# TABLE OF AUTHORITIES

### CASES

*Ades-Berg Investors v. Breeden (In re Bennett Funding Group, Inc.)*, 439 F.3d 155, 157 n.2 (2d Cir. 2006).................................................................................................................................10

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ...................................................4

*Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) ..............................4

*Brown v. City of Houston, Tex.*, 337 F.3d 539, 541 (5th Cir. 2003) ......................................35

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986) .....................................................3, 4

*Coleman Cattle Co. v. Carpenter*, 10 S.W.3d 430, 434 (Tex. App.—Beaumont 2000, no pet.........6, 7

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ....................................35, 36, 37

*Doyle v. Kontemporary Builders, Inc.*, No. 05-10-01510-CV, 2012 WL 1623031, at *3 (Tex. App.—Dallas May 8, 2012, no pet. h.)...........................................................................................5

*Englert v. Englert*, 881 S.W.2d 517, 518 (Tex. App.—Amarillo 1994, no writ) .....................1

*Essex Crain Rental Corp. v. Carter*, Nos. 01-09-00813-CV, 01-11-068-CV, 01-11-00689-CV, 2012 WL 1071231, at *8 (Tex. App.—Houston [1st Dist.] Mar. 29, 2012, no pet. h.) ...........................6, 7

*Flores v. Robinson Roofing & Constr. Co.*, 161 S.W.3d 750, 754 (Tex. App.—Fort Worth 2005, pet. denied) ............................................................................................................5, 6, 19

*Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir), *cert. denied*, 513 U.S. 871 (1994) .............35

*G.M. Houser, Inc. v. Rodgers*, 204 S.W.3d 836, 842 (Tex. App.—Dallas 2006, no pet.)....................5

*Golden Budha Corp. v. Can. Land Co. of Am.*, 931 F.2d 196, 201-02 (2nd Cir. 1991)........................6

*Gredd v. Bear Stearns Secs. Corp. (In re Manhattan Inv. Fund Ltd.)*, 359 B.R. 510, 517-18 (Bankr. S.D. N.Y. 2007) ...................................................................................................6, 7, 9

*Hahn v. Love*, 321 S.W.3d 517, 525-26 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) ..............7

*In re 1031 Tax Group, LLC*, 439 B.R. 47, 72 (Bankr. S.D.N.Y. 2010), *subsequent determination*, 439 B.R. 84 (Bankr. S.D.N.Y. 2010), *and opinion supplemented*, 439 B.R. 78 (Bankr. S.D.N.Y. 2010) ....................................................................................................................................9

*In re Bayou Group, LLC*, 439 B.R. 284, 305 (Bankr. S.D. N.Y. 2010)....................................6

*In re First Alliance Mortg. Co.*, 298 B.R. 652, 665 (C.D. Cal. 2003) ...................................20

*In re IFS Fin. Corp.*, 417 B.R. 419, 441 (Bankr. S.D. Tex. 2009) .......................................20

*In re Norvergence, Inc.*, 405 B.R. 709, 730, 732-33 (Bankr. D. N.J. 2009).........................10

*In re Pearlman*, 440 B.R. 569, 904 (Bankr. M.D. Fla. 2010) .............................................10

*In re Ramirez*, No. 09-70051, 2011 WL 30973, at *3 (Bank. S.D. Tex. Jan. 5, 2011).....................2, 5

*In re Rodriguez*, 209 B.R. 424, 431 (Bankr. S.D. Tex. 1997) .............................................10

*In re Southern Industrial Banking Corp. v. Evans*, 159 B.R. 224, 227 (E. D. Tenn. 1993) ...............15

*In re World Vision Entertainment, Inc.*, 275 B.R. 641, 656 (M.D. Fla. 2002) .................9, 28

*Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 25 (Tex. App.—Tyler 2000, pet. denied).........1

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 793 F.Supp.2d 825, 829 n.2 (N.D. Tex. 2011)..........................................................................................................................1, 8, 9, 10

*Jimmy Swaggart Ministries v. Hayes (In re Hannover)*, 310 F.3d 796, 802-03 (5th Cir. 2002) ..........21

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ............................................................35, 36, 37

*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). ...............................................4

*Nat'l Loan Investors, L.P. v. Robinson*, 98 S.W.3d 781, 784 (Tex. Ct. App.—Amarillo 2003, pet. denied) ............................................................................................................................................21

*Nobles v. Marcus*, 533 S.W.2d 923, 925 (Tex. 1976)...............................................................................5

*Pendergast-Holt v. Certain Underwriters at Lloyd's of London*, 751 F.Supp.2d 876, 897 (S.D. Tex. 2010)................................................................................................................................................8

*Quinn v. Dupree*, 303 S.W.2d 769, 772-73 (Tex. 1957)........................................................................20

*Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) ............................................4

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). ................................................4

*Sallah v. Worldwide Clearing, LLC*, No. 10-62264-Civ., at *4, n.4 (S.D. Fla. Feb. 7, 2012) (unpublished) ..................................................................................................................................9

*Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007)......................................................4

*Sterquell v. Scott*, 140 S.W.3d 453, 460 (Tex. App.—Amarillo 2004, no pet.) ...................................7

*Tanner v. Westbrook*, 174 F.3d 542, 548 (5th Cir.1999) .....................................................................36

*Terry v. June*, 432 F.Supp.2d 635, 640 (W.D. Vir. 2006) ...................................................................9

*Waind v. Waxenberg*, 611 F.Supp.2d 1299, 1318 (M.D. Fla. 2009)....................................................15

*Walker v. Anderson*, 232 S.W.3d 899, 913 (Tex. App.—Dallas 2007, no pet.) ............................6, 20

*Wiand v. Waxenberg*, 611 F.Supp.2d 1299, 1320 (M.D. Fla. 2009)....................................................20

*Wilson v. Woods,* 163 F.3d 935 (5th Cir.1999)....................................................................................36

STATUTES

TEX. BUS. & COM. CODE § 24.004(a)......................................................................................................22

TEX. BUS. & COM. CODE § 24.005(a)(1) ..................................................................................................2

TEX. BUS. & COM. CODE § 24.005(a)(2)(a)..............................................................................................2

TEX. BUS. & COM. CODE § 24.005(a)(2)(b)..............................................................................................2

TEX. BUS. & COM. CODE § 24.009(a)..................................................................................................2, 21

TEX. BUS. & COM. CODE §24.003(a)....................................................................................................8, 9

TEX. BUS. & COM. CODE §24.006 ......................................................................................................8, 21

Texas Business and Commerce Code Section 24.005(b) .....................................................................6, 17

RULES

FED. R. CIV. P 56 ........................................................................................................... 1

FED. R. CIV. P. 12(B)(6) .................................................................................................. 1

FED. R. CIV. P. 56(C) ..................................................................................................... 4

FED. R. CIV. P. 56(C)(4) ................................................................................................ 55

FED. R. CIV. P. 702 ........................................................................................................ 44

FED. R. CIV. P. 807 ........................................................................................................ 50

FED. R. EVID. 401 .................................................................................................... 39, 51

FED. R. EVID. 402 ........................................................................................................ 51

FED. R. EVID. 403 .................................................................................................... 51, 52

FED. R. EVID. 702 ........................................................................................................ 37

FED. R. EVID. 803(8) ..................................................................................................... 50

FED. R. EVID. 901(A) .................................................................................................... 54

<u>PUBLICATIONS</u>

Shannon P. Pratt, Alina V. Niculita, VALUING A BUSINESS THE ANALYSIS AND APPRAISAL OF
    CLOSELY HELD COMPANIES, 351-352 (5th Ed. McGraw Hill 2008) .................................... 38, 39, 41

Defendant Dillon Gage, Inc. of Dallas,[1] ("Dillon Gage" or "Defendant"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, provides this, its Brief in support of Dillon Gage's Response to Ralph S. Janvey, Receiver's (the "Receiver") Motion For Summary Judgment ("Receiver's Motion").    Dillon Gage incorporates by reference the contents of the Appendix filed contemporaneously herewith.   References to the Appendix are referred to as (App. ___).

## I.    SUMMARY

The Court should deny the Receiver's request to unwind several million dollars' worth of arms-length transactions between Dillon Gage and Stanford Coin and Bullion ("SCB") that occurred between the period January 27, 2009 through February 17, 2009.    The Receiver has moved for summary judgment under its TUFTA claim.[2]   The general rule in Texas is that a debtor has the right to prefer his obligation to one creditor over an obligation to another creditor.[3]   TUFTA is designed to prevent transfers of property with the intent to defraud creditors.[4]   TUFTA provides for two (2) theories of recovery:   actual fraud[5] or constructive fraud.[6]   The Receiver has sought summary judgment for both theories.   The Receiver has not presented evidence that any of these transactions

---

[1] The Receiver has also sued Dillon Gage, Inc.   *See* Docket sheet Nos. 1 & 27.   Dillon Gage, Inc. is a distinctly separate entity from Dillon Gage, Inc. of Dallas.   *See* Exhibit N, Hanlon 2012 Declaration, at ¶16 (App. 0548); Exhibit M, Ira Fritz 2012 Declaration, at ¶15 (App. 0154).   Dillon Gage, Inc. had no part in any of the transactions at issue in this lawsuit.   *See id.*   As such, Dillon Gage, Inc. is not a "transferee" as defined by TUFTA and is not a proper party to the lawsuit or the Receiver's Motion.

[2] *See also* Doc. 26, at 1; Dillon Gage agrees that Texas law applies.   This Court has historically not "second guess[ed]" the parties' choice of law.   *See Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 793 F.Supp.2d 825, 829 n.2 (N.D. Tex. 2011).

[3] *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 25 (Tex. App.—Tyler 2000, pet. denied) (citing *Englert v. Englert*, 881 S.W.2d 517, 518 (Tex. App.—Amarillo 1994, no writ)).

[4] *GE Capital Commercial, Inc. v. Wright & Wright, Inc.*, No. 3:09-CV-572-L, 2011 WL 124237, at *4 (N.D. Tex. Jan. 13, 2011) (slip op.)

[5] TEX. BUS. & COM. CODE § 24.005(a)(1).

[6] TEX. BUS. & COM. CODE § 24.005(a)(2)(a) or (b); *see also In re Ramirez*, No. 09-70051, 2011 WL 30973, at *3 (Bank. S.D. Tex. Jan. 5, 2011) (noting that "[a] transfer may be either actually or constructively fraudulent under § 24.005(a).").

furthered the alleged Stanford Ponzi scheme, involved or induced CD investors to purchase more CD's from any Stanford entity, that SCB operated in an illegal manner, or was insolvent at the time of the transactions at issue.  Without proper proof, the Receiver is attempting to stretch inadequate facts into an overbroad result that is simply not supported by TUFTA's purpose.[7]  Because the facts show that the transactions at issue were arms-length and without fraudulent purpose, this Court should deny the Receiver's Motion.

The Court should also deny the Receiver's request for summary judgment because Dillon Gage conducted these transactions "in good faith and for reasonably equivalent value."[8]  Dillon Gage acted diligently and responsibly by personally visiting SCB when SCB's outstanding balance was higher than its credit limit.  During a January 20, 2009 visit, SCB demonstrated successful advertising efforts, a large and valuable inventory, a very busy trading room, and well-furnished offices and advised of a possible $3million deal that would "make them square."  Two (2) days later, after receiving a smaller-than-expected payment from SCB, Dillon Gage followed up with additional diligence by contacting SCB and discussing why the payment was not as large as anticipated.  While advising Dillon Gage that it was suffering from a temporary cash crunch, SCB offered several explanations regarding how it planned to resolve the situation.  Shortly thereafter, SCB did resolve its cash crunch.  SCB sent cash to Dillon Gage, for which Dillon Gage provided gold coins and bullion, at current and agreed market prices.  Such transactions are not void or avoidable under TUFTA.

Ultimately, this Court should deny the Receiver's Motion for five (5) reasons.  Specifically, the Court should deny the Receiver's Motion because:

---

[7] TUFTA "is designed to prevent transfers of property with the intent to defraud creditors."  *GE Capital Comm., Inc. v. Wright & Wright, Inc.*, No. 3:09-CV-572-L, 2011 WL 124237, at *4 (N.D. Tex. Jan. 13, 2011).

[8] TEX. BUS. & COM. CODE § 24.009(a).

(a)     The Receiver has not presented evidence to support its assertions that SCB was part of a Ponzi scheme, insolvent during the time period of the transactions at issue, or that the transactions were conducted in furtherance of any fraudulent intent such that it cannot establish SCB's actual fraudulent intent to divert funds from other creditors;

(b)     The evidence shows that SCB conducted the transactions without any fraudulent intent;

(c)     Dillon Gage conducted the transactions in good faith and for reasonably equivalent value such that the Court must deny the Receiver's TUFTA claim;

(d)     The Receiver did not present evidence that SCB did not receive reasonably equivalent value and that SCB was insolvent at the time of the transactions such that this Court should deny its constructive fraudulent transfer claims.  Likewise, Dillon Gage's proof that SCB received reasonably equivalent value precludes the Receiver from succeeding on this claim; and

(e)     The Court, as stated herein, should strike most of the Receiver's key evidence per Dillon Gage's objections to the Receiver's summary judgment evidence.

For these reasons, this Court should deny the Receiver's motion for summary judgment.

