# ORIGINAL



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JUL - 6 2015

CLERK, U.S. DISTRICT COURT
By_____
Deputy

|  |  |  |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. | § § § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No. 03:10-CV-1973-N-BG |
| DILLON GAGE INC. OF DALLAS and DILLON GAGE INC. | § § § | |
| Defendants. | § § | |

---

## JOINT PRETRIAL ORDER

---

Plaintiff Ralph S. Janvey (the "Receiver") and Defendants Dillon Gage Inc. of Dallas and

Dillon Gage Inc. (together "Dillon Gage"), by their respective undersigned attorneys,

respectfully submit this Joint Pretrial Order pursuant to the Court's Scheduling Order (Doc. 87)

and the Joint Agreement and Stipulation Regarding Certain Pretrial and Trial Matters dated May

11, 2015 (Doc. 128).

Certain sections below have been submitted by, and represent the position of, only the

party whose name or designation is indicated in the section heading.  The signatures of counsel

below do not constitute agreement with, or admission or adoption of, any portion of this Order

submitted individually by another party to this action.

## A. SUMMARY OF THE CLAIMS AND DEFENSES OF EACH PARTY

### *The Receiver's Statement of His Claims*

The Receiver brought this suit to recover more than $5 million in payments that Dillon Gage accepted from Stanford Coins and Bullion, Inc. ("SCB") after it knew that SCB was insolvent. Because SCB was insolvent, and because SCB was part of the insolvent Stanford Ponzi scheme, the transfers were actually fraudulent under TUFTA. Moreover, Dillon Gage did not accept the transfers in good faith because it knew or should have known that SCB was unable to pay its debts as they became due, had lost access to cash and credit from other Stanford companies, and was diverting money from customer orders. Dillon Gage also failed to provide reasonably equivalent value for the transfers it received. It would also be unjust for Dillon Gage to retain the funds it took under these circumstances.

This case arises out of the multi-billion dollar Stanford Ponzi scheme perpetrated by R. Allen Stanford and others through a network of at least 130 entities (the "Stanford Entities") (collectively, "Stanford") in 14 countries for almost two decades. Stanford's core objective was to sell fraudulent certificates of deposit ("CDs") issued by Stanford International Bank, Ltd. ("SIB"). Stanford achieved and maintained a high volume of CD sales by promising above-market returns and falsely assuring investors that the CDs were backed by safe, liquid investments. In reality, however, the Stanford enterprise operated as a classic Ponzi scheme. It used funds from the sale of new CDs ("CD proceeds") to make purported principal and interest payments to existing CD investors. The principals of the Stanford Ponzi scheme also diverted CD proceeds to other unauthorized purposes, including funding Allen Stanford's luxurious lifestyle and financing the operations of other Stanford Entities, including SCB. Stanford operated all of the Stanford Entities as an integrated unit in order to perpetuate its massive

worldwide fraud. Each Stanford Entity either participated in, derived benefit from, or lent the appearance of legitimacy to the Stanford Ponzi scheme. The Stanford Ponzi scheme was insolvent from at least 1999 forward.

One of the Stanford Entities was SCB. SCB dealt in rare coins and precious metals, which it purchased from suppliers and resold to customers. SCB was part of Stanford's network of companies and was one of the Stanford Entities that made up the Ponzi scheme. SCB was touted in Stanford's literature and advertising as being an integrated part of the global Stanford Financial Group. SCB was financially dependent on other Stanford Entities and was given periodic infusions of cash from other Stanford companies, including money derived from the sale of CDs by the Ponzi scheme. SCB engaged in cross-marketing with other Stanford Entities, shared customers with other Stanford Entities, and assisted SCB customers with the purchase of Stanford CDs. SCB was thus a participant in the scheme, benefitted from the scheme, and provided legitimacy to the scheme.

SCB's primary supplier of precious metals and coins was Dillon Gage. SCB regularly ordered from Dillon Gage, either for specific items needed to fulfill orders by SCB customers or for items that SCB would hold in inventory for potential sales. Dillon Gage extended SCB credit for its purchases, with an initial limit of $500,000 that was later extended to $1,000,000. In late 2008, Dillon Gage even allowed SCB to exceed its already increased credit limit by another 100%, up to $2 million. As SCB's primary supplier, Dillon Gage wielded considerable leverage over SCB and had access to inside information about SCB's operations.

SCB frequently was late on payments to Dillon Gage and exceeded its credit limit. In one notable example, Dillon Gage threatened to cut off shipments to SCB in May 2008 unless its accounts were brought current. SCB then requested and obtained $500,000 from SIB that was

used to pay Dillon Gage for past-due orders.  In the words of Dillon Gage president Terry Hanlon, SCB again fell "woefully" behind on its payments beginning in December 2008 and continuing through early 2009.   During that same time frame, SCB lost its access to cash and credit from other Stanford entities, because the Ponzi scheme was running low on cash and liquid assets as it neared collapse.  At that time, SCB owed Dillon Gage more than $2.3 million for orders already placed but not paid, and some of these invoices were extremely overdue.  By Dillon Gage's own account, SCB's failure to pay on time was a "real red flag," particularly when combined with the total amount of money owed.  Because of SCB's mounting pile of overdue invoices and the length of time those invoices had been outstanding, Dillon Gage cut off shipments to SCB in January 2009.

Dillon Gage then engaged in a series of communications with SCB that put Dillon Gage on notice that SCB was insolvent.  First, Dillon Gage's president, Terry Hanlon, flew to Houston to discuss SCB's past-due debts.  He met with SCB representatives in Stanford's headquarters in Houston, Texas.  During that visit and in a series of phone conversations two days later, SCB officials told Dillon Gage that: (1) SCB lacked cash to pay its bills, (2) SCB used SIB as its primary credit facility, (3) SIB had recently cut off access to those funds and credit and had emptied the account used to provide cash to SCB, and (4) SCB was planning to divert funds from a new customer's large order and use those funds to pay Dillon Gage for other orders, rather than using the funds to obtain golds bars to satisfy the new customer's order.  Dillon Gage also knew that SCB was not generally paying its debts as they became due.  Dillon Gage put a freeze on all new shipments and orders until SCB paid off its existing debts.

