IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. | § § § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No. 03:10-CV-1973-N-BG |
| DILLON GAGE INC. OF DALLAS and DILLON GAGE INC. | § § § § | |
| Defendants. | § § | |

**RECEIVER'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND BRIEF IN SUPPORT**

The Receiver moves for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) on the following issues related to his claim under the Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COM. CODE section 24.001, *et seq.* ("TUFTA").

- **Fraudulent Transfers:** The overwhelming evidence establishes that SCB made $5,120,155.67 in payments to Dillon Gage with the intent to hinder, delay, or defraud one or more of SCB's creditors. Therefore, all of the payments at issue constitute fraudulent transfers as a matter of law.

- **Good Faith:** Dillon Gage failed to offer sufficient evidence for a reasonable jury to find that Dillon Gage accepted the transfers from SCB in good faith. Dillon Gage was on actual and constructive notice that SCB was presumptively insolvent and was diverting customer money to try to stay afloat, and Dillon Gage used its leverage over SCB to extract over $5 million in payments at a time when SCB owed millions to other creditors and generally could not pay its debts as they became due.

Based on the record in this case, a rational jury could not enter judgment on these issues in favor of Dillon Gage. Therefore, judgment as a matter of law in favor of the Receiver is appropriate.

## I. LEGAL STANDARD

A motion under Rule 50(a) challenges the legal sufficiency of the evidence to support a verdict. *Nobach v. Woodland Village Nursing Ctr.*, 762 F.3d 442, 446 (5th Cir. 2014). The Court should award judgment as a matter of law whenever "a reasonable jury would not have a legally sufficient evidentiary basis" to find in favor of one party. *Id.* "This occurs when the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary verdict." *Jacobs v. Tapscott*, 516 F. Supp. 2d 639, 643 (N.D. Tex. 2007) (Fitzwater, J.) (quoting *Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 362 (5th Cir. 2004). Judgment as a matter of law is appropriate where no more than a scintilla of evidence in the record favors the nonmoving party. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001) (quoting Rule 50(a)); *see also Kilchrist v. Sika Corp.*, No. 3:10-cv-2567-B, 2012 WL 3599383, at *4 (N.D. Tex. Aug. 22, 2012) (Boyle, J.) (emphasis added) ("To survive a Rule 50 motion, the non-movant must "at least establish a conflict in substantial evidence on each essential element of their claim.").

In ruling on the motion, the Court must consider all of the evidence in the record. *Jacobs*, 516 F. Supp. 2d at 643 (quotation omitted). The Court must not make credibility determinations or weigh the evidence. *Id.* It should give credence to "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Id.* (quotation omitted).

## II. ARGUMENT

**A.     The six payments from SCB to Dillon Gage were fraudulent transfers.**

A reasonable jury could only conclude that the transfers for SCB to Dillon Gage were made with actual fraudulent intent. SCB was insolvent under the express terms of TUFTA

at the time the transfers were made because (1) SCB was generally not paying its debts as they became due, and (2) more than $2 million of SCB's additional paid-in capital was not properly considered an asset of SCB because it was transferred to SCB from other Stanford Entities with intent to hinder, delay, or defraud creditors. *See* TEX. BUS. & COM. CODE §§ 24.003(b), (d), 24.005(b)(9)-(10) (West 2013). Moreover, all of the payments were made before, as a part of, or immediately after SCB incurred at least a $3 million debt that it could not repay. *See id.* at § 24.005(b)(10). As a result, SCB made each of the payments at issue in this case with the actual intent to hinder, delay, and defraud its creditors.