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment may only be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[9] Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence to establish the existence of a genuine fact issue.[10]  "An issue of fact is 'material' if, under applicable substantive law, it might affect the outcome of the case."[11]  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor

---

[9] FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[10] *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

[11] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

of the nonmoving party.[12]  When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party.[13]

In making its determination, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.[14]  A court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied.[15]  The court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the nonmoving party.[16]

### III.   ARGUMENTS AND AUTHORITY

**A.   The $5,120,155.67 worth of transactions between Dillon Gage and SCB for the period January 22, 2009 through February 17, 2009 were arms-length transactions outside the purview of TUFTA.**

### *1.   The Receiver has the burden of proof to establish its TUFTA claims.*

A creditor, such as the Receiver, seeking to avoid or void a transfer under the actual fraud provision of TUFTA bears the burden of proving the fraudulent transfer by a preponderance of the evidence.[17]  "It is the creditor's burden to offer evidence addressing the elements of fraudulent transfer as to each transfer."[18]  Only when the creditor carries its burden of proving actual fraud by a

---

[12] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

[13] *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).

[14] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

[15] *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007).

[16] *Anderson*, 477 U.S. at 249.

[17] *See id.*

[18] *Doyle v. Kontemporary Builders, Inc.*, No. 05-10-01510-CV, 2012 WL 1623031, at *3 (Tex. App.—Dallas May 8, 2012, no pet. h.) (citing *Walker*, 232 S.W.3d at 913).

preponderance of the evidence does the burden then shift to the recipient of the transfer to prove the defense of good faith.[19]

Under the actual fraud theory, a fraudulent transfer occurs when "a debtor makes a transfer with intent to hinder, delay or defraud his creditors by placing the debtor's property beyond the creditor's reach."[20]   To determine whether a debtor had actual intent to hinder, delay or defraud a creditor, the court considers the badges of fraud identified in §24.005(b).[21]   That is to say, the actual intent to defraud is shown by evidence that the transfer was made to an insider; the debtor retained possession or control of the transferred property after the transfer; the transfer or obligation was concealed; the debtor was sued or threatened with a lawsuit before the transfer was made or the obligation incurred; whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; the debtor was insolvent or became insolvent shortly after the transfer was made or obligation incurred; the transfer occurred shortly before or after a substantial debt was incurred; or the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the company.[22]   An individual badge of fraud is not conclusive.[23]   A concurrence of many badges of fraud is needed to provide a case for fraud.[24]

The facts and circumstances set out to be considered in establishing actual fraud are considered to be mere "badges of fraud" and are not exclusive.[25]   Because fraudulent intent "is only

---

[19] *G.M. Houser, Inc. v. Rodgers*, 204 S.W.3d 836, 842 (Tex. App.—Dallas 2006, no pet.).

[20] *Flores v. Robinson Roofing & Constr. Co.*, 161 S.W.3d 750, 754 (Tex. App.—Fort Worth 2005, pet. denied) (citing *Nobles v. Marcus*, 533 S.W.2d 923, 925 (Tex. 1976)).

[21] *In re Ramirez*, 2011 WL 30973, at *4 (citing Texas Business and Commerce Code Section 24.005(b) (1-11).

[22] *See* TEX. BUS. & COM. CODE §24.005(b).

[23] *Walker v. Anderson*, 232 S.W.3d 899, 913 (Tex. App.—Dallas 2007, no pet.).

[24] *See id.*

[25] *Flores*, 161 S.W.3d at 755.; *see also Essex Crain Rental Corp. v. Carter*, Nos. 01-09-00813-CV, 01-11-068-CV, 01-11-00689-CV, 2012 WL 1071231, at *8 (Tex. App.—Houston [1st Dist.] Mar. 29, 2012, no pet. h.).

deduced from facts and circumstances which the law considers as mere badges of fraud, and not fraud *per se*, these must be submitted to the trier of fact, which draws the inference as to the fairness or fraudulent character of the transaction."[26]   As such, "the question of whether a debtor conveyed property with the intent to defraud creditors is 'ordinarily a question for the jury or the court passing on the fact.'"[27]   "Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony."[28]   With few exceptions, fraudulent intent "must be affirmatively shown and will not be presumed."[29]

The Receiver has also sought to avoid the transfers to Dillon Gage at issue under a theory of constructive fraud.  As with actual fraud, a creditor seeking to avoid transfer bears the burden of proof.[30]   Unlike actual fraud, however, constructive fraud does not require a showing of fraudulent intent.[31]   A transfer is constructively fraudulent "if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time…."[32]

In short, a constructive fraudulent transfer occurs when a debtor makes a transfer without receiving equivalent value and when the debtor is insolvent under §24.003 or the debtor's financial

---

[26]  *Flores*, 161 S.W.3d at 755 (quoting *Coleman Cattle Co. v. Carpentier*, 10 S.W.3d 430, 434 (Tex. App.— Beaumont 2000, no pet.); *see also In re Bayou Group, LLC,* 439 B.R. 284, 305 (Bankr. S.D. N.Y. 2010) (quoting *Golden Budha Corp. v. Can. Land Co. of Am.*, 931 F.2d 196, 201-02 (2nd Cir. 1991)).  "Actual fraudulent intent . . . may be established as a matter of law in cases in which the ***debtor runs*** a Ponzi scheme or a similar illegitimate enterprise, because transfers made in the course of a Ponzi operation could have been made for no purpose other than to hinder, delay or defraud creditors." *Gredd v. Bear Stearns Secs. Corp. (In re Manhattan Inv. Fund Ltd.)*, 359 B.R. 510, 517-18 (Bankr. S.D. N.Y. 2007)(emphasis added).  Because there is no evidence or accusation that SCB, the debtor here, ran a Ponzi scheme, this rule of law does not apply to this matter.

[27]  *Id.*  (here quoting *Coleman Cattle Co. v. Carpentier*, 10 S.W.3d 430, 433).

[28]  *Id.*; *accord Essex Crain Rental Corp.*, 2012 WL 1071231, at *8; *Hahn v. Love*, 321 S.W.3d 517, 525-26 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

[29]  *Sterquell v. Scott*, 140 S.W.3d 453, 460 (Tex. App.—Amarillo 2004, no pet.).

[30]  *In re Heritage Org., LLC*, 413 B.R. 438, 463-64 (Bankr. N.D. Tex. 2009).

[31]  *In re Pau*, 456 B.R. 253, 267 (Bank. W.D. Tex. 2011).

[32]  *See* TEX. BUS. & COM. CODE §24.006.

condition satisfies either §§ 24.005(a)(2)(A) or (B).  To be insolvent per §24.003(a), the sum of the

debtor's debts is greater than all of the debtor's assets "at a fair valuation."[33]  TUFTA requires proof

that the debtor was insolvent at the time the debtor made the transfer or incurred the obligation.[34]

The Receiver has failed to present sufficient summary judgment evidence to meet its burden

to prove actual or constructive fraud related to the transactions between SCB and Dillon Gage.  To

the extent the Receiver has presented any evidence, there are material issues of fact that preclude a

finding of actual or constructive fraud.

### 2. *The Receiver is attempting to short-circuit its actual intent burden of proof by asserting the SCB was part of a Ponzi scheme.*

The Receiver initially contends that SCB was part of the alleged Stanford Ponzi scheme and

as such, it has met its initial burden under the actual fraud theory of liability.[35]  Specifically, the

Receiver attempts to establish that SCB was part of the Ponzi scheme by trying to prove that Stanford

International Bank ("SIB") was a Ponzi scheme and that the connection between SCB and SIB and

other Stanford entities were so close as to make SCB an integral part of the alleged SIB Ponzi

scheme.

---

[33] *See* TEX. BUS. & COM. CODE §24.003(a).

[34] *See* TEX. BUS. & COM. CODE §24.006.

[35] The Receiver contends that this Court and the Fifth Circuit have held that the Stanford enterprise was a Ponzi scheme.  The Receiver fails to mention that the Courts' findings of a Ponzi scheme were limited to the context of a preliminary injunction with a lower burden of proof, and did not specifically address SCB. *See Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011) (noting that the Receiver provided, in the context of a preliminary injunction, "sufficient evidence to support a conclusion of success on the merits that the Stanford enterprise operated as [a] Ponzi scheme."). *See Janvey v. Alguire*, Case No. 3:09-cv-724-N, Doc. 456 at 2, 11, 13 (N.D . Tex. June 10, 2010) (holding that in the context of the Receiver's application for a preliminary injunction, the Receiver presented evidence that Stanford operated as a Ponzi scheme); *Janvey v. Democratic Senatorial Campaign Committee, Inc., et al.*, Case No. 3:10-cv-346-N, Doc. 109 at 14 – 16 (N.D. Tex. June 22, 2011) (holding that the Receiver's "uncontradicted" evidence, in the form of the Declaration of Karyl Van Tassel, presented "evidence showing that the Stanford Defendants operated as a Ponzi scheme.").  For example, one Court examining Van Tassel's testimony in this context specifically limited its holdings and findings. *See Pendergast-Holt v. Certain Underwriters at Lloyd's of London*, 751 F.Supp.2d 876, 897 (S.D. Tex. 2010) (noting that the court's ruling was narrow and based on a limited analysis "of conduct found by a preponderance of the evidence in a preliminary injunction context and on a necessarily restricted record.  Further, these findings and conclusions are not intended for use in Criminal or SEC Actions.").

The Receiver attempts to make these connections in an effort to invoke a presumption of actual intent to hinder, delay and defraud creditors.[36]  The Receiver seeks such a finding because: (a) Ponzi schemes are considered insolvent from inception;[37] and (b) because the burden to show intent to hinder, delay or defraud creditors is inferred by the debtor's running a Ponzi scheme.[38]  However, courts are generally careful not to extend an allegation of a Ponzi scheme beyond its actual scope.[39] For the Ponzi scheme presumption to apply, and to obviate the need for proof of transferor's fraudulent intent, the transfers at issue must have been made in direct connection with the alleged Ponzi scheme by the criminal actor or actors.[40]  These presumptions apply only to the Ponzi scheme **operators** and in instances where the **debtor** was determined to be a Ponzi scheme.[41]  As such, even if the Receiver can show that SCB was a Ponzi scheme, which he has not, or an integral part of one, the Receiver must also establish that each and every transaction at issue was made in furtherance of the alleged Ponzi scheme.[42]  The Receiver has not presented evidence that any of the transactions at issue were made in furtherance of the alleged Stanford Ponzi scheme.

---

[36] *See* Docket Sheet No. 27.

[37] *Quilling v. Schonsky*, 247 F.App. 583, 586 (5th Cir. 2007).

[38] *See Gredd*, 359 B.R. at 517-18.

[39] *See In re Southern Indus. Banking Corp.*, 159 B.R. at 228 (noting that "[t]he court must be careful not to over-extend the reasoning of the Ponzi scheme cases . . .").

[40] *In re 1031 Tax Group, LLC*, 439 B.R. 47, 72 (Bankr. S.D.N.Y. 2010), *subsequent determination*, 439 B.R. 84 (Bankr. S.D.N.Y. 2010), *and opinion supplemented*, 439 B.R. 78 (Bankr. S.D.N.Y. 2010); *see generally, In re ATM Financial Servs. Inc.*, 2011 WL 2580 763 at *5 (Bankr. N.D. Fla. 2011); *In re Rodriguez*, 209 B.R. 424, 432 (Bankr. S.D. Tex. 1997).

[41] *See, e.g., Terry v. June*, 432 F.Supp.2d 635, 640 (W.D. Vir. 2006) (applying the presumptions associated with a Ponzi scheme against the "operator" of the Ponzi scheme.); *Gredd*, 359 B.R. at 517-18; *Janvey v. Alguire*, 647 F.3d 585, 598 (5th Cir. 2011) (finding, in the context of preliminary injunction, that SIB was the main operator of an alleged Ponzi scheme and that the entity that sold the CD's issued by SIB, Stratford Group Company, was part of the scheme because it made the bulk of its revenue from the sales of the Stanford CD's).

[42] *See In re World Vision Entertainment, Inc.*, 275 B.R. 641, 656 (M.D. Fla. 2002); *see also Sallah v. Worldwide Clearing, LLC*, No. 10-62264-Civ., 2012 WL 399 209 at *4, n.4 (S.D. Fla. Feb. 7, 2012) (unpublished)

### 3. The evidence shows that SCB was not a Ponzi scheme[43] or a part of the alleged Stanford Ponzi scheme.

The evidence shows that SCB was independent and not part of the alleged Stanford Ponzi scheme. SCB was a Delaware corporation with its principal place of business in Houston, Texas.[44] SCB was a retailer and wholesaler of rare coins and precious metals, which operated prior to its ownership by any Stanford entity.[45]  SCB conducted arms-length sales to collectors, investors, and other coin and precious metals dealers.[46]  SCB operated its business in a manner completely distinct from any other Stanford entity and/or the Stanford Defendants.[47]   While SCB was a stand-alone company, SCB's shares were owned by a holding company of which Allen Stanford owned all of its shares.[48]  Founded originally in 1999, on January 1, 2004, Stanford Group Holdings, Inc. ("SGH") acquired SCB.[49]  Nevertheless, neither Allen Stanford, nor any of his other entities exercised any control whatsoever over SCB or how it handled its client's assets.[50]  SCB maintained all its corporate

---

[43]   A Ponzi scheme is a "fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments."  *See Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011) (quoting BLACK'S LAW DICTIONARY 1198 (8th ed. 2004)); *see also Ades-Berg Investors v. Breeden (In re Bennett Funding Group, Inc.)*, 439 F.3d 155, 157 n.2 (2d Cir. 2006) (referring to the Black's Law Dictionary and stating that "A 'Ponzi' or 'Pyramid' scheme is a fraudulent investment scheme in which money contributed by later investors is used to pay artificially high dividends to the original investors, creating an illusion of profitability, thus attracting new investors.").  The elements of a Ponzi Scheme are: (1) deposits made from investors; (2) the Ponzi operator conducts no legitimate business as represented to investors; (3) the purported business of the Ponzi operator produces no profits or earnings, rather the source of funds is the new investments made by investors; and (4) payments to investors are made from other investor's invested funds. *In re Rodriguez*, 209 B.R. 424, 431 (Bankr. S.D. Tex. 1997); *see also In re Pearlman*, 440 B.R. 900, 904 (Bankr. M.D. Fla. 2010); *In re Norvergence, Inc.*, 405 B.R. 709, 730, 732-33 (Bankr. D. N.J. 2009). Cases interpreting TUFTA are frequently relied upon in bankruptcy §548 cases and vice versa.  *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006).