SCB officials told Dillon Gage in January that they hoped to make a large sale of gold bars to an SCB customer that would bring in approximately $3 million (SCB's cost for the gold

bars plus a modest SCB fee).  Several days later, SCB placed an order with Dillon Gage for approximately $3 million in gold bars and wired the full price of the invoice for the gold bars. The wire instructions from SCB directed that the money was to be used to purchase the gold bars.  But Dillon Gage did not use that money to purchase the gold bars.  Instead, it applied most of that money to SCB's prior outstanding orders, resumed shipping products for those orders, and left the remainder on its books as a "credit" in favor of SCB.  This so-called credit was insufficient to cover the cost of the gold bar order, and Dillon Gage refused to ship the gold bars until it was paid in full.  But SCB lacked sufficient additional funds to pay, and Dillon Gage knew this.

Despite knowing of SCB's insolvency and its diversion of money from another customer's order, Dillon Gage continued to accept new orders from SCB over the next several weeks.  In addition to the approximately $3 million payment for the gold bars, SCB sent five other payments to Dillon Gage between January 22 and February 16, 2009.  The total amount transferred by SCB to Dillon Gage after January 22, 2009—the date on which Dillon Gage unquestionably knew or should have known that SCB was insolvent—was $5,120,155.67.

On February 16, 2009, the SEC filed its lawsuit against R. Allen Stanford, James Davis, Laura Pendergest-Holt, SIB, Stanford Group Company, and Stanford Capital Management, LLC. That same day, the Court appointed Plaintiff Ralph S. Janvey as Receiver for the Stanford Estate and its assets, which included all corporate entities owned, either directly or indirectly, by Allen Stanford, including, but not limited to, SCB.  By this time, SIB's obligations to CD holders exceeded $7 billion, while the assets of all of the Stanford Entities (including SIB) totaled less than $1 billion.  The Court directed the Receiver to marshal and take custody of the estate and its

assets, so that a "maximum . . . disbursement" could eventually be made to compensate Stanford's defrauded creditors.

In the course of the Receiver's investigation, he discovered the fraudulent transfers to Dillon Gage that occurred between January 22 and February 16, 2009. The Receiver filed this lawsuit on September 30, 2010, seeking to recover the transfers to Dillon Gage under the Texas Uniform Fraudulent Transfer Act ("TUFTA") or, in the alternative, the doctrine of unjust enrichment.

Under TUFTA, a creditor of a debtor can void a transfer between the debtor and a third-party if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor." TEX. BUS. & COM. CODE § 24.005(a)(1). The Receiver has filed claims to recover at least $5,120,155.67 in transfers that Stanford made to Dillon Gage. The Receiver is entitled to recover those payments because SCB was insolvent and acted with such actual intent when it transferred the money, making the payments fraudulent under TUFTA. *See id.* Moreover, SCB was part of the Stanford Ponzi scheme, and transfers by a Ponzi scheme are made with fraudulent intent as a matter of law. *See, e.g., Janvey v. Golf Channel*, 780 F.3d 640, 644 (5th Cir. 2015). Therefore, in order to avoid a judgment in favor of the Receiver, Dillon Gage has the burden of proving its affirmative defense under TUFTA by showing *both* that it took the transfers in good faith *and* that it received the transfers in exchange for reasonably equivalent value. *See* TEX. BUS. & COM. CODE § 24.009(a). Dillon Gage cannot avoid liability by satisfying only one prong of its affirmative defense.

Dillon Gage cannot establish TUFTA's affirmative defense. First, Dillon Gage cannot prove that it received the transfers in good faith, because it knew or should have known that SCB was insolvent when it accepted the money. Under TUFTA, "[a] debtor is insolvent if the sum of

the debtor's debts is greater than all of the debtor's assets at a fair valuation"; "[a] debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent"; and "[a]ssets . . . do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable[.]" Tex. Bus. & Com. Code § 24.003. Dillon Gage—SCB's primary supplier—knew that SCB was generally not paying its debts as they became due, knew that SCB's cash and credit from other Stanford companies had been shut off, and knew that SCB was diverting money from customer orders. Dillon Gage also knew that Dallas Gold & Silver Exchange ("DGSE") had been cut off from its Stanford credit line in January 2009. Dillon Gage thus had actual knowledge that SCB was insolvent, and it will not be able to overcome the statutory presumption that SCB was insolvent. Given its knowledge of SCB's insolvency, it is not necessary to also show that Dillon Gage knew or should have known about the underlying Stanford Ponzi scheme. At a minimum, Dillon Gage knew or should have known of facts and red flags indicating that SCB was insolvent and used this knowledge to squeeze further payments from SCB, to the detriment of Stanford's creditors. Dillon Gage's objective knowledge and actions, therefore, negate any claim of good faith.

Dillon Gage also did not provide reasonably equivalent value for the transfers it accepted. Value is assessed from the perspective of Stanford's creditors, not from that of a buyer in the marketplace. *Golf Channel*, 780 F.3d at 645. First, Dillon Gage has admitted that it did not ship products equal to $5,120,155.67 in exchange for the transfers—it claims that SCB ended up with a "credit" of $1,069,562 for which no products were shipped. Second, Dillon Gage admits that it never shipped the 100 gold bars for which SCB designated approximately $3 million of the transfers. Dillon Gage, instead, applied funds from that $3 million payment to orders on which

products had not yet been shipped and, therefore, that payment did not satisfy any antecedent debt.  Third, because Dillon Gage did not accept the transfers in good faith, it cannot claim a reduction in liability for the value of any goods that it did ship.  *See* TEX. BUS. & COM. CODE § 24.009(d)(1).  And fourth, Dillon Gage has never performed the necessary valuation to meet its burden to show that the items it claims to have shipped in response to the disputed transfers were actually worth the $4,050,539.67 SCB paid.  Without such a valuation, it is impossible for Dillon Gage to satisfy its burden to show that what it allegedly provided in exchange for the fraudulent transfers was reasonably equivalent from the perspective of Stanford's creditors.