### 1. SCB was generally not paying its debts as they became due.

The basic facts in this case are not disputed. At the time SCB made each of the transfers to Dillon Gage, SCB was generally not paying its debts as they became due. The witnesses for both parties admitted that SCB was delinquent in paying its largest supplier, Dillon Gage. [*See* 7/7/15 Trial Tr. at 270:4-7 (Van Tassel Testimony); *id.* at 177:1-11, 271:1-7 (Frisard Testimony); 7/8/15 Trial Tr. at 57:2-4 (Terry Testimony); *id.* at 267:13-19 (Fritz Testimony).] In January and February 2009, both the amount and delinquency of SCB's bills were becoming a more "serious problem." [*See id.* at 279:7-17 (Fritz Testimony).] The Receiver testified that, in early 2009, SCB also "owed other creditors millions of dollars in obligations and bills." [*See* 7/7/15 Trial Tr. at 54:7-8 (Receiver Testimony).] And, SCB's former Vice President of Finance and Operations Scott Terry ("Terry"), vouched for the accuracy of SCB's general ledger, which showed $2.9 million in unpaid trade debt as of January 21, 2009 and $3.9 million as of February 17, 2009. [*See* 7/8/15 Trial Tr. at 45:17-23 (Terry Testimony).] Terry also testified that SCB had "negative equity," was "losing money," "stretching its payables" "playing the float" with customer money, diverting customer money to pay down debt, and had already resorted to

"wholesaling out some of [its] inventory to get some cash in." [*See* PX-160 at 11:7-8; 7/8/15 Trial Tr. at 17:17-19, 20:4-22, 25:4-5 (Terry Testimony); s*ee also* 7/7/15 Trial Tr. at 246:5-8 (Van Tassel Testimony).] Like the witness testimony, SCB's negative cash flows, net losses, negative equity, and retained deficits support only one conclusion that SCB generally did not pay its debts as they become due and, hence, was insolvent. [*See* 7/8/15 Trial Tr. at 116:21-117:3 (Van Tassel Testimony).]

Dillon Gage presented no evidence whatsoever that SCB *was* generally paying its debts as they became due. The uncontroverted fact that SCB was insolvent, coupled with the fact that SCB made all of transfers to Dillon Gage either shortly before or after SCB incurred more than $3 million debt to a customer, Pre-War Art (the "Gallery"), demonstrates SCB's fraudulent intent. *See* TEX BUS. & COM. CODE § 24.005(b)(9), (10); [7/8/15 Trial Tr. at 121:24-122:6, 123:11-25 (Van Tassel Testimony)].

2. **The funds transferred to SCB from the Stanford Ponzi scheme are not includible in SCB's assets.**

As the Receiver's expert Karyl Van Tassel explained, SCB was never profitable and was dependent on cash and loans from affiliated Stanford entities for survival. [*See* 7/7/15 Trial Tr. at 225:6-10, 227:19, 250:14-16 (Van Tassel Testimony); *see also* 7/8/15 Trial Tr. at 75, 110:12-15 (Terry Testimony).] Scott Terry of SCB concurred with Van Tassel's assessment that the book value of SCB's liabilities exceeded its assets, and SCB was insolvent under the negative equity test. [*See* 7/8/15 Trial Tr. at 17:17-19, 18:14-16 (Terry Testimony); *id.* at 11:8-25, 98:20-99:1 (Van Tassel Testimony) (as of the date of the Receivership, the balance in SCB's operating account was $1.2 million and its liabilities were $10.7 million).] Although Dillon Gage has expressed disagreement with Van Tassel's assessment that the overwhelming evidence of SCB's

insolvency rendered a valuation unnecessary, Dillon Gage has not adduced even a scintilla of evidence that SCB was, in fact, solvent. No witness offered any testimony that SCB was solvent.

Even if Van Tassel had performed a valuation, Stanford International Bank ("SIB") CD proceeds that were infused into SCB from the Stanford Ponzi scheme are not includible as assets of SCB, thus further increasing SCB's insolvency. *See* TEX. BUS. & COM. CODE § 24.005(d). Ms. Van Tassel's investigation revealed that from 2004 until 2009 SCB received over 21 loans, totaling $8.2 million, from Stanford Entities, including SIB, Stanford Group Company, and Stanford Financial Group Company. [*See* 7/7/15 Trial Tr. at 224:6-8, 244:9-13, 246:1-3, 247:16-18 (Van Tassel Testimony); PX-68 (promissory notes); PX-86 (same).] The following facts and circumstances show that these intercompany transfers from other Stanford Entities to SCB were made with fraudulent intent:

- SCB was an insider of the affiliated Stanford Ponzi Scheme Entities that transferred funds to SCB. *See* TEX BUS. & COM. CODE § 24.005(b)(1); [7/8/2015 Trial Tr. at 105:24-106:3 (Van Tassel Testimony).]