[44]   *See* Exhibit G, 2009 Frisard Declaration, at ¶2 (App. 0108); *see also* Exhibit O, at ¶2 (App. 0550-0551).

[45]   *See Id.*

[46]   *See Id.*

[47]   *See* Exhibit G, Frisard 2009 Declaration at ¶3 (App. 0108).

[48]   *See* Exhibit O, 2012 Frisard, at ¶3 (App. 0551); *see also* Exhibit T, ¶3 (App. 1152); "Stanford Defendants" refers to those entities and individuals that are named defendants in the SEC action.

[49]   *See* Exhibit O, 2012 Frisard Declaration, at ¶1 (App. 0550).

[50]   *See* Exhibit G, 2009 Frisard Declaration, at ¶2 (App. 0108); *see also* Exhibit O, 2012 Frisard Declaration ¶5 (App. 0551-0552); Exhibit T, at ¶6 (App. 1152-1153).

formalities and maintained separate accounting and financial records.[51]   To the extent SCB had common back office services with any Stanford entity, SCB paid to use those services,[52] and the use of those services are frequent with entities having common ownership.[53]   None of this is indicative of SCB being involved in a Ponzi scheme.[54]

SCB had absolutely no involvement in the sale of CDs that were the subject of the SEC lawsuit and related criminal matters.[55]   For those individuals that purchased gold through SCB and left it with SCB, SCB independently handled and segregated these assets.[56]   SCB did not sell CDs.[57] SCB did not refer any of its customers to any of the Stanford entities or the Stanford Defendants to purchase SIB's CDs.[58]   SCB's inventory of coins for its customers included less than 3% of holdings from other Stanford entities.[59]

SCB did not influence Stanford Investors into purchasing the allegedly tainted CDs.   The evidence shows that the Stanford investors were moved to invest in SIB's CDs due to their rate of return and no other reason.[60]   In this regard, several investors have made statements in the related Stanford Cases.   Those investors have testified contrary to Van Tassel's conclusory statements and claimed that they were attracted to the Stanford CDs based upon the rate return contained in their

---

[51]  *See* Exhibit O, ¶3 (App. 0551).

[52]  *See* Exhibit T, ¶3 (App. 0551).

[53]  *See* Exhibit R, at pg. 12 (App. 0578).

[54]  *See* Exhibit R, at pg. 12 (App. 0578).

[55]  *See* Exhibit G, 2009 Frisard Declaration, at ¶2 (App. 0108); *see also* Exhibit O, 2012 Frisard Declaration ¶5 (App. 0551-0552).

[56]  *See* Exhibit G, 2009 Frisard Declaration, at ¶3, 5 (App. 0108); *see also* Exhibit O, 2012 Frisard Declaration ¶5 (App. 0551-0552).

[57]  *See* Exhibit, O, Frisard 2012 Declaration, at ¶4 (App. 0551); *see also* Exhibit T, at ¶4 (App. 1152).

[58]  *See* Exhibit, O, Frisard 2012 Declaration, at ¶4 (App. 0551).

[59]  *See* Exhibit R, Declaration of Marla Reynolds, at pg. 5. (App. 0571).

[60]  *See* Exhibit H, Declaration of Carolyn Cranston, at ¶5 (App. 0111); Exhibit I, Declaration of Lyman Fleniken, at ¶6 (App. 0114-0115); Exhibit J, Declaration of John Schwob, at ¶6 (App. 0129); Exhibit K, Declaration of Edward Roybal, at ¶6 (App. 0137-0138); Exhibit L, Declaration of Billy J. Bergeron, at ¶5 (App. 0145).

individual CD agreements.[61]   They did not claim that SCB or any other Stanford-related entity influenced his or her decision to purchase the CDs the subject of the Stanford and SEC litigation.[62]

SCB was also not a Ponzi scheme in itself.  SCB's accounting records demonstrate that it had the characteristics of a legitimate business that sold precious metals and coins to the general public.[63] SCB produced profits and earnings from the sale of goods, not the SIB investors.[64]  In 2007 through 2008, SCB's revenue from these sales was increasing by nearly $3 million.[65]  SCB did not solicit new customers to get money to pay old customers.[66]  SCB did not take deposits from customers to hold in trust; rather, it accepted payment for purchases.[67]  SCB did not make disbursements or payments to customers unless it was purchasing from them.[68]  Furthermore, SCB did not exhibit any of the SEC's "red flags" that are indicative of a Ponzi scheme.[69]

As such, this Court should find that SCB was not a Ponzi scheme or a part of the alleged Stanford Ponzi scheme.  Based on these findings, the Court should also conclude that the Receiver does not enjoy the benefit of the above-discussed Ponzi scheme presumptions.

---

[61] *See* Exhibit H, Declaration of Carolyn Cranston, at ¶5 (App. 0111); Exhibit I, Declaration of Lyman Fleniken, at ¶6 (App. 0114-0115); Exhibit J, Declaration of John Schwob, at ¶6 (App. 0129); Exhibit K, Declaration of Edward Roybal, at ¶6 (App. 0137-0138); Exhibit L, Declaration of Billy J. Bergeron, at ¶5 (App. 0145).

[62] *See* Exhibit H, Declaration of Carolyn Cranston, at ¶5 (App. 0111); Exhibit I, Declaration of Lyman Fleniken, at ¶6 (App. 0114-0115); Exhibit J, Declaration of John Schwob, at ¶6 (App. 0129); Exhibit K, Declaration of Edward Roybal, at ¶6 (App. 0137-0138); Exhibit L, Declaration of Billy J. Bergeron, at ¶5 (App. 0145).

[63] *See* Exhibit R, Declaration of Marla Reynolds, at pg. 6. (App. 0572).

[64] *See* Exhibit R, Declaration of Marla Reynolds, at pg. 7.  (App. 0573); *see also* Exhibit O, ¶5 (App. 0551-0552); Exhibit T, (App. 1152-1153).

[65] *See* Exhibit T, ¶6.   (App. 1152-1153).

[66] *See* Exhibit O, 2012 Declaration of Joe Frisard, at ¶5.  (App. 0551-0552).

[67] *See* Exhibit O, ¶5. (App. 0551-0552).

[68] *See* Exhibit T, ¶6 (App. 1152-1153); Exhibit O, ¶5 (App. 0551-0552).

[69] *See* Exhibit R, Declaration of Marla Reynolds, at pgs. 7-8.  (App. 0573-0574).

### 4.    The Receiver has not established that SCB was part of a Ponzi scheme.

The Receiver's attempted proof seeking to link SCB to the alleged Stanford Ponzi scheme is conclusory, unreliable, and without merit.  Specifically, the Receiver asserts, through its expert Karyl Van Tassel, that SCB lent legitimacy to the SCB Ponzi scheme and therefore was part of the alleged Ponzi scheme.[70]  Setting aside the fact that such a determination is a legal conclusion for the Court to decide,[71] the statement is controverted by investor testimony,[72] statistical data, or any other evidence other than her *ipse dixit*.

While the Receiver relied upon several Van Tassel Declarations and supplements, only one specifically discussed SCB.[73]  Van Tassel's February 2012 declaration discussing SCB is completely void of specific discussion, supporting background information, or underlying evidence to support her conclusion linking SCB to the Stanford Ponzi scheme.[74]  She concludes, without supporting methodology and factual basis, that SCB was part of the Stanford Ponzi scheme because it was financially dependent as represented by its receipt of a $250,000.00 capital contribution in 2006 that she asserts was from investor funds[75] and because as a Stanford entity, SCB purportedly lent credence or credibility to the Ponzi scheme.

Van Tassel's opinion that SCB was part of the alleged Ponzi scheme because it lent credence to it is controverted by her own deposition testimony.  In her depositions of August 2, 2011 and June

---

[70]    *See* Receiver's App. 1178.

[71]    *See, e.g., Am. Cancer Soc. v. Cook*, 675 F.2d 524, 528 (5th Cir. 2012).

[72]    *See* Exhibit H, Declaration of Carolyn Cranston, at ¶5 (App. 0111); Exhibit I, Declaration of Lyman Fleniken, at ¶6 (App. 0114-0115); Exhibit J, Declaration of John Schwob, at ¶6 (App. 0129); Exhibit K, Declaration of Edward Roybal, at ¶6 (App. 0137-0138); Exhibit L, Declaration of Billy J. Bergeron, at ¶5 (App. 0145).

[73]    *See* Receiver's Exhibit 23 (Receiver's App. 1176-1192).

[74]    *See* Receiver's Exhibit 23 (Receiver's App. 1176-1192).

[75]    *See* Receiver App. 1179.

5, 2012, Van Tassel admits the following facts that undermine her conclusion that SCB was part of the alleged Ponzi scheme:

(a)     She did not interview any investors for any purpose, including regarding what motivated them to purchase the Stanford CDs;[76]

(b)     She could not tell whether SCB sold gold coin and bullion to third parties other than Stanford entities;[77]

(c)     No other entity other than SIB sold the allegedly tainted CDs;[78]

(d)     She did not analyze SCB as an entity by itself in the context of whether it was a Ponzi scheme;[79]

(e)     To her knowledge, no employee of SCB was arrested or charged to be involved in the alleged Stanford Ponzi scheme;[80]

(f)     She did not have any specific information regarding whether any employee at SCB knew of the alleged Stanford Ponzi scheme;[81]

(g)     From her review of SCB's books and records, its financial transactions reflected sales and purchases "which you would expect to see."[82]

In short, Van Tassel makes critical concessions during her depositions that undermine her February 2012 declaration and any support for her conclusion that SCB was a part of any Ponzi scheme by way of lending credibility to the alleged Stanford Ponzi scheme.

Furthermore, Van Tassel's efforts to trace the 2006 capital contribution of $250,000.00 are without support and do not present reliable summary judgment evidence that these funds came from SIB's CD investors.  Van Tassel asserts in her June 7, 2011 supplemental declaration, upon which

---

[76] *See* Exhibit E, Van Tassel, August 3, 2011 Depo. Transcript, Vol. II, 311:17-20 (App. 0087).

[77] *See* Exhibit F, Van Tassel, June 5, 2012 Depo. Transcript, 91:9-23 (App. 0099).

[78] *See Id.* at 46:12-18 (App. 0098).

[79] *See Id.* at 144:8-13 (App. 0100).

[80] *See Id.* at 144:23-145:9 (App. 0100-0101); 147:5-9 (App. 0102).

[81] *See Id.* at 147:10-13 (App. 0102).

[82] *See* Exhibit F, Van Tassel, June 5, 2012 Depo. 158:10-159:6 (App. 0103-0104).

she relies in her February 2012 declaration, that she reviewed approximately 30% of the checks into Trustmark account 1707 and from that sample extrapolated that the overwhelming amount of funds from that account come from SIB's CD investors.[83]   Van Tassel's explanation is unreliable as she provides no explanation or proof of the completeness of the source of the population, the randomness of her selected population, or that the time period of the checks would be representative of the whole sample.[84] Without this information, the statistical reliability of the statement cannot be determined.[85]

The Receiver also contends that SCB was insolvent.  Even if that were true, which Dillon Gage disputes, "[e]very business that is balance-sheet insolvent is not a Ponzi scheme.  The outcome may be the same –earlier debts paid and later debts not paid- but that does not make an insolvent business a Ponzi scheme."[86]

### 5.      *SCB was solvent between January 22, 2009 and February 17, 2009 and the Receiver has failed to establish that SCB was insolvent during that time.*

As a fall back to his novel Ponzi scheme linkage theory, the Receiver addresses only one of the eleven (11) "badges of fraud" in an effort to establish evidence of SCB's alleged actual intent to make fraudulent transfers between January 22, 2009 and February 17, 2009.[87]  The Receiver asserts that SCB was insolvent.[88]   The evidence does not show that SCB was insolvent during the period relevant to the transactions at issue.

---

[83] *See* Receiver's Exhibits 2 (Receiver's App. 75) and 23 (Receiver's App 1179).

[84] *See* Exhibit S, Declaration of Paul C. French, III, at pgs. 24-25. (App. 1074-1075).