Additionally, because Dillon Gage did not accept the transfers from the Ponzi scheme in good faith and given its conduct despite its knowledge of SCB's financial problems, Dillon Gage wrongfully secured or passively received a benefit that it would be unconscionable for Dillon Gage to retain.  Such benefit was obtained by the taking of undue advantage on account of Dillon Gage's financial chokehold over SCB as its primary supplier.  Accordingly, and in the alternative to his TUFTA claim, the Receiver is also entitled to recover the transfers to Dillon Gage as a remedy to prevent unjust enrichment.

The Receiver is entitled to recover his costs and attorneys' fees from Dillon Gage under TUFTA.  *See* TEX. BUS. & COM. CODE § 24.013.  The amounts of such costs and attorneys' fees will be submitted via post-judgment briefing in accordance with the Federal Rules.

### Dillon Gage's Statement of Claims and Defenses

This case does not arise out of the Stanford Ponzi scheme.  It arises out of the Receiver's suit to claw back six payments that SCB, an entity that did not operate as part of the Stanford Ponzi scheme, made to Dillon Gage, a third-party vendor, for the purchase of coins and bullion

from which SCB earned legitimate profits that benefitted SCB's creditors (or would have, but for the Receiver shuttering SCB's business).

In January and February of 2009, SCB made six payments to Dillon Gage totaling $5,124,425.67 in exchange for (1) the satisfaction of antecedent debt that SCB incurred in the course of arm's-length purchases of coins and bullion from Dillon Gage; (2) coins and bullion reasonably equivalent in value to the amount invoiced to SCB for the same; and (3) executory contracts under which SCB acquired the future right to purchase coins and bullion at a set price. At the time of the transfers, SCB was not insolvent, and did not otherwise make the transfers with actual fraudulent intent. Nor can fraudulent intent be presumed: SCB operated as a legally separate entity, was not itself a Ponzi scheme, and did not exist to promote, expand, or support a Ponzi scheme.

Even if SCB were found insolvent or part of the Stanford Ponzi scheme, Dillon Gage was not and should not have been on notice of either circumstance, and accepted the transfers from SCB in good faith. Dillon Gage also provided reasonably equivalent value to SCB in exchange for the transfers through the satisfaction of antecedent debt, contemporaneous transfer of coins and bullion reasonably equivalent in value to the amounts paid for the same, and future economic opportunity. SCB did not make the transfers with the intent of hindering, delaying or defrauding creditors, but to earn profits with which to pay its creditors. Not one of these transfers was fraudulent.

Dillon Gage, Inc. of Dallas is a wholesaler of coins and bullion. From 1999 until shut down by the Receiver in February of 2009, SCB operated as a retailer of rare coins and bullion, selling these hard commodities to collectors, numismatists, investors, and dealers. SCB's business model was that of a traditional retail merchant: it bought coins and bullion wholesale

and sold them at a retail mark-up.  SCB did not accept payments from customers for any purpose but to sell or store coins and bullion to or for those customers.

Although Stanford Group Holdings, Inc. ("SGH") owned SCB, SCB remained a legally separate entity, run day-to-day by Joseph Frisard ("Frisard"), its President, with the assistance of Scott Terry ("Terry"), its Vice President of Finance and Operations.  SCB did not sell or broker any traditional investment products, including SIB CDs, on behalf of itself or any Stanford-owned entity.  Like others in its industry, including DGSE, SCB did periodically borrow money from various Stanford entities via documented notes with industry standard interest rates between 6% and 12%, none of which were past-due in January or February of 2009.  At all relevant times, SCB could also have taken out loans from other financial institutions or liquidated its substantial inventory for additional capital.  SCB maintained its corporate records separate from any other Stanford-owned entity and used a third-party accounting firm to prepare its financial statements.  SCB controlled its own customers' funds and assets.  Neither Stanford nor any other Stanford-owned entity directed SCB to make any transfers to Dillon Gage in January and February of 2009.

From 2004 until February of 2009, SCB and Dillon Gage maintained a typical arm's-length retailer-vendor relationship.  In their course of business together, SCB would request to purchase specific coins and bullion from Dillon Gage.  Dillon Gage would offer to provide the coins or bullion to SCB for the going market price (or "spot price") plus the customary industry margin for that particular product.  Once both parties agreed on pricing and SCB placed an order with Dillon Gage, Dillon Gage would ship the coins and bullion per SCB's instructions, and invoice SCB accordingly.  Sometimes, this meant shipping the goods to SCB.  Other times, Dillon Gage would drop-ship directly to the SCB customer.  Shipment could take up to fourteen

days to reach the recipient.  Payment was generally considered due ten days after receipt.  These practices aligned with industry standards.

Also in the course of their business together, SCB established an open account with Dillon Gage.  SCB would accrue an outstanding balance (as it could, up to its credit line), which it would later reduce by making payments to Dillon Gage.  SCB's initial credit line with Dillon Gage was $500,000.00.  In 2008, demand and prices for gold and other precious metals increased dramatically, and Dillon Gage increased SCB's credit line to $1 million.  This enabled the parties to maintain their established volume of business.  Dillon Gage had also developed a standard practice of allowing its open account customers to exceed their limits by 100%.  As specific to SCB, this in effect increased SCB's credit line to $2 million.