- Allen Stanford retained possession or control of the property transferred to SCB and could cut off SCB's funding at any time. *See* TEX BUS. & COM. CODE § 24.005(b)(2); [7/8/2015 Trial Tr. at 106:7-16 (Van Tassel Testimony).]

- The transfers from other Stanford Entities to SCB were concealed. *See* TEX BUS. & COM. CODE § 24.005(b)(3), (7). SIB did not disclose to investors either (1) its funneling of money to affiliated Stanford Entities, including SCB, or (2) the assumption of debt by Allen Stanford that was rolled up into the $2 billion note that remained outstanding when the Receivership was instituted. [*See* 7/8/2015 Trial Tr. at 106:20-107:11 (Van Tassel Testimony).]

- SCB was itself insolvent. Furthermore, the entire Stanford Financial Group was run as a Ponzi scheme from at least 1999 forward and, hence, inherently insolvent since inception. *See* TEX BUS. & COM. CODE § 24.005(b)(9), (10); [7/8/2015 Trial Tr. at 107:17-23 (Van Tassel Testimony).]

When the Receivership was instituted on February 17, 2009, SCB had $1.5 million in outstanding inter-company payables and over $2 million in additional paid-in capital, comprised

of stolen investor funds. [*See* 7/8/15 Trial Tr. at 111:2-7, 177:24-25 (Van Tassel Testimony).] Accounting for these fraudulently transferred "assets" only further reduces SCB's equity.

### 3. SCB had no access to additional capital to cover its bills and began intentionally diverting customer money.

When SCB's access to capital from the other Stanford Entities was cut off in late 2008, SCB found itself with no other sources of cash to pay its bills. [*See* 7/7/15 Trial Tr. at 252:1-9 (Van Tassel Testimony); 7/8/15 Trial Tr. at 15:14-17, 32:4-19 (Terry Testimony); *id.* at 119:17-22 (Van Tassel Testimony); PX-104 (e-mail from Terry to David Bishop).] Given that SCB was wholly owned by Allen Stanford and "intertwined with all the Stanford companies," which operated as a Ponzi scheme from at least 1999 forward, SCB could not turn to traditional outside financing for capital. [*See* 7/7/15 Trial Tr. at 197:3-5, 228:12-22 (Van Tassel Testimony); *id.* at 71:5-9 (Receiver Testimony); PX-24 at 12 (Davis Plea).] In response, SCB began diverting customer money to cover its bills. [*See* 7/8/15 Trial Tr. at 26:1-5 (Terry Testimony) (explaining that SCB did not have money to pay Dillon Gage on January 22, 2009 "because the money from those prepaid orders ha[d] been used for other things").] Specifically, SCB used a more than $3 million payment from the Gallery for an order of 101 gold bars to pay down its more than $2.3 million outstanding debt with Dillon Gage. Terry admitted that the Gallery had no idea that SCB planned to use its money to "get square" with Dillon Gage and that if SCB had disclosed its intentions to the Gallery, the Gallery never would have sent the money to SCB. [*See* 7/8/15 Trial Tr. at 13:10-18 (Terry Testimony).] Both SCB and Dillon Gage knew that, after the Gallery's money was used to pay down SCB's account with Dillon Gage, SCB would "still owe [Dillon Gage] for the gold." [*See id.* at 12:25-13:2.] SCB was simply creating new liabilities, not paying its debts.

Because the evidence introduced during trial establishes that SCB was insolvent, could not pay its bills as they became due, and was intentionally diverting customer money to keep its doors open, no reasonable juror could conclude that SCB did not have fraudulent intent when it made $5,120,155.67 in payments to Dillon Gage. These payments constitute fraudulent transfers as a matter of law.

### B. Dillon Gage did not accept the transfers from SCB in good faith.

Because the transfers to Dillon Gage were fraudulent, the Receiver is entitled to judgment as a matter of law unless Dillon Gage establishes a statutory defense. TEX. BUS. & COM. CODE § 24.009(b). Dillon Gage claims that it received the fraudulent transfers at issue "in good faith and for a reasonably equivalent value." *Id.* § 24.009(a). "A transferee invoking this defense has the burden to show both objective good faith and the exchange of reasonably equivalent value." *Janvey v. Alguire*, 846 F. Supp. 2d 662, 672 (N.D. Tex. 2011) (Godbey, J.). Because Dillon Gage failed to present sufficient evidence of good faith, the Receiver is entitled to judgment as a matter of law as to the payments Dillon Gage received from SCB.