[85] *See* Exhibit, S at pgs. 24-25 (App. 1074-1075).

[86] *In re Southern Industrial Banking Corp. v. Evans*, 159 B.R. 224, 227 (E. D. Tenn. 1993); *see also Waind v. Waxenberg*, 611 F.Supp.2d 1299, 1318 (M.D. Fla. 2009) (denying summary judgment because there was a genuine issue of fact regarding whether there was a Ponzi scheme and denoting that not every misrepresentation, or embezzlement case is a Ponzi scheme).

[87] TEX. BUS. & COM. CODE §24.005(b) (1-11).

[88] Cause No. 3:10-cv-1973-N, at Doc No. 27, pgs. 4-8.

The summary judgment evidence establishes that SCB was solvent at the time of the transactions at issue. SCB's president, Joe Frisard testified that SCB was solvent prior to the Receiver's appointment.[89] While acknowledging that SCB had seasonal cash flow issues, both he and Scott Terry recall that SCB could pay its obligations as they came due back in 2009.[90] SCB had a large inventory and assets that, at fair market value, were in excess of its liabilities through the time the receiver took over in February 2009.[91] Due to the timing in which SCB paid Dillon Gage for shipments, it was not uncommon for SCB to owe Dillon Gage money.[92] That did not mean it could not pay Dillon Gage. SCB's short-term seasonal cash flow issue was resolvable by finding additional capital or liquidating inventory.[93]

The Receiver relies on its accounting and finance expert, Van Tassel, and the deposition testimony of Scott Terry ("Terry") to support its claim that SCB was insolvent.[94] Van Tassel's declaration, Receiver's Exhibit 23, does not provide any supported testimony that SCB was insolvent in 2009, during the time in which the transactions at issue occurred.[95] Furthermore, the methodology used by Van Tassel known as "book value" is not reliable and contrary to authority that even she recognizes as persuasive.[96] Van Tassel uses "book value" in making her insolvency analysis.[97] Book

---

[89] *See* Exhibit C, Frisard Depo., at 85:4-14.

[90] *See* Exhibit O, 2012 Frisard Declaration, at ¶7 (App. 0552); *see also* Exhibit T, 2012 Scott Terry Declaration, at ¶8 (App. 1153).

[91] *See* Exhibit O, 2012 Frisard Declaration, at ¶7 (App. 0552); *see also* Exhibit T, 2012 Scott Terry Declaration, at ¶8 (App. 1153).

[92] *See* Exhibit O, 2012 Frisard Declaration, at ¶7 (App. 0552); *see also* Exhibit T, 2012 Scott Terry Declaration, at ¶8 (App. 1153).

[93] *See* Exhibit T, ¶8 (App. 1153).

[94] Receiver's Motion, [Doc. 27], at pg. 7.

[95] Receiver's App. 1178-1179. The Receiver may contend in response that the declaration says SCB was insolvent from "2006 forward", however, none of the paragraphs following that statement provide an analysis for the period the subject of this motion, January through February 2009. *See Id.*

[96] *See* Exhibit S, Declaration of Paul C. French, III, at pgs. 8-14 (App. 1058-0164).

[97] *See* Exhibit S, Declaration of Paul C. French, III, at pg. 9 (App. 1059).

value is not a proper valuation methodology.[98]  In fact, experts in valuation have noted that it is not a

valuation method at all.[99]  Further, this Court has found that book valuation, in the context of

conducting a fraudulent transfer insolvency analysis, is improper.[100]

      The only actual non-opinion testimony regarding SCB's insolvency that the Receiver relies

upon for the period at issue is Scott Terry ("Terry").  The Receiver's reliance on Terry to establish

insolvency is also misplaced.  During questioning at his deposition, he testified regarding balance

sheet solvency, but did not do so based on fair market valuation of assets.[101]  Terry admits in his

deposition, "I'm not an expert at valuing."[102]  Terry recalls that SCB could pay its debts as they

became due, and could pay its operational costs in 2009.[103]  He also recalls that SCB had seasonal

cash flow problems in early 2009, but such was resolvable if SCB could obtain short-term credit or if

inventory was liquidated.[104]  He testified that SCB could pay its office expenses and all of its vendors

except, temporarily, for Dillon Gage.[105]  Even then, Terry noted that SCB was only having issues

paying Dillon Gage *per Dillon Gage's expectations*.[106]  The evidence, as discussed below, shows that

SCB could and did pay Dillon Gage.  He further testified that, other than Dillon Gage, SCB had no

other vendors with significant outstanding obligations in 2009.[107]  Terry believed that had the

---

[98]  *See Id.* at pgs. 8-14 (App. 1058-1064)

[99]  *See Id.*

[100]  *See Waller v. Pidgeon*, No. 3:06-CV-0506-D, 2008 WL 2338217, at *7 (N.D. Tex. June 5, 2008) (dismissing with prejudice a receiver's fraudulent transfer case because the Receiver's use of book value was insufficient to prove insolvency).

[101]  *See* Exhibit T, 2012 Scott Terry Declaration, at ¶8 (App. 1153).

[102]  Exhibit D, Scott Terry Depo., at 157:19-24; 158:1-13 (App. 0074-0075).

[103]  *See* Exhibit T, 2012 Scott Terry Declaration, at ¶8 (App. 1153).

[104]  *See id.* (App. 1153).

[105]  *See* Exhibit D, Scott Terry Depo., at 89:24-25; 90:1-17 (App. 0070-0071); *see also* Exhibit T 2012 Scott Terry Declaration, at ¶8 (App. 1153).

[106]  *See* Exhibit D, Scott Terry Depo., at 125:1-6 (App. 0072).

[107]  *See* Exhibit D, at 90:6-13  (App. 0071).

Receiver not been appointed, SCB would have worked itself out of the cash flow problem.[108]  There

was no valid business reason for the Receiver to shut down the operations of SCB as it was a viable

entity.[109]

The evidence does not support the Receiver's contention that SCB was insolvent at the time

of the transactions the issue of this motion.  Furthermore, the Receiver fails to establish any other

"badges of fraud," and as such the Receiver cannot carry his burden to prove his actual fraudulent

transfer claims.  Because the Receiver is unable to carry his burden, the Court must deny the

Receiver's Motion for Summary Judgment on his actual fraudulent transfer claim.

**B.      The Summary Judgment Evidence establishes that Dillon Gage acted in good faith and provided reasonably equivalent value for the $5,120,155.67 worth of transactions at issue.**

Even if the Court finds that the Receiver has met the burden relative to actual fraud and

concludes an absence of issues of material fact regarding that allegation, the Court must still deny the

Receiver's Motion.  The Court must deny the motion because, as the controlling law provides, a

transfer is NOT voidable as fraudulent "against a person who took in good faith and for a reasonably

equivalent value or against any subsequent transferee or obligor."[110]   Dillon Gage's proof that the

transactions at issue occurred in good faith and for reasonably equivalent value establishes its

affirmative defense to the Receiver's actual fraud TUFTA claim as a matter of law.[111] The competent

summary judgment evidence establishes that Dillon Gage took the alleged transfers in good faith and

for reasonably equivalent value, and as such the Court should deny the Receiver's Motion.

Furthermore, and even though it is not Dillon Gage's burden, Dillon Gage's evidence of reasonable

---

[108]  *See id.*, at 143:3-9  (App. 0073).

[109]  *See* Exhibit O, ¶7  (App. 0552).

[110]  *Wright & Wright, Inc.*, 2011 WL 124237, at *4; *see also* TEX. BUS. & COM. CODE § 24.009(a).

[111]  *See also* TEX. BUS. & COM. CODE § 24.009(a).

equivalent value undermines the first element of the Receiver's constructive fraud TUFTA claim such that it should be precluded.[112]

### 1.    *Dillon Gage has the burden to establish its TUFTA affirmative defense.*

A person who invokes the affirmative defense "carries the burden of establishing good faith and the reasonable equivalence of the consideration obtained."[113]   A transferee who takes property without knowledge of such facts as would excite the suspicions of a person of ordinary prudence and put him on inquiry of the fraudulent nature of an alleged transfer takes the property in good faith and is a bona fide purchaser.[114]   The relevant question is "whether the transferee had actual knowledge of the debtor's fraudulent purpose or had knowledge of such facts or circumstances as would have induced an ordinarily prudent person to make inquiry, and such inquiry, if made with reasonable diligence, would have led to the discovery of the transferor's fraudulent purpose."[115]   The evidence will show that Dillon Gage did not have, nor should it have had, knowledge of the Stanford Ponzi scheme, or SCB's alleged insolvency such that Dillon Gage must have acted in good faith.

Dillon Gage also must establish reasonably equivalent value for the transactions at issue. Pursuant to Texas Business and Commerce Code, section 24.004(a), value is "given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent

---

[112]   *See* TEX. BUS. & COM. CODE §24.006 (noting that the elements of a constructive fraud claim under TUFTA require proof that the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time).   Furthermore, Dillon Gage's proof that SCB was solvent at the time of the alleged transfers eliminates the "insolvency" element of a TUFTA constructive fraud claim.

[113]   *Flores v. Robinson Roofing & Constr. Co., Inc.*, 161 S.W.3d 750, 756 (Tex. App.—Fort Worth 2005, pet. denied).

[114]   *Flores*, 161 S.W.3d at 756.

[115]   *Waind v. Waxenberg*, 611 F.Supp.2d 1299, 1320 (M.D. Fla. 2009) (discussing how good faith is determined through the Florida Uniform Fraudulent Transfer Act which is virtually identical to TUFTA at issue in our case).

debt is secured or satisfied."[116]   A party receives "reasonably equitable value" for what it gives up if it gets roughly the value it gave.[117]   The Texas Supreme Court notes that "[t]he satisfaction of an antecedent debt is also deemed a valuable consideration within the meaning of our statutes on fraudulent conveyances."[118]   In making this determination, courts must consider all aspects of a transaction and both direct and indirect burdens on the debtor when determining value.[119]   The court examines whether the estate lost value.[120]   The value of the transfer is determined at the date of the transfer.[121]

The evidence shows that each payment was used to pay a debt or obligation.  For its money, SCB and/or its customers received a good from Dillon Gage.  These payments either secured a future delivery or satisfied a prior delivery of goods from Dillon Gage.  For the remaining $1million that was not used, Dillon Gage voluntarily returned the proceeds by agreement with the Receiver.  The evidence shows that each payment was used to pay a debt or obligation.  For its money, SCB or its customers received a good from Dillon Gage. For the remaining $1 million Dillon Gage voluntarily deposited the funds in trust in light of the disputed ownership claims between the Receiver and Pre-War Art.

---

[116] TEX. BUS. & COM. CODE § 24.004(a); *see also In re IFS Fin. Corp.*, 417 B.R. 419, 441 (Bankr. S.D. Tex. 2009).

[117] *See In re Imagine Masters, Inc.*, 421 B.R. 164, 179-80 (Bankr. E.D. Pa. 2009).

[118] *Quinn v. Dupree*, 303 S.W.2d 769, 772-73 (Tex. 1957); *see also Walker v. Sonafi Pasteur (In re Aphton Corp.)*, 423 B.R. 76, 89 (Bankr. D. Del. 2010)(noting that "Courts have held that when a transfer is made to pay an antecedent debt, the transfer may not be set aside as constructively fraudulent."); *In re First Alliance Mortg. Co.*, 298 B.R. 652, 665 (C.D. Cal. 2003)(stating that "[r]epayments of fully secured obligations . . . do not hinder, delay, or defraud creditors . . . and therefore cannot be fraudulent.").

[119] *See also In re IFS Fin. Corp.*, 417 B.R. at 442.

[120] *Nat'l Loan Investors, L.P. v. Robinson*, 98 S.W.3d 781, 784 (Tex. Ct. App.—Amarillo 2003, pet. denied).

[121] *Jimmy Swaggart Ministries v. Hayes (In re Hannover)*, 310 F.3d 796, 802-03 (5th Cir. 2002).

### 2.     *The summary judgment evidence shows that Dillon Gage acted in good faith.*

Dillon Gage acted with good faith and as such, this Court should deny the Receiver's actual fraud claim.[122]   Dillon Gage did not know, nor could it have known that the transactions at issue were anything but the normal types of transactions it had with SCB for the previous four (4) years.[123]  Dillon Gage did not know, nor could it have known about the alleged Stanford Ponzi scheme.   Dillon Gage did not know nor could it have known about SCB's alleged insolvency as SCB's own executives did not believe SCB was insolvent.

### a.     *Well before the transactions at issue, Dillon Gage and SCB had conducted numerous transactions and had an arms-length business relationship.*

As part of its business, SCB bought and sold precious metals in the form of coin or bullion to and from vendors like Dillon Gage.[124]   Sometime after November 24, 2004, Dillon Gage and SCB began to conduct business together.[125]   Dillon Gage served as a wholesale vendor and frequent provider of rare coins and bullion for SCB.[126]   Dillon Gage and SCB conducted business together from November 2004, until February 17, 2009 when the FBI seized SCB's assets; SCB has been in receivership since that time.[127]   In addition to buying and selling coins and bullion, SCB stored coins and bullion for some of its customers.[128]

---

[122]   Dillon Gage acknowledges that both good faith and reasonably equivalent value must be shown to establish Dillon Gage's affirmative defense to the Receiver's actual fraud TUFTA claim.