As a standard practice with its open account customers, as long as a customer did not exceed its line of credit with Dillon Gage, Dillon Gage would automatically ship all goods ordered by that customer.  Also as a standard practice, if a customer exceeded its line of credit, Dillon Gage would temporarily hold shipment with respect to that customer until that customer's balance was again reduced below the limit.  At no time during their course of business together did Dillon Gage treat SCB any differently than Dillon Gage treated like customers, including in January and February of 2009.  Dillon Gage never did any business with, or was otherwise associated with, any other Stanford-named entity (though Dillon Gage did business with DGSE).

In January of 2009, having routinely transacted with Dillon Gage over the years, SCB grew an account balance of approximately $2.3–$2.4 million, thereby exceeding its credit limit with Dillon Gage.  Although Dillon Gage permitted SCB's balance to grow for a short time because Dillon Gage was receiving steady orders from SCB, SCB's payments came in more slowly than Dillon Gage would have liked.  Terry Hanlon ("Hanlon"), President of Dillon Gage

(and specifically, its Metals Division) thus reached out to Frisard and Terry to discuss reducing the balance.

In mid-January, Hanlon visited the offices of SCB. During that visit, Hanlon inquired into SCB's financial state. SCB, in turn, provided Hanlon a number of reassurances that SCB would be able to pay the balance owed to Dillon Gage. Hanlon noted SCB's recently-purchased advertising, very active sales floor, and inventory, which is estimated to have been valued at $3–$5 million wholesale at the time. Frisard represented to Hanlon that SCB was about to engage in a very large deal, and that SCB's balance with Dillon Gage would be fully paid in the near future. Pursuant to the parties' discussions and the activity and inventory that he witnessed at SCB's offices, Hanlon concluded that Frisard was intentionally delaying payment to Dillon Gage so that SCB could use its cash outlay to purchase and hold rare coins (which earned SCB higher margins than the gold bullion that SCB typically purchased from Dillon Gage). Hanlon received no indication that SCB was insolvent or headed for insolvency.

On January 22, 2009, Dillon Gage received a payment of over $200,000.00 from SCB. Hanlon held the opinion at the time that a "large payment" should mean $500,000.00 or more. He contacted SCB to inquire why the payment was not as large as he believed it should have been, and discussed the matter with Terry. During these discussions, Terry acknowledged that SCB was having temporary cash flow issues, but at no time conveyed that SCB was unable to pay for outstanding orders, insolvent, or not paying other vendors or creditors to pay for the already shipped orders. Hanlon had no reason to believe otherwise. Per industry awareness at the time, SCB was in fact paying all of its other vendors and creditors. Dillon Gage was the one holdback.

At the time, SCB also provided three possible solutions to its short-term cash flow issues. It could (a) sell some of its inventory; (b) collect its accounts receivable; or (c) obtain outside funding. Hanlon understood that SCB had over $1 million in receivables. Hanlon nonetheless informed Terry that, as was par for the course, Dillon Gage would hold shipment to SCB until the account was brought current (i.e., to a balance of $2 million or below). Terry indicated that the account balance would not be a problem for SCB, again emphasizing that SCB had a large upcoming deal that would enable SCB to pay down its account with Dillon Gage.

The rare coin, bullion, and precious metals industry has predictable seasonal flows. In November and December of each year, coin and bullion retailers refrain from purchasing coins and bullion and unload what coin and bullion they have on hand to reduce their inventory, and thereby also reduce their annual state taxes on inventory. The following January, retailers begin to rebuild their inventory, using much of their cash outlay to acquire coin and bullion. The remaining cash outlay is spent on advertising to attract customers to purchase that coin and bullion. Advertising is run throughout the first half of the year, and especially in the first few months.

Because of these immediate and sizeable expenditures, coin and bullion retailers are often cash poor coming into a new year. Moreover, recovery of cash is gradual, in large part because payment plans are not uncommon and stretch recovery out further, and 40% of a retailer's receivables are collected in the last week of the month. Retailers acquire greater cash flow through January and February sales. During periods of low cash flow, a coin and bullion retailer will often seek to pay its larger vendors last because the larger vendors generally have the financial ability to be more flexible on payment terms while the retailer waits out a seasonal low.

In 2008 and 2009, because of market forces, the gold market was thriving. Inventory could be turned over relatively quickly. Coins and bullion increased in liquidity, and, if sold at regular pace, within 30 to 60 days, could earn a retailer a margin of 10–30% on rare coins and 0.5–2.0% on bullion.

Given the general economic cycles of the industry and the condition of the gold market in 2008 and 2009, Hanlon found SCB's explanations to be reasonable; had no reason to question the payments that Dillon Gage received from SCB in late January and early February; and would have anticipated that SCB's business would in fact increase throughout the beginning of that year as SCB was realizing its accounts receivable from customers making payments on their purchases. Any concerns about solvency would also be tempered by the fact that SCB could sell its inventory (or use it as collateral) for quick liquidity if needed.

Shortly thereafter, Dillon Gage received a payment and voucher from SCB dated January 23, 2009, in the amount of $501,326.30. This payment was applicable to goods already shipped by Dillon Gage to or for SCB. On January 27, 2009, Dillon Gage then received another payment and voucher for $394,567.40 for goods already shipped. On January 30, 2009, it received another payment and voucher for $368,491.51 for goods already shipped directly to or for the benefit of SCB's customers.