Under TUFTA, a transferee must prove that it took the transfers without either actual or constructive knowledge (1) that the debtor was insolvent, or (2) that the debtor made the transfers with fraudulent intent or was engaged in a fraud.[1] *Hahn v. Love*, 321 S.W.3d 517, 527 (Tex. App. — Houston [1st Dist.] 2009, pet. denied) ("A transferee who takes property with knowledge of such facts as would excite the suspicions of a person of ordinary prudence and put him on inquiry of the fraudulent nature of an alleged transfer does not take the property in good faith. . . ."); *GE Capital Comm., Inc. v. Worthington Nat'l* Bank, 754 F.3d 297, 301 (5th Cir.

---

[1] *See also Doeling v. Grueneich* (*In re Grueneich*), 400 B.R. 688, 693 (8th Cir. 2009); *Humble Oil & Ref. Co. v. Campbell,* 69 F.2d 667, 670-71 (5th Cir. 1934); *Armstrong v. Collins*, Nos. 01-Civ. 2437(PAC), 02 Civ. 2796(PAC), 02 Civ. 3620(PAC), 2010 WL 1141158, at *19 (S.D.N.Y. Mar. 24, 2010); *Banner v. Kassow*, 104 F.3d 352, 1996 WL 680760, at *3 (2d Cir. Nov. 22, 1996); *In re Indep. Clearing House Co.*, 77 B.R. 843, 861-62 (D. Utah 1987).

2014) ("To establish that it acted in good faith, [a creditor] must prove . . . that it lacked actual and constructive knowledge of the debtor's fraud."); *Citizens Nat. Bank of Tex. v. NXS Constr., Inc.*, 387 S.W.3d 74, 85 (Tex. App. — Houston [14th Dist.] 2012, no pet.), *reh'g overruled* (Nov. 28, 2012) ("A transferee who takes property with knowledge of such facts as would excite the suspicions of a person of ordinary prudence and put him on inquiry of the fraudulent nature of an alleged transfer does not take the property in 'good faith.'"); *Smith v. Garcia Suarez* (*In re IFS Fin. Corp.*), 417 B.R. 419, 422 (Bankr. S.D. Tex. 2009) (citing *Warfield*, 436 F.3d at 559-60); *Brown v. 3d Nat'l Bank* (*In re Sherman*), 67 F.3d 1348, 1355, 1357 (8th Cir. 1995) ("[A] transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency" or to "suggest a transfer may be fraudulent. . . ."); *Jobin v. McKay* (*In re M & L Bus. Mach. Co., Inc.*), 84 F.3d 1330, 1336 (10th Cir. 1996) (same); *Hayes v. Palm Seedlings Partners-A* (*In re Agric. Research & Tech. Grp., Inc.*), 916 F.2d 528, 535-36, 540 (9th Cir. 1990) (finding that transferor's insistence on payment despite debtor's "imminent insolvency" supported a finding of bad faith).

Dillon Gage has not presented any evidence that it accepted the transfers from SCB without either actual or constructive knowledge (1) that SCB was insolvent, or (2) that SCB was diverting customer money to pay Dillon Gage and, hence, was engaged in a fraud. Instead, taking together the undisputed facts, Dillon Gage's admissions, and the sworn testimony of the witnesses, there is legally insufficient evidence from which a reasonable jury could conclude that Dillon Gage accepted the transfers in good faith.