[123]   *See* Exhibit T, 2012 Scott Terry Declaration, at ¶9  (App. 1154).

[124]   *See* Exhibit G, 2009 Frisard Declaration at ¶¶2, 6 (App. 0108).

[125]   *See* Exhibit C, Frisard Depo. 16:8-23 (App. 0045); s*ee also* Exhibit B, Fritz Depo. 11:5-21 (App. 0030).

[126]   *See* Exhibit P, 2009 Declaration of Terry Hanlon, at ¶2(App. 0556); s*ee also* Exhibit B, Fritz Depo. 15:12-18 (App. 0031).

[127]   *See* Exhibit C, Frisard Depo. 85:15-20 (App. 0055); s*ee also* Exhibit G, 2009 Frisard Declaration, at ¶1 (App. 0108); *see also* Exhibit N, ¶2. (App. 0544-0545).

[128]   *See* Exhibit G, 2009 Frisard Declaration at ¶¶3-5 (App. 0108).

Prior to its seizure and receivership, SCB was a significant customer of Dillon Gage.[129] When a customer of SCB placed an order that SCB did not have in its inventory, SCB would turn to a vendor such as Dillon Gage to acquire the goods.[130] Dillon Gage would then sell the coins or bullion to SCB, and ship the goods pursuant to SCB's instructions.[131] If Dillon Gage was the vendor, it could take as long as fourteen (14) days to receive the shipment and the terms of payment were ten (10) days after receipt.[132] As such, it was not uncommon for SCB to owe money to Dillon Gage.[133]

Due to the volume of business between SCB and Dillon Gage, SCB established an open account with Dillon Gage.[134] As payments were received from SCB, each payment was credited against the total outstanding balance, thereby reducing the balance.[135] SCB was making payments every Friday.[136] Initially, SCB's credit limit was $500,000.[137] During 2008, as the gold market improved dramatically to hedge against various other deteriorating economic markets, Dillon Gage increased the credit limit for its established customers such as SCB.[138] Dillon Gage doubled SCB

---

[129] *See* Exhibit A, Hanlon Depo. 15:24-25; 16:1-3 (App. 0008-0009); *see also* Exhibit N, ¶2  (App. 0544-0545).

[130] *See* Exhibit P, 2009 Declaration of Terry Hanlon, at ¶2 (App. 0556).

[131] *See id.*  (App. 0556).

[132] *See* Exhibit C, Frisard Depo., at 48:7-23. (App. 0051).

[133] *See* Exhibit O, 2012 Declaration of Frisard, at ¶ 10. (App. 0553).

[134] *See* Exhibit P, 2009 Declaration of Terry Hanlon, at ¶3(App. 0056); *see also* Exhibit Q, Declaration of Ira Fritz, at ¶3 (App. 0562); *see also* Exhibit C, Frisard Depo. 16:24-25; 17:1-3 (Characterizing SCB's account with Dillon Gage as a "running account.") (App. 0045-0046).

[135] *See* Exhibit P, 2009 Declaration of Terry Hanlon, at ¶3 (App. 0056); *see also* Exhibit  Q, 2009 Declaration of Ira Fritz, at ¶3 (App. 0562); Exhibit B, Fritz Depo. 29:13-23; 30:1-6 (App. 0032-0033).

[136] *See* Exhibit C, Frisard Depo. 23:24-25; 24:1-4  (App. 0047-0048).

[137] *See* Exhibit P, 2009 Declaration of Terry Hanlon, at ¶3 (App. 0056); *see also* Exhibit Q, 2009 Declaration of Ira Fritz, at ¶3 (App. 0562).

[138] *See* Exhibit P, 2009 Declaration of Terry Hanlon, at ¶4 (App. 0056-0057); *see also* Exhibit Q, 2009 Declaration of Ira Fritz, at ¶4 (App. 0562).

credit limit to $1,000,000 and, for a limited time, allowed established customers like SCB to exceed that limit by 100 percent.[139]

> **b.     Based on this relationship, Dillon Gage did not know, nor could it have known of SCB's alleged connection with a Ponzi scheme.**

Before the Receiver's involvement, Dillon Gage did not know about the alleged Ponzi scheme or SCB's alleged possible involvement.[140]   Aside from SCB, Dillon Gage did not deal with any other Stanford entity and did not have any detailed knowledge of the connection between SCB and any other Stanford entity.[141]   Dillon Gage never received any money from any of the Stanford Defendants and did not do business directly with them.[142]   Dillon Gage had no knowledge of any of the facts stated in Van Tassel's Declarations regarding the alleged Stanford Ponzi scheme and Van Tassel's assertions that SCB was part of it.[143]

Dillon Gage could not have known about any alleged Stanford Ponzi scheme or SCB's alleged involvement.   The Receiver presented no evidence that Dillon Gage should have known about the alleged Stanford Ponzi scheme or SCB's alleged involvement.   As is noted above, SCB was not a Ponzi scheme or a part thereof.[144]   None of Dillon Gage's discussions with SCB concerned the business of any other Stanford entities or how Allen Stanford made money.[145]   SCB never told anyone at Dillon Gage that Allen Stanford was part of a Ponzi scheme or any other fraudulent

---

[139]   *See* Exhibit P, 2009 Declaration of Terry Hanlon, at ¶4 (App. 0056-0057); *see also* Exhibit Q, 2009 Declaration of Ira Fritz, at ¶4 (App. 0562).

[140]   *See* Exhibit N, Hanlon 2012 Declaration, at ¶13 (App. 0548); *see also* Exhibit M, 2012 Ira Fritz Declaration at ¶12  (App. 0154).

[141]   *See* Exhibit N, at ¶13 (App. 548); *see also* Exhibit M, at ¶¶12, 13 (App. 154).

[142]   *See* Exhibit N, Hanlon 2012 Declaration, at ¶13 (App. 548) and Exhibit M, 2012 Ira Fritz Declaration, at ¶12 (App. 154).

[143]   *See* Exhibit N, Hanlon 2012 Declaration, at ¶13 (App. 548) and Exhibit M, 2012 Ira Fritz Declaration, at ¶12 (App. 154).

[144]   Dillon Gage incorporates its arguments and evidence controverting the Receiver's contentions on this issue.

[145]   *See* Exhibit N, Hanlon 2012 Declaration, at ¶14 (App. 548).

activity.[146]  In fact, Joe Frisard was a purchaser of SIBs CD's, along with his wife.[147]  Even SCB's president and vice president did not have knowledge of Allen Stanford's alleged wrongdoing before the Receiver was appointed.[148]  Until the allegations against Allen Stanford went public after the receivership, Dillon Gage had no reason to believe that any of the Stanford entities were involved in a Ponzi scheme, including SCB.[149]

> ### i. *Dillon Gage did not know, nor should it have known at any time that SCB was insolvent.  In early January 2009, Dillon Gage observed SCB exceeding its credit limits.  On January 20, 2009, Dillon Gage met with SCB to investigate the matter.  SCB assured Dillon Gage that it would take care of its obligations by the end of the month.*

SCB routinely conducted trades with Dillon Gage on the precious metals commodities market and had run up an outstanding accounts receivable balance with Dillon Gage of approximately $2.3-2.4 million by January 2009.[150]  This amount was greater than 100% of Dillon Gage's $1 million credit limit to SCB.[151]  Dillon Gage permitted this for a limited time.[152]  While it was not uncommon for Dillon Gage's customers, like SCB, to owe Dillon Gage money, the amount at issue and SCB's slow payment caused Dillon Gage to seek answers from SCB regarding when payment would occur.[153]

---

[146] *See* Exhibit O, ¶9 (App. 553).

[147] *See id.* (App. 553).

[148] *See* Exhibit T, Terry 2012 Declaration, at ¶10 (App. 1154); *see also* Exhibit O, ¶9 (App. 553).

[149] *See* Exhibit N, Hanlon 2012 Declaration, at ¶13 (App. 548); *see also* Exhibit M, 2012 Ira Fritz Declaration at ¶12 (App. 154).

[150] *See* Exhibit A, Hanlon Depo. 44:7-25; 45:1-6; 92:1-5; 111:1-19 (App. 10-13; 18); Exhibit P, 2009 Declaration of Terry Hanlon, at ¶5 (App. 557); *see also* Exhibit C, Frisard Depo. 142:6-23 (App. 59).

[151] *See* Exhibit P, 2009 Declaration of Terry Hanlon, at ¶5 (App. 557); *see also* Exhibit Q, 2009 Declaration of Ira Fritz, at ¶5 (App. 562).

[152] *See* Exhibit N, at ¶4 (App. 545).

[153] *See* Exhibit N, 2012 Terry Hanlon Declaration, at ¶5 (App. 545-46).

SCB's outstanding balance with Dillon Gage resulted in Terry Hanlon ("Hanlon"), president of Dillon Gage[154] traveling to Houston on January 20, 2009 to visit with Joe Frisard ("Frisard"), the president of SCB.[155] During this visit, Hanlon met with Frisard and Scott Terry ("Terry"), SCB's vice president of finance and operations.[156] They discussed the outstanding balance, and Frisard provided Hanlon with a tour of SCB's facilities.[157] Located at 5050 Westheimer Road, in Houston, the offices were beautifully furnished, well-staffed, and buzzing with activity.[158] During the tour, SCB showed Hanlon an extensive inventory that was represented to him to be worth hundreds of thousands, if not millions, of dollars.[159] SCB showed Hanlon various advertising vehicles.[160] As a result of this advertising, when they brought him to the trading room, the phones were "ringing off the hook."[161] Frisard also made several representations regarding the strength of SCB's business, that everything was going to be fine, and told Hanlon of a possible deal for approximately $3 million worth of gold bars.[162] Regarding SCB's outstanding balance, Frisard recalled in his deposition that he told Hanlon, "It will be taken care of by the end of the month."[163]

> **c.** **Dillon Gage followed up on January 22, 2009 after receiving a smaller than anticipated payment from SCB. SCB informed Dillon Gage that it was having cash flow issues but had several possible solutions to the problem.**

---

[154] *See* Exhibit P, 2009 Declaration of Terry Hanlon, at ¶1 (App. 0556)(noting that Terry Hanlon was the President of Dillon Gage's Metals Division).

[155] *See* Exhibit C, Frisard Depo. 86:20-25; 87:1-2; 90:3-9 (App. 56-58); s*ee also* Exhibit A, Hanlon Depo. 44:7-25; 45:1-25; 46:1-11 (App. 10-12).

[156] *See* Exhibit D, Scott Terry Depo. 8:19-22 (App. 69); *see also* Exhibit O, at ¶12 (App. 553).

[157] *See* Exhibit N, 2012 Terry Hanlon Declaration, at ¶7 (App. 546); *see also* Exhibit O, at ¶12 (App. 553).

[158] *See* Exhibit N, 2012 Terry Hanlon Declaration, at ¶7 (App. 546); *see also* Exhibit O, at ¶12 (App. 553).

[159] *See* Exhibit N, 2012 Hanlon Declaration (App. 546); *see also* Exhibit O, at ¶12 (App. 553).

[160] *See* Exhibit N, 2012 Hanlon Declaration (App. 546); *see also* Exhibit O, at ¶12 (App. 553).

[161] *See* Exhibit N, 2012 Hanlon Declaration, at ¶7 (App. 546).

[162] *See* Exhibit N, 2012 Hanlon Declaration, at ¶8 (App. 546).; Exhibit A, Hanlon Depo. Trans. 99:7-25; 100:1-4 (App. 14-15); *see also* Exhibit O, at ¶12 (App. 553)(representing that he told Dillon Gate that SCB was financially sound and able to pay down obligations to Dillon Gate).

[163] *See* Exhibit C, Frisard Depo. 27:14-23 (App. 49).

During the January 2009 visit, SCB assured Hanlon that Dillon Gage was to receive a large payment against outstanding invoices the next day.[164]  When he received what he considered to be a smaller than "large payment", on January 22, 2009, he was concerned and contacted SCB to inquire why the payment was not as large as he believed it should be.[165]  He reached Scott Terry of SCB and discussed the situation with him.[166]

During the call, Terry stated that SCB was having cash flow issues.[167]  Dillon Gage heard several explanations for the cash flow issues including: (a) large purchases at recent auctions; (b) the unavailability of credit from SIB; and (c) the recent liquidation of Stanford's coin and/or bullion portfolio.[168]  At no time did SCB convey that they were not going to be able to pay for the outstanding orders, were insolvent, or were going to have to avoid paying other vendors or creditors to pay for the already shipped orders.[169]

SCB provided at least three (3) solutions to its short term cash flow problem including: (a) selling of some of its inventory; (b) collection of its accounts receivable; and (c) obtaining additional funds from outside SCB.[170]  Hanlon informed Terry that Dillon Gage could not ship orders to SCB until the account was brought current.[171]  During that conversation, Terry reiterated that SCB was doing a large gold bar deal that would get some cash to "get you guys square."[172]

---

[164] Exhibit A, Hanlon Depo. Trans. 99:7-25; 100:1-4 (App. 14-15).

[165] Exhibit N, 2012 Hanlon Declaration, at ¶9 (App. 546).

[166] Exhibit A, Hanlon Depo. Trans. 105:5-25; 106:1-25 (App. 16-17).