Then, on February 2, 2009, SCB placed an order with Dillon Gage for 101 gold bars (presumably the large deal that SCB had indicated would take care of its entire balance with Dillon Gage). At the time the order was placed, Dillon Gage agreed to lock in the pricing for the gold bars and invoiced SCB $3,002,639.10. That day, SCB wired Dillon Gage $3,002,639.10. Dillon Gage, pursuant to SCB's instructions and in accordance with the standard business practices between the parties, applied the wired funds to SCB's open account. Also pursuant to

SCB's instructions, Dillon Gage shipped $1,933,077.10 in coins or bullion against the $3,002,639.10 payment to fulfill existing orders that SCB had placed with Dillon Gage for its customers who were waiting to receive their coins and bullion products. The parties had planned to complete the February 2 order for the 101 gold bars at a later date in March of 2009, for which SCB set aside $1.5 million that it anticipated paying Dillon Gage but for the receivership.

As of February 2, 2009, SCB was current on all payments due to Dillon Gage.

On February 6, 2009, Dillon Gage received another payment and voucher from SCB for $366,174.50, again to pay existing bills for goods already shipped. Finally, on February 13, 2009, Dillon Gage received another payment and voucher for $486,959.60 for goods already shipped.

Ultimately, in exchange for the transfers that Dillon Gage received from SCB between January 23, 2009 and February 16, 2009, Dillon Gage provided to SCB $4,050,593.67 in coins and bullion. Dillon Gage charged SCB spot price plus a standard industry margin for the coins and bullion, and SCB did or would have resold the coins and bullion at a standard retail mark-up for profit. Also in exchange for these transfers, Dillon Gage promised to provide SCB 101 gold bars at a locked-in price that would enable SCB to earn a profit of $26,000, towards which SCB paid $1,069,562.42 prior to the receivership.

To prevail on his claim of fraudulent transfer under a theory of actual fraud, the Receiver must prove that SCB made each of the transfers at issue "with actual intent to hinder, delay or defraud any creditor." *See* TEX. BUS. & COMM. CODE § 24.005(a)(1). To establish actual fraudulent intent, the Receiver must establish, at minimum, more than one of the eleven badges of fraud listed under § 24.005(b)(1)–(11) of TUFTA. *See In re SMTC Mfg. of Tex.*, 421 B.R. 251, 300 (Bankr. W.D. Tex. 2009). Although the Receiver alleges that SCB was insolvent, he

has not conducted a fair valuation of the assets and liabilities that SCB held in January and February of 2009. The Receiver therefore cannot establish that the sum of SCB's debts was greater than all of its assets *at fair valuation* at the time of the transfers. *See* TEX. BUS. & COMM. CODE § 24.003(a). The Receiver also cannot name a single then-due debt owed by SCB to any creditor in January and February of 2009. He therefore cannot establish that SCB was not *generally* able to pay its debts *as they became due* at the time of the transfers. *See* TEX. BUS. & COMM. CODE § 24.003(b). The Receiver likewise cannot establish any other badge of fraud.

Actual fraudulent intent may be presumed where the transferor was operating as a Ponzi scheme and made the transfers in furtherance of that scheme. *In re IFS Fin. Corp.*, 417 B.R. 419, 438–39 (Bankr. S.D. Tex. 2009); *Janvey v. Golf Channel*, 780 F.3d 640, 644 (5th Cir. 2015). But the presumptions applied to Ponzi schemes in this circuit are to be construed narrowly and do not apply to transfers made out of legitimate business operations, *see cf. In re American Housing Foundation*, No. 14-10563, 2015 WL 1918854, at *10 (5th Cir. Apr. 28, 2015), and Texas courts have rejected the "single enterprise theory," *see SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 454–55 (Tex. 2009). A showing of alter ego is instead required to hold a subsidiary liable for the fraudulent acts of its parent. *Id.*; *In re Moore*, 379 B.R. 284, 289 (Bankr. N.D. Tex. 2007). Because SCB was itself a legitimate business, was not an alter ego of the Stanford Entities, and made the transfers to Dillon Gage in furtherance of only its legitimate business, the Ponzi scheme presumption simply is not applicable. The Receiver cannot establish that SCB made the transfers at issue with actual fraudulent intent, and his claim for actual fraudulent transfer thus fails.

Even if the Receiver establishes that the transfers at issue were actual fraudulent transfers under § 24.005(a)(1) of TUFTA, the transfers are still not voidable if Dillon Gage establishes

that it received the transfers in good faith and for a reasonably equivalent value. *See* TEX. BUS. & COMM. CODE § 24.009. Because Dillon Gage was not and should not have been put on notice that SCB was purportedly insolvent, that SCB was purportedly part of the Stanford Ponzi scheme, or that the transfers at issue were voidable, Dillon Gage took the transfers from SCB in good faith. Because Dillon Gage provided satisfaction of antecedent debt, contemporaneous exchange of coins and bullion, and future economic opportunity to SCB, each which was within the range of values that SCB would have paid for the same in an arm's-length transaction, *see* TEX. BUS. & COMM. CODE § 24.004(d), Dillon Gage also provided reasonably equivalent value in exchange for those transfers. Dillon Gage therefore can establish an affirmative defense under § 24.009 of TUFTA, and the Receiver cannot avoid the transfers at issue.

To prevail on his claim of fraudulent transfer under a theory of constructive fraud, the Receiver must prove that SCB made each of the transfers at issue "without receiving a reasonably equivalent value in exchange for the transfer or obligation," and either (1) "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction," or (2) "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." *See* TEX. BUS. & COMM. CODE § 24.005(a)(2)(A) & (B). But, as discussed above, SCB did receive reasonably equivalent value in exchange for each transfer that it made to Dillon Gage. Moreover, the transfers did not cause SCB to be left with assets unreasonably small in relation to its business such that it could not have continued as a going concern thereafter. Nor did SCB make the transfers with the intent of causing itself to become insolvent as a result of the transfers. Further, the Receiver presents no expert testimony

to support his burden of proof on either § 24.005(a)(2)(A) or (B). The Receiver's claim for constructive fraudulent transfer necessarily fails.