Dillon Gage knew that SCB was insolvent and that SCB was fraudulently using money coming in with customer orders to pay down its debts to Dillon Gage. In a January 22, 2009 phone call between Dillon Gage President Terry Hanlon ("Hanlon") and Scott Terry, Terry

told Hanlon that SCB had lost its "long-term revolving credit facility" with SIB. [*See* PX-160 at 6:19-17:2 (January 22, 2009 Call).] Given that SCB was pre-paid by its customers, Hanlon wanted to know why customer money was being "infused into [SCB's] operating account" instead of being paid to Dillon Gage, said it was "a case of . . . robbing Peter to pay Paul," and questioned, "at some point how does it get itself evened out?" [*See id.* at 8:10-15, 9:14-16.] While acknowledging that it would create a hardship for SCB, because SCB would not be able to deliver product to its customers, Hanlon told Terry that Dillon Gage was going to stop shipping SCB's orders. [*See id.* at 19:1-2.] When Hanlon asked what the plan was to clear up the old debt, Terry's only short-term solution was to use the money from the art gallery "to get you guys square." [*See id.* at 9:25-10:2.] Hanlon did not object. [*See* 7/8/15 Trial Tr. at 39:1-10.]

Dillon Gage has presented no evidence that its conduct was consistent with good faith. Indeed, the evidence shows that Dillon Gage ratified and participated in SCB's plan to siphon off customer money to pay more than $2.3 million in past due debts owed to Dillon Gage. On February 2, 2009, the Gallery wired SCB over $3 million for the purchase of 101 gold bars. [*See* PX-141, 144.] SCB then wired more than $3 million to Dillon Gage with invoices indicating that payment was for the gold-bar order, and Dillon Gage itself acknowledged that SCB "paid [Dillon Gage] for the gold bars." [*See* 7/8/15 Trial Tr. at 143:21-22.] Even though it was common practice for SCB to remit a "payment voucher and identify what bills were being paid," Dillon Gage instead applied the payment to SCB's past due debt and began shipping new product against the payment. [*See* 7/8/2015 Trial Tr. at 274:21-24 (Fritz Testimony).] When Dillon Gage's General Manager, Ira Fritz, informed Terry that he was shipping against the payment and needed SCB to get its balance flat before Dillon Gage would ship the gold bars, Terry asked no questions. [*See* 7/8/2015 Trial Tr. at 30:8-14 (Terry Testimony).] With

knowledge that SCB's credit line from Stanford had been cut off and that SCB was diverting customer funds to meet its payment obligations, Dillon Gage admittedly participated in the fraudulent scheme in order to eliminate its own "exposure." [*See* PX-170 at 3:2-4 ("I'm sitting here with a million 78 worth of cash. So I'm not particularly worried about this thing but -- but if I'm reading the article [about Stanford], I'd be worried as shit.").] Given the overwhelming evidence that Dillon Gage lacked good faith when it received each of the post-January 22, 2009 payments from SCB, Dillon Gage's affirmative defense fails as a matter of law and should not be submitted to the jury.

### III.  CONCLUSION

For these reasons, the Receiver requests that the Court enter judgment as a matter of law that (1) the each of the six payments, which total $5,120,155.67, from SCB to Dillon Gage were fraudulent transfers, and (2) Dillon Gage did not accept the payments in good faith.

| | |
|---|---|
| Dated:  July 9, 2015 | Respectfully submitted, |
| | **BAKER BOTTS L.L.P.** |
| | By: */s/ Kevin M. Sadler*  |
| | Kevin M. Sadler |
| | Texas Bar No. 17512450 |
| | kevin.sadler@bakerbotts.com |
| | David T. Arlington |
| | Texas Bar No. 00790238 |
| | david.arlington@bakerbotts.com |
| | Brendan A. Day |
| | Texas Bar No. 24052298 |
| | brendan.day@bakerbotts.com |
| | 1500 San Jacinto Center |
| | 98 San Jacinto Blvd. |
| | Austin, Texas 78701-4039 |
| | (512) 322-2500 |
| | (512) 322-2501 (Facsimile) |
| | |
| | Timothy S. Durst |
| | Texas Bar No. 00786924 |
| | tim.durst@bakerbotts.com |
| | 2001 Ross Avenue |
| | Dallas, Texas 75201 |
| | (214) 953-6500 |
| | (214) 953-6503 (Facsimile) |
| | |
| | **ATTORNEYS FOR RECEIVER RALPH S. JANVEY** |

### CERTIFICATE OF SERVICE

On July 9, 2015, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I will serve all counsel of record electronically or by other means authorized by the Court or the Federal Rules of Civil Procedure.

        /s/ *Kevin M. Sadler*  
        Kevin M. Sadler