[167] Exhibit N, 2012 Hanlon Declaration, at ¶10 (App. 547).

[168] *See id*. (App. 547).

[169] *See* Exhibit N, Hanlon 2012 Declaration, at ¶11 (App. 547); Exhibit M, Fritz 2012 Declaration, at ¶10 (App. 153); Exhibit T, at ¶8 (App. 1153-1154); Exhibit O, ¶7 (App. 552).

[170] Exhibit N, 2012 Hanlon Declaration, at ¶10 (App. 547).

[171] *See* Exhibit P, 2009 Declaration of Terry Hanlon, at ¶7 (App. 557).

[172] *Id.* (App. 557).

### d.   Dillon Gage did not know, nor should it have known that SCB was purportedly insolvent.

As is noted above, SCB was not insolvent during the applicable time.[173]  Nevertheless, at no time did Dillon Gage learn that SCB was purportedly balance sheet "insolvent" or unable to pay its bills to its vendors.  At most, Dillon Gage was aware that SCB was having a short term cash flow issue.[174]  Because Dillon Gage shipped the precious metals to SCB and/or its customers before it received payment, it is common in this industry for Dillon Gage's customers (like SCB) to be behind on payment.[175]  Because, for the most part, SCB paid for the gold after Dillon Gage shipped the precious metals, it was hard for SCB not to owe Dillon Gage money at any given time.[176]  As such, SCB, like other institutional customers, almost always had an outstanding balance.

Nevertheless, Dillon Gage did not put its head in the sand and willfully ignore SCB's outstanding balance.[177]  As  noted, on January 20, 2009, and January 22, 2009, Dillon Gage engaged SCB and learned that although they were having some cash flow issues, SCB was financially sound and had several solutions to increase cash flow.[178]  At no time during the January 20, 2009 meeting or the January 22, 2009 phone call did Frisard, Terry, or anyone working for SCB inform Dillon Gage that SCB was insolvent, would not be able to pay Dillon Gage, or give Dillon Gage any reason to believe that they were insolvent or would not be unable to pay its obligations to Dillon Gage.[179]  At no time during the January 20, 2009 meeting or the January 22, 2009 phone call did Frisard,

---

[173]  Dillon Gate incorporates its solvency proof herein as stated above.

[174]  *See* Exhibit N, Hanlon 2012 Declaration, at ¶¶6-11 (App. 546-547).

[175]  *See* Exhibit O, at ¶10 (App. 553).

[176]  *See* Exhibit C, Frisard Depo. 47:24-25; 48:1-25; 49:1-13 (App. 50-52).

[177]  *See, e.g., In re World Villion Entm't, Inc*., 275 B.R. at 659 (noting that "a transferee may not remain willfully ignorant of facts which would cause it to be on notice of a debtor's fraudulent purpose.").

[178]  *See* Exhibit N, at ¶¶5-11 (App. 545-547); *see also* Exhibit O, at ¶12 (App. 553); *see also* Exhibit T, at ¶8 (App. 1153).

[179]  *See* Exhibit N, 2012 Terry Hanlon Declaration, at ¶11 (App. 547); *see also* Exhibit O, at ¶ 7 (App. 553); *see also* Exhibit T, at ¶8 (App. 1153).

Terry, or anyone working for SCB inform Dillon Gate that SCB had other debts or obligations that were not going to be paid if Dillon Gage was paid.[180] Following its protocol regarding vendors that had exceeded their credit limits, Dillon Gage acted as any reasonable vendor would do and stopped shipping new orders on credit until SCB was caught up.[181] SCB acted quickly and soon caught up payments for shipments that Dillon Gage had already made and a $3million payment for Dillon Gage to ship against.

Dillon Gage could not have known SCB was "insolvent" because it was not and because SCB's principals never conveyed that message to Dillon Gage. SCB's management believed that SCB was financially viable and able to pay its bills.[182] Joe Frisard believed that SCB was caught up financially with paying Dillon Gage just prior to the Receivership being appointed.[183] SCB's management believed that but for the Receivership stepping in and shutting it down, they would have continued to be a viable entity as SCB's revenue was growing.[184] The appointment of the Receivership caught SCB's management by surprise and effectively shut down a viable company.[185]

In short, Dillon Gage acted diligently by inquiring into SCB's financial status, and Dillon Gage did not find, nor could it have found based on these facts, that SCB was a Ponzi scheme, part of a Ponzi scheme or otherwise insolvent. Dillon Gage acted in good faith with respect to the above-referenced transactions and as such, this Court should deny the Receiver's TUFTA claim for actual fraudulent transfer.

---

[180] *See* Exhibit N, 2012 Terry Hanlon Declaration, at ¶11 (App. 547); *see also* Exhibit O, at ¶ 7 (App. 553); *see also* Exhibit T, at ¶8 (App. 1153).

[181] *See* Exhibit N, 2012 Terry Hanlon Declaration at ¶4 (App. 545); *see also* Exhibit P, at ¶7 (App. 557).

[182] *See* Exhibit O, Joseph Frisard 2012 Declaration, at ¶7 (App. 553);  Exhibit T, 2012 Scott Terry Declaration, at ¶8 (App. 1153).

[183] *See* Exhibit C, Frisard Depo. 47:24-25; 48:1-25; 49:1-13 (App. 50-52).

[184] *See* Exhibit D, Terry Depo. 143:3-9 (App. 73); Exhibit T, 2012 Scott Terry Declaration, at ¶8 (App. 1153).

[185] *See* Exhibit C, Frisard Depo. 85:15-25; 86:1-7 (App. 55-56).

### 3. The summary judgment evidence conclusively establishes that Dillon Gage delivered reasonably equivalent value for the funds it received from SCB.

Dillon Gage provided reasonably equivalent value for the transactions at issue.    The transactions at issue are reflected in five (5) payment vouchers and one inventory sheet from Dillon Gage.[186]  For those transactions reflected in the payment vouchers, Dillon Gage had already shipped gold coins and/or bullion before it received the payments reflected in the vouchers.[187]  For those transactions associated with the February 2, 2009 payment of approximately $3,000,000, Dillon Gage shipped almost $1.8 million worth of gold coins and/or bullion against the $3,000,000.[188] Each of the transactions were based on the spot market price of the precious metal at issue with a margin of 1-2% added to the price.[189]  Each of these sales reflecting a current spot price and the above-stated margin are well within the industry standards and were agreed upon by the parties.[190]

Dillon Gage has established evidence that it shipped to SCB $4,050,593.67 worth of goods in the form of precious metals, rare coins and bullions.[191]  SCB credited these against receivables and therefore reflected the receipt of value.[192]  None of the shipments were returned as undeliverable.[193]

---

[186] *See* Receiver's App. 1171-1175 & Exhibits IF-B – IF-G, Attachment to Ira Fritz 2012 Declaration (App. 159-542).

[187] *See* Exhibit M, Ira Fritz 2012 Declaration, at ¶¶5-7, 9-10 (App. 151-153); *see also* Exhibits IF-B-D and IF-F-G (App. 159-223; 433-542).

[188] *See* Exhibit M, Ira Fritz 2012 Declaration, at ¶8 (App. 152-53); *see also* Exhibit IF-E (App. 234-432).

[189] *See* Exhibit M, at ¶3 (App. 0151); *see also* Exhibit O, ¶8 (App. 0552).

[190] *See* Exhibit M, Ira Fritz 2012 Declaration, at ¶¶5-10 (App. 0151-0153); Exhibit O, Joe Frisard 2012 Declaration, at ¶8 (App. 0552).

[191] *See* Exhibit R, at pgs. 12-13 (App. 0578-0579); *see also* Exhibit R, sub-exhibit 8 (App. 0996-1008)(providing a detailed analysis of the evidence establishing the shipment of each transaction).

[192] *See* Exhibit R, at pgs. 12-13 (App. 0578-0579).

[193] *See* Exhibit M, at ¶¶5-10 (App. 0151-0153).

As such, Dillon Gage provided reasonably equivalent value, by way of delivering to SCB and/or its clients, the goods it purchased.[194]

While SCB received these shipments, it may have been in limbo after the receivership. On February 16, 2009, the Receiver stepped in and froze all of Allen Stanford and his related-entities' assets, including those assets held by SCB. The receiver shut SCB down.[195] The Receiver and Examiner later filed their Joint Motion Regarding Coin and Bullion Assets ("Joint Motion") requesting that some of SCB's frozen assets be released because the assets belonged to SCB's customers.[196]

On January 5, 2010, less than a year after the receiver was appointed, this Court and entered an Order on the Joint Motion.[197] The Order released, among other things, approximately $20 million of coins and bullion stored for 147 customers that SCB held for their benefit, $1million worth of coins and bullion for approximately 70 customers who paid in full prior to SCB's being taken over by the Receiver, and permitted SCB to liquidate $500,000 worth of coins and bullion that SCB held for customers that had not already paid in full for their purchases.[198] Because Dillon Gage shipped the vast majority of the coins and bullion concerning the transactions at issue to SCB prior to the Receiver's appointment, the coins and bullion released by this Court's January 5, 2010 Order certainly included these assets.[199]

---

[194] *See e.g.*, *In re Image Masters, Inc.*, 421 B.R. at 179 (finding "reasonably equivalent value" where for each transfer from the debtor to a defendant, the debtor received in return an equal dollar-for-dollar reduction in liability).

[195] *See* Exhibit M, 2012 Declarations of Ira Fritz, at ¶ 16 (App. 0154).

[196] *See* Cause No. 3:09-CV-00298-N, [Doc. 654].

[197] *See* Cause No. 03:09-CV-00289-N [Doc. No. 943].

[198] *See id.*

[199] *See generally* Exhibit M, 2012 Declaration of Ira Fritz, at ¶¶ 5-10 (App. 0151-0153).

The Receiver contends that Dillon Gage did not give reasonably equivalent value for $1,069,562 that it held after the Receiver stepped in and closed down SCB. The remaining $1,069,562 was not a fraudulent transfer as it was intended for use on future shipments. The unnecessary closing of SCB is what caused the funds to go unused. After the Receiver stepped in, it cancelled the SCB orders that were pending.[200] Dillon Gage returned these funds in Trust for later determination after it learned that there was a dispute between the Receiver and Gagosian Galleries over who owned the proceeds.[201] As such, the Receiver's ownership claims over these proceeds cannot be determined in this lawsuit, as Dillon Gage makes no claim to the funds and has returned them.

## C.   The Receiver is unable to establish its TUFTA claim for constructive fraud.

The Receiver cannot succeed on its constructive fraud claim for two reasons. Initially, and contrary to the Receiver's assertion that the burden is on Dillon Gage, the Receiver has presented no evidence that Dillon Gage did not provide SCB with reasonably equivalent value for the orders at issue. Of the $5.2 million in transactions at issue, Dillon Gage provided reasonably equivalent value for $4,050,593.67.[202] Secondly, Dillon Gage presented evidence that SCB was solvent during the relevant time period for the transactions at issue.[203] Because the summary judgment evidence conclusively establishes these facts, the Receiver cannot succeed with its constructive fraud claim.[204]

---

[200]   Receiver App. 1163-1166 (explaining that Dillon Gage was paying for orders and needed to know if SCB was going to pay for the outstanding orders in light of the Receivership); *see also* Exhibit M, ¶16 (App. 0154).

[201]   *See generally* Exhibit M, ¶¶16-17 (App. 0154-0155).

[202]   Consistent with this Court's July 15, 2011 Agreed Order, Dillon Gage returned $1,069,562.00 to the Receiver. This amount reflected the credit balance of SCB's account with Dillon Gage after SCB's orders were cancelled.

[203]   Dillon Gage incorporates Section III(A)(5) and its evidence herein.

[204]   *See* TEX. BUS. & COM. CODE §24.006.

**D.      The Receiver's Summary Judgment Evidence is Objectionable and Should be Stricken.**

Dillon Gage objects and seeks to strike the Receiver's summary judgment evidence. Specifically, Dillon Gage seeks to strike, either in their entirety or specified parts thereof, the following exhibits:

*1.      Karyl Van Tassel ("Van Tassel") Declarations & Supplemental Declarations:*

- **Receiver's Exhibit 1:**      July 27, 2009 Declaration (Receiver App. 1-67);

- **Receiver's Exhibit 2:**      June 7, 2011, Supplemental Declaration (Receiver App. 68-80);

- **Receiver's Exhibit 3:**      June 1, 2011 Declaration (Receiver App. 81-135);

- **Receiver's Exhibit 4:**      June 2, 2011 Supplemental Declaration (Receiver App. 136 – 1024); and

- **Receiver's Exhibit 23:**      February 10, 2012 Declaration (Receiver App. 1176-1192).

*2.      James M. Davis documents:*

- **Receiver's Exhibit 11:**      Plea Agreement (Receiver App. 1063-1094); and

- **Receiver's Exhibit 12:**      Transcript of Rearraignment (Receiver App. 1095-1123).

*3.      Other Documents:*

- **Receiver's Exhibit 7:**      Telephone Transcript of January 22, 2009 phone call (Receiver App. 1040-1051).