By the transfers, Dillon Gage did not receive any benefit that traces back to investments in SIB CDs. SCB made the transfers using funds that it obtained from its customers — those who ordered goods from SCB and on whose behalf SCB in turn ordered the same from Dillon Gage — and Dillon Gage provided SCB with coins and bullion to satisfy those customers' orders. The Receiver is not entitled to have Dillon Gage disgorge those funds.

Dillon Gage asserts the affirmative defenses of estoppel and promissory estoppel; fraud and fraudulent or negligent misrepresentation; and illegality. At the time of the transfers at issue, SCB indicated to Dillon Gage that it was solvent; that its sales were increasing; that cash flow issues were being resolved and were related at least in part to paperwork; and that SCB was capable of paying all of its debts. When SCB made its February 2, 2009 payment to Dillon Gage, SCB also indicated that it would be making additional payments in the future and requested that Dillon Gage apply this payment to debts owed on prior orders. Dillon Gage relied on these representations when entering into contracts for the sale of goods, extending additional credit, accepting the transfers from SCB in January and February of 2009.

Dillon Gage further asserts the affirmative defenses of unclean hands and *in pari delicto*. To the extent that SCB's business was unlawful or fraudulent, the Receiver has ratified its transactions by consummating existing sales orders and selling its inventory, rather than rejecting all executory contracts and returning unsold merchandise to Dillon Gage for a refund. To the extent that SCB's transfers to Dillon Gage are found fraudulent, by re-selling inventory purchased from Dillon Gage, the Receiver has unclean hands and stands *in pari delicto* with SCB with respect to those transfers.

Dillon Gage further asserts the affirmative defenses of set-off and recoupment. Pursuant to *Janvey v. Brown*, 767 F.3d 430 (5th Cir. 2014), Dillon Gage sets off or recoups its claims for fraud, negligent misrepresentation, quantum meruit, unjust enrichment, and restitution against SCB for $4,050,593.67 for bullion and coins shipped to or on behalf of SCB against the Receiver's claims.

Dillon Gage further asserts the affirmative defense of failure to mitigate. The Receiver failed to exercise reasonable care to mitigate any damages to the receivership estate that he may claim against Dillon Gage. He failed to preserve SCB as a going concern and market its assets so as to preserve the value of SCB's good will. He failed to obtain market prices for SCB's assets, including its customer list, broker relationships, dealer relationships, and inventory. The Receiver initially took no action with respect to outstanding sales orders that SCB had submitted to Dillon Gage prior to the receivership, which would have permitted SCB to obtain coins and bullion at pre-set prices that would generate profit for SCB.

Dillon Gage further asserts the affirmative defense of unjust enrichment. The Receiver brought this lawsuit to claw back purportedly fraudulent payments made by SCB to Dillon Gage in exchange for bullion and coins. The Receiver has since sold (or continues to possess) the bullion and coins that SCB received from Dillon Gage. To the extent the Receiver has sued to collect the sums that Dillon Gage received in exchange for these goods and the Receiver has sold or seeks to keep the goods, the Receiver has been or will be unjustly enriched

Dillon Gage further asserts the affirmative defense of res judicata or claim preclusion. The Receiver has claimed that Dillon Gage knew or should have known that SCB was a Ponzi scheme or was "part of" the Stanford Ponzi scheme by virtue of news articles about the SEC investigation into Stanford and SIB published in mid-February of 2009. In *Janvey v. Democratic*

*Senatorial Campaign Comm., Inc.*, however, the Receiver took the position that he did not and should not have known that Stanford operated a Ponzi scheme and that the transfers in that case were fraudulent by virtue of news articles about the SEC investigation (and, in fact, about the transfers themselves). The Receiver is precluded from claiming the opposite with regard to Dillon Gage. Additionally, to the extent that the Receiver now claims that the transfer of $3,002,639.10 on February 2, 2009 was for the benefit of Pre-War Art, Inc., rather than SCB, this claim is barred by res judicata based upon the judgment in *Pre-War Art, Inc. v. Stanford Coins & Bullion, Inc.*

Dillon Gage further asserts the affirmative defense of collateral estoppel, judicial estoppel, or estoppel in pais. Also in *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, the Receiver successfully took the position that he could not and should not have known that Stanford operated a Ponzi scheme until after he had been appointed as Receiver, had utilized the services of a forensic accountant to examine the books and records of SIB and other Stanford entity, and James Davis had pleaded guilty. He also stated that "To the outside world, before commencement of the Receivership, [SCB] appeared to be independently viable." The Receiver is precluded from claiming the opposite in this case.

### B. STATEMENT OF STIPULATED FACTS

The Receiver and Dillon Gage list the following statements of stipulated facts:

- SCB was wholly owned by Stanford Financial Group Company from SCB's formation in 1999 until January 1, 2004.

- SCB was wholly owned by Stanford Group Holdings, Inc. from January 1, 2004 forward.

- Allen Stanford was the sole owner of Stanford Group Holdings, Inc. and Stanford Financial Group Company.

- Dillon Gage received the following transfers from SCB on the following dates:

| Date | Amount |
|------|--------|
|      |        |

| January 23, 2009 | $501,326.30 |
|---|---|
| January 27, 2009 | $394,567.40 |
| January 30, 2009 | $368,491.51 |
| February 2, 2009 | $3,002,639.10 |
| February 6, 2009 | $366,171.50 |
| February 13, 2009 | $486,959.86 |
| **TOTAL:** | **$5,120,155.67** |

By stipulating to the facts above, the Receiver and Dillon Gage do not contend or agree that evidence concerning these issues is inadmissible at trial. The Receiver and Dillon Gage contend that evidence concerning these matters may be necessary to give the jury context for the Receiver's claims or Dillon Gage's defenses, to avoid confusing the jury, and to avoid unfair prejudice to the Receiver or to Dillon Gage.

### C. LIST OF CONTESTED ISSUES OF FACT[1]

The Receiver lists the following contested issues of fact:

- Whether SCB was insolvent at the time of the transfers to Dillon Gage.