Specifically, the Court should strike the Van Tassel Declarations and Supplemental Declarations, either in specified part or in their entirety, for the following five (5) reasons:

(1)     Van Tassel's Declarations and statements regarding business valuation of various Stanford Entities, and SCB, are unreliable and are therefore inadmissible;

(2)     Van Tassel's balance sheet analysis is flawed and not properly administered;

(3)     Van Tassel's tracing methodology is improper and does not display an accepted methodology or fails to describe sufficiently what methodology was used;

(4)     Van Tassel does not hold the necessary qualifications to offer an opinion on valuation;

(5)     Van Tassel Declarations are riddled with objectionable evidence.

For these reasons, the Van Tassel Declarations and Supplemental Declarations are not proper summary judgment evidence and this Court must strike those identified objectionable parts. Likewise, the Court should strike the James Davis Plea Agreement and Transcript of Rearraignment for the following three (3) reasons:

(1)     Both documents are inadmissible hearsay;

(2)     Davis's plea agreement and rearraignment transcript are irrelevant;

(3)     If the Court finds them to be relevant, their probative value is outweighed by their prejudicial effect.

Accordingly, the Court should strike the James Davis Plea Agreement and Transcript of Rearraignment.  Finally, this Court should strike Receiver's Exhibit 7, the Telephone Transcript, because Plaintiff has not properly authenticated the transcript and it contains some 27 errors – making it unreliable and inadmissible.

For all of these reasons, the Court should grant this Motion, strike the referenced Plaintiff's Summary Judgment Evidence, and deny Plaintiff's Motion for Summary Judgment due to its inability to carry its evidentiary burden of proof.

# IV.   ARGUMENTS AND AUTHORITIES

Evidence on summary judgment may only be considered to the extent that it is not based on hearsay or other information that is inadmissible at trial.[205]   Expert testimony such as these declarations must be reliable to be admissible.[206]   Courts do not consider statements that are conclusory based upon speculation or are simply an expert's *ipse dixit*.[207]   Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence.[208]

Specifically, Fed.R.Civ.P. 702 and 703, as interpreted in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), govern the admissibility of testimony of expert witnesses. Rule 702, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Civ.P. 702.

Accordingly, before allowing expert testimony to be heard, a district court must be assured that the proffered witness is qualified to testify by virtue of his "knowledge, skill, experience, training or education." *Id.* A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject. *Wilson v. Woods,* 163

---

[205]   *See Powell v. Dallas Morning News, L.P.*, 776 F.Supp.2d 240, 246 (N.D. Tex. 2011)(citing *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995).

[206]   FED. R. EVID. 702.

[207]   *Id*. (citing *Brown v. City of Houston, Tex.*, 337 F.3d 539, 541 (5th Cir. 2003)).

[208]   *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir), *cert. denied*, 513 U.S. 871 (1994).

F.3d 935 (5th Cir.1999). The issue is whether a particular expert has "sufficient specialized knowledge to assist the jurors in deciding the particular issues...." *Tanner v. Westbrook,* 174 F.3d 542, 548 (5th Cir.1999) (quoting Kumho, 526 U.S. at 156).

In evaluating the admissibility of expert testimony, the key factors are reliability and relevance. *Daubert,* 509 U.S. at 589 (under Rule 702, expert testimony must be "not only relevant, but reliable"). The relevancy requirement ensures that the expert testimony will actually "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Fed.R.Evid. 401 defines relevant evidence as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *See* Fed. R. Evid. 401.  The reliability requirement ensures that the expert testimony is "supported by appropriate validation" and "establishes a standard of evidentiary reliability." *Id.* at 590. This determination requires the court to assess "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 593. To assist courts in this determination, the Supreme Court has suggested that trial courts examine a nonexclusive list of factors including whether a theory or technique has or can be tested, published, subjected to peer review, has or can be subjected to standards controlling its operation, the known or potential rate of error, and whether the theory or technique is generally accepted. *Id.* at 593–94. The Court has also instructed trial courts to "be mindful of other applicable rules," such as Rules 703, 706, and 403, when determining the admissibility of expert testimony. *Id.* at 595.

*Kumho* stressed that the *Daubert* factors may be relevant to the reliability of experience-based testimony. The overarching goal of *Daubert's* gate-keeping requirement, however, is to ensure the reliability and relevancy of expert testimony and to make certain that an expert, whether basing

testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. *Kumho Tire*, 526 U.S. at 152. The party offering the expert testimony has the burden of establishing that it is admissible under Rule 702 and the *Daubert–Kuhmo* standard. *See Kumho Tire,* 526 U.S. at 147; *see also Matins v. Exxon Corp.,* 302 F.3d 448, 459–460 (5th Cir.2002).

A.      **The Court should strike the Van Tassel Declarations.**

      1.      ***Van Tassel's Declarations and statements regarding business valuation of various Stanford Entities, and SCB, are unreliable and are therefore inadmissible.***

Van Tassel's declaration regarding SCB's solvency is not based on reliable principles and methods.   Namely, Van Tassel utilizes "book value" to value SCB and determine that it is "insolvent."   In her deposition of June 5, 2012, she states as follows:

129

```
 9       Q.  All right.  Okay.  In your conclusion in
10   Exhibit 3 where you say SCB was insolvent -- its
11   liabilities exceeded its assets -- is the valuation that
12   you use for assets book value?
13       A.  It may not be book value.  It would be -- it
14   would be the book value, which may be lower of the cost
15   or market.
16       Q.  Okay.
17       A.  And if I could point out, it says my analysis
18   of the insolvency is set forth in the paragraphs that
19   follow.  That's why I believe Paragraphs 7 and 8 are
20   very much a part of my insolvency analysis.
21           MR. LeMAY:  Move to strike that last part.
22       Q.  (BY MR. LeMAY)  So you're saying that the
23   asset -- the value of assets that you used in your
24   insolvency analysis was either book value or lower?
25       A.  Well, it would be book value, which may not be
```

130

```
 1   cost.[209]
```

---

[209] Exhibit S, French Declaration, pp. 23-24 (App. 1073-1074).

Van Tassel makes it clear that when examining the insolvency of SCB, she is using book value to make her determination.[210]  When discussing SIB and SFGC in her Declarations, she utilized the same methodology that she did when she analyzed SCB.[211]

When valuing a business, accounting book value is not a reliable methodology.  In fact, it is not a recognized methodology at all.  According to Shannon P. Pratt, an authority that Van Tassel utilized and has recognized as "providing guidance" in the area of business valuation,[212] book value is "not a valuation method at all."  In his 2008 book, VALUING A BUSINESS:  THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES, Pratt states:

> It is important to distinguish between the application of any asset-based approach valuation method and simple reliance on accounting "book value" to conclude a value estimate.  Under any standard of value, the true economic value of a business enterprise equals the company's accounting book value only by coincidence.  More likely than not, the true economic value of a company will either be higher or lower than its accounting book value.  There is no theoretical support, conceptual reasoning, or empirical data to suggest that the value of a business enterprise (under any standard of value) will necessarily equal the company's accounting book value.
>
> From a valuation perspective, the terms *book value* or *net book value* are merely accounting jargon.  Net book value (often called book value, in the vernacular) is synonymous with the amount of owners' equity recorded on the company's cost-basis balance sheet.
>
> In any event, accounting book value is not a recommended business valuation method.  In fact, accounting book value is not a business valuation method at all….  The values presented on the cost-basis balance sheet are usually not representative of a current economic value for business valuation purposes.  Also, there may be one or more intangible asset accounts or continent liability accounts that should be considered in a business valuation – but that are not presented on a cost-basis balance sheet at all.[213]

---

[210] *Id* (App. 1073-1074).

[211] *See id.*, p. 6 (App. 1056).

[212] *See id.*, pp. 10-11 (App. 1060-61).

[213] Exhibit S, App. 1061, para. 18; *see also* Shannon P. Pratt, Alina V. Niculita, VALUING A BUSINESS THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES, 351-352 (5th Ed. McGraw Hill 2008).

It is clear that the methodology that Van Tassel utilized to provide a specific value to SCB and several Stanford Entities is not supported by any of the kinds of data and reliability required by the Federal Rules of Evidence.

Further, Van Tassel's SCB solvency declarations were not in accordance with applicable professional standards or in accordance with the Texas State Board of Public Accountancy Rules of Professional Conduct. Specifically, Van Tassel made a $250,000.00 deduction from her asset/liability calculation based on a determination that the deducted funds were proceeds of a Ponzi scheme.[214] While Van Tassel claims that this deduction is proper according to GAAP, she cites no specific standard, nor can any such standard be located.[215] In addition, as summarized in the chart below, Van Tassel fails to implement reliable methodology throughout the declarations.

| EXHIBIT/APPENDIX REFERENCES: | SUMMARY OF OBJECTIONABLE PORTIONS: | APPLICABLE OBJECTION/ GROUND TO STRIKE: |
|---|---|---|
| Exhibit 1 (Rec. App. 11), ¶31. | The methodology used to CD purchase in U.S. Dollars was to review "approximately 33% of the commercial deposits reflected on the Trustmark 1707 account…for the period of time of January 1, 2008 through February 17, 2009." | **FRE 702:** There is no description as to what method was used to partition out the 33% of commercial deposits. |
| Exhibit 1 (Rec. App. 13), ¶33. | The methodology used to determine that a majority of funds come directly or indirectly from CD sales is described as the same methods "described above" and "additional analysis of data relating to SIB's primary operating accounts." | **FRE 702:** It is impossible to determine if the testimony is the product of reliable principles and methods when the only description is "additional analysis of data." |
| Exhibit 1 (Rec. App. 17), ¶41. | The methodology used to analyze checks written from the | **FRE:** There is no description as to what percentage of checks |

---

[214] Exhibit S, App. 0165, para. 67.

[215] Exhibit S, App. 1067, para. 27.

| | Trustmark 1558 account was to "review[] approximately 300 checks written to the Trustmark 1558 account." | the "300 checks" represent and how those 300 checks were selected for review. |
|---|---|---|
| Exhibit 2 (Rec. App. 75), ¶9. | The methodology is the same as described in Exhibit 1 (Rec. App. 11), ¶31 (objected to above), except for an inconsistent statement that only 30% of the commercial deposits were reviewed instead of the previously testified to 33%. | **FRE 702:** There is no description as to what method was used to partition out the 30% of commercial deposits and no consistency with prior testimony as to the method used. |
| Exhibit 3 (Rec. App. 95), ¶22. | The methodology used to determine that from at least 2004 proceeds from the sale of new CDs was used to make interest and principal payments is described in whole as "[b]ased on FTI's analysis to date." | **FRE 702:** It is impossible to determine if the testimony is the product of reliable principles and methods when the only description is "based on…analysis to date." |

Van Tassel's methodology for valuing a business is not reliable and this Court should strike her testimony regarding valuation and insolvency.[216]

## 2)      Van Tassel's balance sheet analysis is flawed and not properly administered.

Van Tassel did not follow any generally accepted methodology when conducting an asset approach valuation through a balance sheet approach.  Van Tassel's balance sheet approach was faulty based on lack of completeness.

Further, Van Tassel failed to consider off-balance-sheet assets such as goodwill.  The "[p]roper application of an Asset Approach based valuation requires the valuation analyst to consider

---

[216] *See* FED. R. CIV. P. 702.

off-balance-sheet assets such as goodwill."[217]  In the face of this standard, Van Tassel seems to have

no awareness of this component to the standard valuation analysis:

> "1    A.  How are you defining "goodwill"?
> 2    Q.  In the accounting sense.
> 3    MR. ARLINGTON:  Objection, vague and
> 4    ambiguous.
> 5    A.  _I have not done an independent evaluation of_
> 6    _goodwill or other assets._
> 7    Q.  (BY MR. LeMAY)  Why?
> 8    A.  _Because it wasn't necessary for my analysis._
> 9    Q.  _Why do you believe that?_
> 10   A.  _Because this was a business that, for purposes_
> 11   _of -- of what I needed to show, was insolvent, based_
> 12   _upon its financial information and other various_" [218]

In light of Van Tassel's failure to properly apply generally accepted methodology, the Court

should strike Van Tassel's opinion and disregard any conclusions derived from her balance sheet

analysis.

### 2.    Van Tassel's tracing methodology is flawed and does not display an accepted methodology and/or fails to describe sufficiently what methodology was used.

Van Tassel methodology as to the tracing of funds in order to determine what level of funds

derived from the sale of CDs either does not adhere to generally acceptable methodology or is not

described sufficiently to determine whether or not her methodology is acceptable.  Van Tassel's

complete description of her methodology is that she reviewed "checks representing approximately

30% of the commercial deposits reflected on the Trustmark 1707 account."[219]  Accordingly, Van

Tassel finds as her opinion that "the vast majority, over 98% of those checks corresponded to a

---

[217] Exhibit S, App. 1072-1073, para. 37 (citing Shannon P. Pratt, Alina V. Niculita, VALUING A BUSINESS THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES, 351-352 (5th Ed. McGraw Hill 2008).

[218] Exhibit S, App. 1073, para. 38 (emphasis added)(citing Oral Videotaped Deposition of Karyl Van Tassel, dated June 5, 2012, page 95, lines 21 through 25; page 96, lines 1 through 12).