- Whether SCB's liabilities exceeded its assets.

- Whether SCB was generally unable to pay its debts as they became due.

- Whether Dillon Gage accepted the transfers it received from SCB in good faith.

- Whether Dillon Gage knew or reasonably should have known that SCB was insolvent when it accepted the transfers from SCB.

- Whether Dillon Gage was aware of facts that would have excited the suspicions of a reasonable person and led that person to investigate the nature of the transfers, the nature of the Stanford enterprise, or the solvency of the Stanford Entities or SCB when it accepted the transfers.

- Whether Dillon Gage consciously ignored facts that would suggest the fraudulent nature of the transfers, the fraudulent nature of the Stanford enterprise, or the insolvency of SCB or the Stanford enterprise.

---

[1] If the Court finds that any of these contested issues of fact are more properly characterized as issues of law, the parties respectfully request that they be considered issues of law. Further, by listing these items as contested issues of fact, neither party waives any right to argue, at the appropriate time during trial, that it is entitled to judgment as a matter of law on any issue in the case.

- Whether Dillon Gage conducted any inquiry or investigation into the transfers it received, SCB, or the Stanford enterprise.

- Whether any inquiry or investigation by Dillon Gage into the transfers it received, SCB, or the Stanford enterprise was diligent under the circumstances.

- Whether SCB operated in furtherance of the Ponzi scheme.

- Whether SCB was a part of the Ponzi scheme.

- Whether SCB benefitted from the Ponzi scheme.

- Whether SCB lent legitimacy to the Ponzi scheme.

- Whether the value, if any, that Dillon Gage provided was reasonably equivalent to the transfers that it received from SCB from the perspective of Stanford's creditors.

- Whether Dillon Gage wrongfully secured a benefit, or passively received a benefit, that would be unconscionable for Dillon Gage to retain.

- Whether Dillon Gage obtained any benefit by fraud, duress, or the taking of undue advantage.


Dillon Gage lists the following contested issues of fact:

- Whether SCB was insolvent at the time of the transfers to Dillon Gage.

- Whether SCB was an alter ego of the Stanford Entities.

- Whether SCB's liabilities exceeded all of its assets at fair valuation.

- Whether SCB was generally unable to pay its debts as they became due.

- Whether Dillon Gage accepted the transfers it received from SCB in good faith.

- Whether Dillon Gage knew or reasonably should have known that SCB was insolvent when it accepted the transfers from SCB.

- Whether Dillon Gage was aware of facts that would have excited the suspicions of a reasonable person and led that person to investigate the nature of the transfers or SCB's solvency when it accepted the transfers.

- Whether Dillon Gage consciously ignored facts that would suggest the fraudulent nature of the transfers or SCB's insolvency.

- Whether Dillon Gage conducted any inquiry or investigation into the transfers it received or SCB.

- Whether any inquiry or investigation by Dillon Gage into the transfers it received or SCB was diligent under the circumstances.

- Whether a reasonable inquiry or investigation by Dillon Gage into the transfers it received would have revealed their fraudulent nature or SCB's insolvency.

- Whether SCB operated in furtherance of and was a part of the Ponzi scheme.

- Whether SCB benefitted from the Ponzi scheme.

- Whether SCB lent legitimacy to the Ponzi scheme.

- Whether the value, if any, that Dillon Gage provided in exchange for the transfer it received from SCB on February 2, 2009 was reasonably equivalent to that transfer from the perspective of Stanford's creditors.

- Whether Dillon Gage wrongfully secured a benefit, or passively received a benefit, from SCB that would be unconscionable for Dillon Gage to retain.

- Whether Dillon Gage obtained any benefit by fraud, duress, or the taking of undue advantage.

- Whether SCB fraudulently or negligently made misrepresentations to Dillon Gage about SCB's financial status in January and February of 2009.

- Whether SCB made misrepresentations to Dillon Gage about any transfer that SCB made to Dillon Gage in January and February of 2009 and whether that transfer was fraudulent.

- Whether the Receiver has ratified the transfers that SCB made to Dillon Gage in January and February of 2009.

- Whether the Receiver exercised reasonable care to mitigate any damages to the receivership estate that he claims has been caused to the estate by Dillon Gage.

- Whether the Receiver took reasonable care to preserve SCB as a going concern.

- Whether the Receiver took reasonable care to maximize the value of SCB's property for the benefit of its creditors.

- Whether the Receiver has wrongfully secured a benefit, or passively received a benefit, from Dillon Gage that would be unconscionable for the Receiver to retain.

Listing a contested issue of fact in this section C of the Joint Pretrial Order does not constitute an agreement or admission that the contested issue of fact is relevant to the resolution of the case or that evidence concerning that issue is relevant or admissible. Listing a contested issue of fact does not constitute an agreement or admission that it is a question of fact relevant to the proper legal standard.

### D. LIST OF CONTESTED ISSUES OF LAW[2]

The Receiver lists the following contested issues of law:

- Whether the evidence establishes conclusively as a matter of law that SCB was insolvent.

- Whether the evidence establishes conclusively as a matter of law that SCB was part of the Ponzi scheme.

- Whether the evidence establishes conclusively as a matter of law that the transfers from SCB to Dillon Gage were made with actual intent to hinder, delay, or defraud Stanford's creditors.

- Whether the evidence establishes conclusively as a matter of law that Dillon Gage did not accept the payments from SCB in good faith.

- Whether the evidence establishes conclusively as a matter of law that Dillon Gage did not provide reasonably equivalent value for the transfers.

- Whether the evidence establishes conclusively as a matter of law that Dillon Gage was unjustly enriched by its receipt of payments from SCB.


Dillon Gage lists the following contested issues of law:

- Whether the evidence establishes conclusively as a matter of law that SCB was or was not insolvent.