[219] _See_ Exhibit 2, Rec. App. 75, para. 9.

specific purchase identified in the SIB CD sales records"[220]   However, Van Tassel gives no information regarding how the checks were collected and compiled.  As explained in the French Declaration, "[o]ne of the most important…rules [in statistical sciences] require[s] that the sample be randomly drawn."[221]   The French Affidavit explains further that " The sample needs to be a good representation of the study population (the population to which the results are meant to apply), in order for the researcher to be comfortable using the results from the sample to describe the population.  If the sample is biased, meaning that in some systematic way it is not representative of the study population, conclusions drawn from the study sample may not apply to the study population."[222]   Once again, based on Van Tassel's failure to properly apply a reliable methodology in formation of her opinions, the Court should strike Van Tassel's opinion.

### 3.     *Van Tassel does not hold the necessary qualifications to offer an opinion on valuation.*

While Van Tassel is a CPA, she has no specialty in valuation – the very issue to which she is forming an opinion.  As stated in the French Declaration, "Ms. Van Tassel does not indicate that:

a) she holds any valuation related credentials,
b) or belongs to any valuation credentialing organizations,
c) or has completed any valuations related course work requiring written examination, and
d) she also does not make any mention of the applicable required professional AICPA Valuation Standards."[223]

Without any experience or specialization in the central issue of her opinion, Van Tassel lacks the qualification to offer an opinion and the Court should exclude her opinion on this basis alone.

---

[220] *Id.*

[221] Exhibit S, App. 1075, para. 44.

[222] *Id.* (citing Statistics In a Nutshell, Sarah Boslaugh & Paul Andrew Watters, Bias in Sample Selection and Retention, page 15).

[223] Exhibit S, French Declaration, App. 1057, para. 10.

**B.      This Court should strike James M. Davis's Plea Agreement and the Transcript of his Rearraignment because they are hearsay, irrelevant, and their probative value are outweighed by their prejudicial effect.**

In support of its summary judgment motion, the Receiver relies upon James M. Davis's Plea Agreement[224] and the Transcript of his Rearraignment.[225]   The Receiver relies upon Davis's statements for the proposition that the "Stanford enterprise was a ponzi scheme from the beginning."[226]   The Court should strike Davis's Plea Agreement because it constitutes inadmissible hearsay, is irrelevant and its probative value is outweighed by its prejudicial effect.

**1.      Davis's plea agreement constitutes inadmissible hearsay.**

In an effort to paint SCB with the same brush as SIB, the Receiver relies upon the plea agreement of James Davis to establish that the "Stanford enterprises" were a Ponzi scheme.  Davis's Plea implicates several individuals other than him and was offered in exchange for a reduction in his criminal liability.[227]   A plea agreement is simply an agreement between a defendant and the government.[228]   It is neither a final judgment, nor a plea of guilty.[229]   As a matter of law, a plea agreement on its face is inadmissible hearsay and that, subject only to an applicable hearsay exception, is not summary judgment evidence.[230]

---

[224]   *See* Receiver Exhibit 11 (Receiver App. 1063 – 1094).

[225]   *See* Receiver Exhibit 12 (Receiver App. 1095 – 1123).

[226]   *See* Receiver's Brief in Support of its Motion for Summary Judgment, at 6.

[227]   *See Pendergast-Holt*, 751 F.Supp.2d at 890 n.52; see also Receiver Exhibit 11 (Receiver App. 1074).

[228]   *See Hartford Fire Ins. Co. v. Clark*, 727 F.Supp.2d 765, 781 (D. Minn. 2010).

[229]   *See id.*

[230]   *See, e.g., In re Slatkin*, 525 F.3d 805, 811 (9th Cir. 2008)(holding in context of a Ponzi scheme case that the plea agreement of the responsible party was hearsay, but ultimately admissible in that case under a hearsay exception-Fed. R. Civ. P. 807); *Clark*, 727 F.Supp.2d at 780-781 (D. Minn. 2010) (holding that a plea agreement is hearsay and cannot be admitted into evidence to prove the truth of the matters asserted therein without a hearsay exception). Curiously, the Receiver cites the *Slatkin* case as authority in support of admitting Davis's plea agreement.  *The In re Slatkin* court admitted Slatkin's plea agreement under Federal Rule of Evidence 807 as it related to Slatkin's conduct. Here, unlike Slatkin's plea agreement that went directly to the heart of the issues in his case, Davis's plea agreement

---

The Receiver may contend that Davis's plea agreement and plea transcript have been admitted in related Stanford litigation and therefore should be admitted in this case.  A reading of these cases, however, strongly weighs against the admission of Davis's documents in this instance. In *Pendergast-Holt*, the court determined that those parts of Davis's plea and transcript that incriminated him were admissible under hearsay exception Federal Rule of Evidence 803(b)(3) "for limited purposes."[231]  The court held, however, that "to the extent Davis describes others' conduct, particularly that which is incriminating, the statements are not received in evidence.  These statements, whether true or not, are efforts to cooperate with the Government and thus reduce Davis's exposure to prison."[232]  Here, the Receiver relies on the plea agreement and transcript for the purpose of establishing that the Stanford entities, presumably including SCB, were part of a Ponzi scheme. Permitting the plea agreement and transcript to be utilized for that purpose would be inconsistent with *Pendergast-Holt*.  For these reasons, the Court should hold that the Davis Plea Agreement is inadmissible hearsay and strike it from the record.

> **2.      *Davis's plea agreement and rearraignment transcript are irrelevant and the Court should strike them.  Alternatively, if the Court finds them to be relevant, their probative value is outweighed by their prejudicial effect and therefore this Court should strike them.***

This Court must strike Davis's plea agreement and rearraignment transcript because they are irrelevant and inadmissible.  Evidence that is not relevant is not admissible.[233]  The Federal Rules of Evidence provide that "[r]elevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less

---

does not go to a material fact related to Receiver's Motion for Summary Judgment, i.e., whether SCB was part of a Ponzi scheme.

[231]  *Pendergast-Holt*, 751 F.Supp.2d at 890 n.52.  (holding also that Davis's plea is not a statement of the United States Government so Fed. R. Evid. 803(8) is inapplicable).

[232]  *Id.*

[233]  *See* FED. R. EVID. 402.

probable than it would be without the evidence."[234]  Evidence determined to have some relevance may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or is misleading.[235]

Davis's plea agreement and rearraignment transcript are irrelevant because they address <u>his</u> criminal conduct, and that of his alleged co-conspirators, while working with various Stanford entities <u>other than SCB</u>.  Specifically, his plea agreement and transcript go to his conduct at Stanford International Bank, Ltd. ("SIBL") and Stanford Financial Group ("SFG").[236]  His plea agreement, and transcript, lay out detailed facts concerning SIBL's scheme to promote the sale of SIBL's Certificates of Deposit ("CD") to investors, but make no reference whatever to SCB and its role, if any, in SIBL's scheme.[237]  The conduct discussed in the plea agreement, and summarized in the transcript, neither addresses SCB directly in any way, nor does it attribute any conduct to SCB.  Rather, the testimony focuses on Davis and his co-conspirators relative to their efforts to promote the sale of SIBL's CDs to investors.  As such, the plea agreement and transcript have no tendency to demonstrate that SCB was part of a Ponzi scheme or, more specifically, that SCB was a Ponzi scheme.  For these reasons, the Court should hold that the Davis's Plea Agreement and Rearraignment Transcript are irrelevant and therefore inadmissible.[238]

In the unlikely event the Court determines that the Davis plea and rearraignment transcript are relevant, the Court should nonetheless strike the evidence because its probative value is

---

[234] *See* FED. R. EVID. 401.

[235] *See* FED. R. EVID. 403.

[236] *See* Receiver's Exhibit 11 (Receiver App. 1075-1082).

[237] *See id.*

[238] *See* FED. R. EVID. 401.

substantially outweighed its prejudicial effect.[239]  Unfair prejudice, in this context, has been defined to mean "an undue tendency to suggest [a] decision on an improper basis, commonly, though not necessarily, an emotional one."[240]  While all evidence is prejudicial, it is considered unfairly prejudicial if it "appeals to the jury's sympathies, arouses its sense of horror, provokes its instincts to punish, or triggers other mainsprings of human action."[241]  Evidence is particularly prejudicial when "the proffered evidence connects a party with a highly charged public issue."[242]

As is outlined in the relevance discussion above, Davis makes no mention of SCB in his plea or testimony.  Instead, he focuses on his misconduct, and the alleged misconduct of others, during his involvement with SIBL and Stanford Financial Group ("SFG").  His admissions regarding fraudulent conduct related to duping investors into investing in SIBL's CDs makes no reference to, and does not directly or indirectly implicate, SCB.  His admissions include discussions of bribery of public officials in Antigua, SIBL making personal loans made the Alan Stanford of at least $2 billion, and a routine practice of fraudulent reporting and concealed bank statements that in no way are related to or concerning SCB.  The Receiver has attempted to utilize these facts to taint SCB and paint it with the same brush as SIBL and SFG.  The Receiver's use of this evidence is an attempt to create "guilt by association" with the alleged Stanford Ponzi scheme.  Such misuse of evidence is precisely what Rule 403 was designed to prevent.  This Court should determine that the David Plea Agreement and Re-arraignment transcript are inadmissible summary judgment evidence because its prejudicial effect outweighs any of its substantially lacking probative value.

---

[239] *See* FED. R. EVID. 403.

[240] *See U.S. v. Blackstone*, 56 F.3d 1143, 1146 (9th Cir. 1995).

[241] *See id*.

[242] *See id*.

**C.**   **Because the Telephone Transcript relied upon by Plaintiff is not properly authenticated and contains some 27 errors, it is inadmissible and this Court should strike it from the record.**

It is well-settled law that authentication is a precondition to the admissibility of documents to be utilized as evidence.[243]   Moreover, as stated below and in Defendants' interrogatory responses, the telephonic transcript errors are as follows:[244]

| Page/Line: | Nature of Defect: |
|---|---|
| File Name | Incorrect file name. |
| Pg. 1, ln.25 | Uses "mean" rather than "think." |
| Pg. 1, ln. 29 | Omission "You know," before beginning of sentence. |
| Pg. 2, ln. 20 | Omission "You know," before beginning of second sentence. |
| Pg. 3., ln. 2 | Includes "an" and omits "a" after "effectively." |
| Pg. 4, ln. 21. | Omits "um" at end of line. |
| Pg. 5, ln. 9 | Adds "given" and omits "in" instead. |
| Pg. 5, ln. 9 | Adds "who" and omits "where" instead. |
| Pg. 5, ln. 22 | Omits "you know" after comma. |
| Pg. 6, lns. 5-6 | Erroneously includes "since we have been together now" after hyphen. |
| Pg. 6, ln. 8. | Erroneously includes "that". |
| Pg. 6, ln. 16. | Adds "that" where it should have "who" |
| Pg. 6, ln. 24 | Omits "I mean" after comma. |
| Pg. 7, ln. 1 | Adds "I mean" where it should have "you know" |
| Pg. 7, ln. 2 | Omits "just" after "We're". |
| Pg. 7, ln. 5. | Erroneously includes "to speed up the process" when it should say "you." |
| Pg. 7, ln. 26. | Adds "it will" when it should say "to" |
| Pg. 7, ln. 28 | Omits "as" after "sometimes' and ads "to" when it should say "as." |
| Pg. 8, ln. 2. | Omits "You know" from the beginning of sentence. |
| Pg. 8, ln. 8 | Omits "Umm" between sentences. |
| Pg. 8, ln. 12. | Erroneously includes "to give you" and omits "that so you'll have" |
| Pg. 9, ln. 2. | Adds "have" when it should say "got". |
| Pg. 9, ln. 7. | Adds "we" instead of "we've" |
| Pg. 9, ln. 17 | Omits "you know" after comma. |

---

[243]   FED. R. EVID. 901(a).

[244]   *See* Receiver Exhibit 7 (Receiver App. 1040-1051).

| Page/Line: | Nature of Defect: |
|---|---|
| Pg. 10, ln. 4. | Adds "That would" instead of "Not to" |
| Pg. 10, ln. 19. | Erroneously adds "to" after "frame" |
| Pg. 10, ln. 23. | Omits "Alright" from beginning of sentence. |

Because the above-identified documentary evidence is not properly authenticated and is incorrect in at least twenty-seven (27) ways, it is not competent summary judgment proof;[245] and this Court must grant this Motion to Strike.

## V.   CONCLUSION

WHEREFORE PREMISE CONSIDERED, Defendants Dillon Gage pray this Court deny Plaintiff's motion for summary judgment as more specifically argued above and grant Defendants Dillon Gage any and all other relief to which it may be entitled.

Respectfully submitted,

**KANE RUSSELL COLEMAN & LOGAN PC**

By: /s/ Robert N. LeMay
        Kenneth C. Johnston
        State Bar No. 00792608
        Robert N. LeMay
        State Bar No. 12188750
        Richard Hathaway
        State Bar No. 24032278
        Joseph A. Hummel
        State Bar No. 24056879

        3700 Thanksgiving Tower
        1601 Elm Street
        Dallas, Texas   75201
        (214) 777-4200 (telephone)
        (214) 777-4299 (facsimile)

        **ATTORNEYS FOR DEFENDANT DILLON GAGE, INC. OF DALLAS D/B/A THE DILLON GAGE GROUP AND D/B/A DILLON GAGE METALS**

---

[245] FED. R. CIV. P. 56(c)(4).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing has been served via the Court's ECF System on this 20th day of June, 2011.

/s/ Robert N. LeMay
Robert N. LeMay