- Whether the evidence establishes conclusively as a matter of law that SCB did or did not make the payments to Dillon Gage with actual fraudulent intent.

- Whether the evidence establishes conclusively as a matter of law that SCB was or was not part of the Ponzi scheme.

---

[2] If the Court finds that any of these contested issues of law are more properly characterized as issues of fact, the parties respectfully request that they be considered issues of fact.

- Whether the presumption of insolvency and actual fraudulent intent applies to an entity that was not operating as a Ponzi scheme or as an alter ego of one.

- Whether the evidence establishes conclusively as a matter of law that SCB did or did not make the payments to Dillon Gage with constructive fraudulent intent.

- Whether the evidence establishes conclusively as a matter of law that Dillon Gage was or was not unjustly enriched by the payments it received from SCB.

- Whether the evidence establishes conclusively as a matter of law that Dillon Gage did or did not accept the payments from SCB in good faith.

- Whether the evidence establishes conclusively as a matter of law that Dillon Gage did or did not provide reasonably equivalent value for the transfers.

- Whether the evidence establishes conclusively as a matter of law that Dillon Gage does or does not have a right to offset or recoupment against the Receiver's claims for $4,050,593.67 in coins and bullion that Dillon Gage provided to SCB prior to the receivership.

- Whether either party is entitled to recover his or its costs and attorneys' fees from the adverse party under TUFTA.

Listing a contested issue of law in this section D of the Joint Pretrial Order does not constitute an agreement or admission that the statement is a correct expression of the proper legal standard.

### E. Estimate of the Length of Trial

The parties estimate that trial will last 7 days.

### F. Additional Matters that Might Aid in the Disposition of the Case

The Receiver believes that resolution of the following motions will aid in the disposition of the case:

- Receiver's Motion for Summary Judgment, filed February 10, 2012 (Doc. 26)
- Receiver's Motion to Quash Dillon Gage's Subpoena for Oral Deposition of Paul Montgomery, filed April 1, 2015 (Doc. 104)
- Receiver's Motion to Exclude Testimony and Opinions of Dillon Gage's Expert Marla Reynolds, filed May 27, 2015 (Doc. 142)

- Receiver's Motion to Exclude Testimony and Opinions of Dillon Gage's Expert Michael R. Fuljenz, filed May 27, 2015 (Doc. 143)

Also currently pending before the Court are :

- Defendants' Cross-Motion for Summary Judgment, filed April 24, 2015 (Doc. 117)
- Defendant's Motion to Exclude Expert Opinion Testimony of Karyl Van Tassel, filed May 27, 2015 (Doc. 144)

The Receiver opposes the above motions and does not believe that their resolution will aid in the disposition of the case.

Although Dillon Gage opposes the motions below that have been filed by the Receiver, Dillon Gage believes that resolution of any of the following will aid in the disposition of this case:

- Defendants' Cross-Motion for Summary Judgment, filed April 24, 2015 (Doc. 117)
- Defendant's Motion to Exclude Expert Opinion Testimony of Karyl Van Tassel, filed May 27, 2015 (Doc. 144)
- Receiver's Motion for Summary Judgment, filed February 10, 2012 (Doc. 26)
- Receiver's Motion to Quash Dillon Gage's Subpoena for Oral Deposition of Paul Montgomery, filed April 1, 2015 (Doc. 104)
- Receiver's Motion to Exclude Testimony and Opinions of Dillon Gage's Expert Marla Reynolds, filed May 27, 2015 (Doc. 142)
- Receiver's Motion to Exclude Testimony and Opinions of Dillon Gage's Expert Michael R. Fuljenz, filed May 27, 2015 (Doc. 143)

SIGNED this _6_ day of _July_, 2015

Hon. David C. Godbey
United States District Judge

Dated:  June 5, 2015

Respectfully submitted,

**BAKER BOTTS L.L.P.**

By: */s/ Kevin M. Sadler*

    Kevin M. Sadler
    Texas Bar No. 17512450
    kevin.sadler@bakerbotts.com
    David T. Arlington
    Texas Bar No. 00790238
    david.arlington@bakerbotts.com
    Brendan A. Day
    Texas Bar No. 24052298
    brendan.day@bakerbotts.com
    Robert I. Howell
    Texas Bar No. 10107300
    robert.howell@bakerbotts.com
    98 San Jacinto Blvd., Suite 1500
    Austin, Texas 78701-4078
    (512) 322-2500
    (512) 322-2501 (Facsimile)

    Timothy S. Durst
    Texas Bar No. 00786924
    tim.durst@bakerbotts.com
    2001 Ross Avenue
    Dallas, Texas 75201
    (214) 953-6500
    (214) 953-6503 (Facsimile)

**ATTORNEYS FOR**
**RECEIVER RALPH S. JANVEY**

GRUBER HURST ELROD JOHANSEN HAIL SHANK LLP

By: /s/ Orrin L. Harrison III
    Orrin L. Harrison III
     State Bar No. 09130700
     oharrison@ghjhlaw.com
    Michael J. Lang
     State Bar No. 24036944
     mlang@ghjhlaw.com
    Laura M. Fontaine
     State Bar No. 24065239
     lfontaine@ghjhlaw.com
    Priya A. Bhaskar
     State Bar No. 84082690
     pbhaskar@ghjhlaw.com

    1445 Ross Avenue, Suite 2500
    Dallas, TX 75202
    Telephone: (214) 855-6801
    Facsimile: (214) 855-6808

**ATTORNEYS FOR DILLON GAGE, INC. OF DALLAS AND DILLON GAGE, INC.**

## CERTIFICATE OF SERVICE

On June 5, 2015, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that I will serve all counsel of record electronically or by other means authorized by the Court or the Federal Rules of Civil Procedure.

/s/ *Kevin M. Sadler*
Kevin M. Sadler