**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL. | § § § § § | |
| Plaintiff, | § § | |
| v. | § § | Case No. 03:10-CV-1973-N-BG |
| DILLON GAGE INC. OF DALLAS and DILLON GAGE INC. | § § § | |
| Defendants. | § § | |

---

**RECEIVER'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND RESPONSE
TO DEFENDANTS' MOTION FOR ENTRY OF FINAL JUDGMENT**

---

Kevin M. Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
David T. Arlington
Texas Bar No. 00790238
david.arlington@bakerbotts.com
Brendan A. Day
Texas Bar No. 24052298
brendan.day@bakerbotts.com
**BAKER BOTTS L.L.P.**
1500 San Jacinto Center
98 San Jacinto Blvd.
Austin, Texas 78701-4039
(512) 322-2500
(512) 322-2501 (Facsimile)

Timothy S. Durst
Texas Bar No. 00786924
tim.durst@bakerbotts.com
Christopher Norfleet
Texas Bar No. 24070338
christopher.norfleet@bakerbotts.com
**BAKER BOTTS L.L.P.**
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
(214) 953-6503 (Facsimile)

**ATTORNEYS FOR
RECEIVER RALPH S. JANVEY**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................... 3

LEGAL STANDARDS ....................................................................................................... 7

ARGUMENT ...................................................................................................................... 8

1.  The evidence is conclusive that SCB made the $3 million payment with actual
    fraudulent intent. ......................................................................................................... 9

    a.  SCB intended to—and did—hinder, delay, and defraud the Gallery. ........................... 10

    b.  There was insufficient evidence to support a verdict that the $3 million
        payment was a mere "preference"—direct evidence showed that it defrauded
        the Gallery............................................................................................................... 13

2.  SCB's other payments to Dillon Gage also hindered, delayed, and defrauded
    its creditors. ................................................................................................................. 14

3.  Dillon Gage did not have good faith:  it knew SCB was insolvent and making
    transfers with fraudulent intent, and then used its leverage to extract payments
    to the detriment of other SCB creditors.................................................................... 16

4.  The Court should deny Dillon Gage's motion for entry of final judgment. .......................... 19

CONCLUSION.................................................................................................................. 19

CERTIFICATE OF SERVICE ........................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ammerican Home Assurance Co. v. United Space Alliance, LLC,*
378 F.3d 482 (5th Cir. 2004) ................................................................................................7

*Baker v. Great Northern Energy, Inc.,*
64 F. Supp. 3d 965 (N.D. Tex. 2014) ................................................................................11

*Brennan's Inc. v. Dickie Brennan & Co.,*
376 F.3d 356 (5th Cir. 2004) ............................................................................................7, 8

*CDI Corp. v. GT Solar Inc.,*
No. H-11-3487, 2013 WL 873785 (S.D. Tex. Mar. 7, 2013) ..................................................11

*Citizens National Bank of Texas v. NXS Construction, Inc.,*
387 S.W.3d 74 (Tex. App.—Houston [14th Dist] 2012, no pet.)..........................................17

*Englert v. Englert,*
881 S.W.2d 517 (Tex. App.—Amarillo 1994, no writ).........................................................9

*GE Capital Commercial, Inc. v. Worthington National Bank,*
754 F.3d 297 (5th Cir. 2014) ..............................................................................................17

*Geneva Corporate Finance, Inc. v. Waddell,*
251 F.3d 157 (5th Cir. 2001) ..............................................................................................13

*Goodner v. Hyundai Motor Co.,*
650 F.3d 1034 (5th Cir. 2011) ..............................................................................................8

*Hayes v. Palm Seedling Partners (In re Agricultural Research & Technology Grp., Inc.),*
916 F.2d 528 (9th Cir. 1990) ..............................................................................................19

*In re Cowin,*
No. 13-30984, 2014 WL 1168714 (Bankr. S.D. Tex. Mar. 21, 2014)...................................15

*In re Grueneich,*
400 B.R. 688 (B.A.P. 8th Cir. 2009).....................................................................................17

*In re Hannover Corp.,*
310 F.3d 796 (5th Cir. 2002)................................................................................................17

*In re SMTC Manufacturing of Texas,*
421 B.R. 251 (Bankr. W.D. Tex. 2009)................................................................................12

*Jacobs v. Tapscott,*
516 F. Supp. 2d 639 (N.D. Tex. 2007) ..................................................................................7

*Janvey v. Golf Channel, Inc.*,
No. 13-11305, 2015 WL 3972216 (5th Cir. June 30, 2015)...............................................9, 13

*Lassetter v. Strategic Materials, Inc.*,
192 F. Supp. 2d 698 (N.D. Tex. 2002) (Lynn, J.).......................................................8

*Osherow v. Hensley (In re Pace)*,
456 B.R. 253 (Bankr. N.D. Tex. 2011) (Clark, J.)...................................................15

*Reed v. Griggs (In re Cash Rewards, Inc.)*,
No. 10-3212, 2012 WL 967862 (Bankr. N.D. Tex. Mar. 21, 2012).......................................15

*Sheets v. Wells Fargo Bank, N.A.*,
No. 3:12-cv-4534-N, 2013 WL 5914404 (N.D. Tex. Sept. 11, 2013)....................................10

*Smith v. Suarez (In re IFS Financial Corp.)*,
417 B.R. 419 (Bankr. S.D. Tex. 2009) .................................................17

*Templeton v. O'Cheskey (In re Am. Housing Foundation)*,
785 F.3d 143 (5th Cir. 2015) .................................................17

*Tow v. Amegy Bank, N.A.*,
505 B.R. 455 (S.D. Tex. 2014) .................................................12

*U.S. v. Fritz*,
No. SA-12-CA-550, 2014 WL 5514381 (W.D. Tex. Sept. 10, 2014) ...................................15

*Wallace v. Methodist Hospital Systems*,
271 F.3d 212 (5th Cir. 2001) .................................................8

**STATUTES**

TEXAS BUSINESS & COMMERCE CODE § 24.003.........................................................14

TEXAS BUSINESS & COMMERCE CODE § 24.005.........................................................8, 9, 14, 16

TEXAS BUSINESS & COMMERCE CODE § 24.009.........................................................9

**OTHER AUTHORITIES**

FED. R. CIV. P. 50 .................................................1, 7, 8, 19

## INTRODUCTION

Receiver Ralph S. Janvey moves for judgment as a matter of law under Rule 50(b) on his fraudulent transfer claim.  The evidence at trial demonstrated that (1) Stanford Coins & Bullion, Inc. ("SCB") intended to hinder, delay, or defraud its creditors through its transfers to Dillon Gage, and (2) Dillon Gage had notice of this fraudulent intent and therefore lacked good faith. The facts of the case were undisputed, and Dillon Gage presented no evidence showing lack of fraudulent intent by SCB or disputing Dillon Gage's knowledge of SCB's insolvency and fraudulent plan.  Because the jury's verdict was not supported by sufficient evidence, judgment as a matter of law for the Receiver and against Dillon Gage is appropriate.

The payments to Dillon Gage in this case were all fraudulent transfers.  SCB made the payments during the three weeks immediately before the Court placed SCB and the other Stanford companies into the Receivership.  All of the transfers occurred when SCB was millions of dollars behind on its bills, had no cash to pay those bills, and had been cut off from additional cash and credit from Stanford.  SCB was presumptively insolvent because it was not generally paying its bills as they became due.  And all of the payments occurred mere days before or after SCB incurred a $3 million debt to a new creditor, which it had no way to pay.  Dillon Gage presented no evidence to contradict any of these points.

While SCB made all of the transfers with fraudulent intent, the evidence of that intent was overwhelmingly and uniquely clear with regard to the $3 million transfer on February 2. This is because (unlike most fraud cases, where intent must proven circumstantially) there was direct evidence of SCB's plan to defraud its creditor.  Dillon Gage's witnesses testified that SCB took $3 million from the Gagosian Gallery for the purchase of 101 gold bars, all the while intending to send the money to Dillon Gage to clear SCB's old debts.  SCB did so knowing it had

no cash reserves to pay those old debts, no funds to pay for the gold bars before they had to be delivered, and that Dillon Gage was unwilling to ship the gold bars before receiving full payment.  Dillon Gage recorded the calls where SCB laid out its fraudulent plan step by step.  Of course, SCB did not reveal its plan to the Gallery, and every witness agreed the Gallery never would have sent the money if it knew SCB's intentions.  This was not merely a debtor preferring one creditor over another—it was defrauding one creditor (the Gallery) by making payments to another (Dillon Gage).  Given this direct evidence of intent to defraud, the jury's verdict is unsupportable.

Moreover, while there was no verdict on the issue of good faith because the jury did not reach that question, no rational jury could have found for Dillon Gage.  Dillon Gage's own phone recordings and witnesses proved that it knew all about SCB's plan to misapply the Gallery's money, and about SCB's dire financial situation that prompted that plan.  Dillon Gage knew that SCB had lost access to cash and credit from Stanford's bank and was misapplying funds from customer orders.  Dillon Gage then used its knowledge as leverage to ensure that it got paid—at the expense of SCB's other creditors.  Accepting payments knowing they are made with an intent to hinder or defraud other creditors, and using inside knowledge of insolvency for your own advantage, is plainly not good faith.

Because SCB intended to hinder, delay, and defraud its creditors when it made the transfers, and Dillon Gage knew it, there is insufficient evidence to support the verdict.  The Receiver is entitled to judgment as a matter of law.

Finally, the Receiver opposes Dillon Gage's motion for entry of final judgment (*see* Doc. 228) and requests that it be denied for the reasons set forth herein.

## FACTUAL BACKGROUND

The evidence at trial showed that SCB was insolvent, had no cash reserves to pay its old debts, and used the money from the Gallery's gold bar order to pay those debts.  Dillon Gage knew about SCB's financial problems and its own witnesses testified—emphatically—that this was SCB's plan.  SCB executed this plan knowing it had no funds to pay for the gold bars before they had to be delivered and that Dillon Gage was unwilling to ship the gold bars before receiving full payment.  Of course, the Gallery did not learn any of this until it was too late.

### SCB was insolvent in January and February 2009.

In early 2009, SCB was insolvent.  SCB was operating without any cash cushion, largely because the company had never made any profit since it was founded by James Davis in 1999.  *See* Trial Tr. 4 at 209 (App. 61) (Van Tassel Test.).  From inception, SCB relied on funds from a Stanford International Bank cash account to keep it afloat and pay its bills.  But in early 2009 SCB lost access to that account.  *See* PX 160 at 8 (App. 72); Trial Tr. 3 at 16 (App. 17) (Terry Test.) ("[W]e didn't have access to [the account] anymore.").  SCB's requests to borrow other money from Stanford companies to pay its bills were rejected.  *See* Trial Tr. 3 at 32 (App. 20) (Terry Test.).

At the same time, SCB was under pressure to pay millions of dollars in overdue debts to Dillon Gage, its largest supplier.  *See* Trial Tr. 3 at 35 (App. 21) (Terry Test.).  SCB's Vice President, Scott Terry, testified that SCB had more than $2 million in past-due bills to Dillon Gage because it had used customers' pre-paid order money on "other things."  Trial Tr. 3 at 26 (App. 18).  Without access to cash and credit from Stanford's bank, SCB couldn't bring its debts current and depended entirely on Dillon Gage's shipping products on credit.  Mr. Terry testified

that "if your biggest supplier cuts off [shipments] when you're already struggling with cash, that's a big problem."  Trial Tr. 3 at 35 (App. 21).

### Dillon Gage was on notice of SCB's insolvency as of January 22, 2009.

In late January, 2009, Dillon Gage learned about SCB's dire financial circumstances. During a visit to SCB's office in Houston, and follow-up phone calls in the subsequent days, Dillon Gage' President, Terry Hanlon, learned:

- SCB was diverting money received from customers for pre-paid orders for purposes other than paying Dillon Gage for products to fulfill those orders.  PX 160 at 6 (App. 70), 8 (App. 72).

- SCB was using "capital that we have that really belongs to customers." *Id.* at 13 (App. 77).

- SCB regularly used Stanford's bank as a source of credit to pay its bills. *Id.* at 7 (App. 71).

- Stanford had pulled all of the money out of the account used to supply cash to SCB. *Id.* at 8 (App. 72).

- As a result, SCB was wholesaling its inventory to raise cash. *Id.* at 11 (App. 75).

- Dallas Gold and Silver—another coin company tied to Allen Stanford—had also lost access to credit from Stanford's bank. *Id.* at 4-5 (App. 68-69); PX 162 at 5 (App. 91) (Hanlon: "I've got two companies that are having problems with cash flow that both stem from Stanford.").

These facts led Mr. Hanlon to conclude that SCB was "robbing Peter to pay Paul."  PX 160, at 9 (App. 73).

Dillon Gage used the information it learned about SCB's financial problems—none of which was available to SCB's other creditors—to reduce its exposure at the expense of those other creditors.  *See* Trial Tr. 4 at 20 (App. 49).  It halted new shipments to SCB and its customers and cut off SCB's credit line.  *See* PX 136 (App. 130); Trial Tr. 4 at 20 (App. 49) (Fritz Test.); Trial Tr. 4 at 145 (App. 59) (Hanlon Test.).  Dillon Gage's vice president Ira Fritz

admitted that the company knew about SCB's dire financial situation and was taking steps to protect itself from further "exposure."  Trial Tr. 4 at 53 (App. 56).

Dillon Gage's alarm over SCB's financial condition stemmed from the fact that SCB was not simply slow-paying its bills—it lacked the cash to pay those bills even if it wanted to.  SCB told Dillon Gage that the reason it wasn't paying its bills was "cash flow."  PX 160 at 6 (App. 70).  Mr. Terry admitted that SCB had lost access to credit from Stanford, and that the account SCB typically used to borrow money from the bank had been cleared out.  *Id.* at 8 (App. 72).  Mr. Hanlon recognized that "[C]ash flow . . . was the real reason that you weren't just sending money to us."  PX 162 at 5 (App. 91).  Mr. Terry testified that SCB didn't have money in its bank accounts to pay what it owed to Dillon Gage at the time.  *See* Trial Tr. 3 at 32 (App. 20) ("[W]e needed cash to—to pay our bills, yes.").  Investigation of SCB's finances later revealed that Mr. Terry was absolutely correct:  Because SCB never made a profit or had sufficient cash flow, it was entirely dependent on cash from Stanford's bank to pay its bills.  *See* Trial Tr. 4 at 209 (App. 61) (Van Tassel Test.).  When SCB lost access to that cash and credit, it lost its only financial cushion.  *Id.*

## SCB planned to use cash from new orders to pay old debts—and Dillon Gage knew it.

SCB told Dillon Gage not only about its dire financial situation in January 2009, but also about SCB's scheme to get its old debts paid off.

Starting during Mr. Hanlon's visit to Houston, and continuing in later phone calls, SCB told Dillon Gage that it hoped to close a pre-paid $3 million "crazy deal" for gold bars—now known to be with the Gagosian Gallery—and use the proceeds to pay off Dillon Gage.  *See* PX 160 at 9-10 (App. 73-74); Trial Tr. 3 at 247 (App. 36), 283 (App. 38) (Fritz Test.); Trial Tr. 3 at 11-12 (App. 13-14) (Terry Test.); Trial Tr. 4 at 10-11 (App. 44-45) (Fritz Test.).  Dillon Gage

knew that the margins on gold bar sales were very thin, and that no single deal could generate enough profit for SCB to pay its past debts.  *See* Trial Tr. 3 at 38 (App. 22) (Terry Test.) (profit margin was approximately 1%); Trial Tr. 3 at 282-84 (App. 37-39) (Fritz Test.).  Such a deal would only provide a short-term solution because Dillon Gage required full payment before it would deliver the gold bars and SCB would still need to find money (that it didn't have) to pay for that order.  Mr. Terry confirmed this when he told Mr. Hanlon that SCB would use the money from the sale to get Dillon Gage "square," but that SCB would "still owe you for that order when the product arrives, but you know, *that would give us some time*."  PX 160 at 9-10 (App. 73-74) (emphasis added).

SCB's plan was to buy extra time by "playing the float" with the money from the gold bar order.  *See* Trial Tr. 3 at 30 (App. 19) (Terry Test.).  SCB did not do this for the sake of convenience—it was an absolute necessity because SCB didn't have any other money to pay Dillon Gage.  Mr. Terry conceded that SCB lacked cash to pay Dillon Gage were it not for the incoming payment from the Gallery.  Trial Tr. 3 at 15 (App. 16).  He said that using money from the gold bar deal was the "only thing" that would enable SCB to pay Dillon Gage in the immediate future.  *See* PX 160 at 3 (App. 67).  Ms. Van Tassel confirmed that SCB lacked any cash cushion whatsoever.  Trial Tr. 4 at 209 (App. 61).  Once SCB used the money from the Gallery order to clear old debts, it would still "owe [Dillon Gage] for that order when the product arrives."  PX 160 at 10 (App. 74).

The evidence showed that when the $3 million payment eventually came in, Dillon Gage followed SCB's instructions and applied the money to its old debts—not to pay for 101 gold bars. Even though all of the paperwork indicated that the payment was for the 101 gold bars, Dillon Gage used that money to reduce SCB's balance for earlier purchases.  Trial Tr. 4 at 14-15 (App.

46-47) (Fritz Test.).  Mr. Hanlon knew when the $3 million came in that it was for the "crazy" gold deal that he had discussed with SCB.  Trial Tr. 4 at 129 (App. 57).  He later admitted to the Gallery that SCB had used the money from the Gallery's order to clear SCB's old debts.  *See* PX 174 at 9-10 (App. 114-15); Trial Tr. 4 at 129-30 (App. 57-58) (Hanlon Test.).

SCB still didn't have enough cash to pay for the gold bars when the Receivership was created on February 17, 2009.  *See* Trial Tr. 3 at 60-61 (App. 23-24) (Terry Test.); Trial Tr. 3 at 95 (App. 28) (Van Tassel Test.).  SCB's lack of funds to pay for the gold order was confirmed by the other five payments it made during this time.  Even when told that it needed to pay up front for the gold bars before they would ship, SCB continued sending in piecemeal payments that failed to cover the full amount.  *See* PX 137 (App. 132-36); PX 168 at 4 (App. 101) (Fritz: "I've got to have your balance way down before I ship these bars.").  SCB's persistent failure to pay underscored that it misapplied the Gallery's payment out of desperation because SCB could not get money anywhere else.

## LEGAL STANDARDS

"A motion for judgment as a matter of law challenges the legal sufficiency of the evidence to support the verdict.  *Jacobs v. Tapscott*, 516 F. Supp. 2d 639, 643 (N.D. Tex. 2007) (Fitzwater, J.) (quotation omitted) (granting motion), *aff'd*, 277 F. App'x 483 (5th Cir. 2008); *see* Fed. R. Civ. P. 50(a)(1).  "This occurs when the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary verdict." *Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 362 (5th Cir. 2004).  Where the jury's factual findings are not supported by substantial evidence, or the legal conclusions implied from the verdict cannot legally be supported by those findings, judgment as a matter of law is appropriate.  *See Am. Home Assurance Co. v. United Space Alliance, LLC*, 378 F.3d 482, 486

(5th Cir. 2004) (reversing denial of Rule 50 motion).  "There is no legally sufficient evidentiary basis when the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict."  *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001).

The Court must not weigh the evidence and must draw reasonable inferences in favor of the nonmoving party.  *Brennan's Inc.*, 376 F.3d at 362   But the Court must also "give credence to that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."  *Lassetter v. Strategic Materials, Inc.*, 192 F. Supp. 2d 698, 701 (N.D. Tex. 2002) (Lynn, J.) (alteration and quotation omitted) (granting Rule 50 motion).  "[T]o survive a Rule 50 motion, the party opposing the motion must at least establish a conflict in substantial evidence on each essential element of their claim" or defense.  *See Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1040 (5th Cir. 2011).

## ARGUMENT

The jury's verdict of no fraudulent transfer was not supported by sufficient evidence.  No rational jury could conclude, based on the record at trial, that SCB did *not* intend to hinder, delay, or defraud its creditors when it made the transfers in question.  Under the Texas Uniform Fraudulent Transfer Act, a transfer is fraudulent if it is made by the debtor with actual intent to hinder, delay, or defraud any creditor of the debtor.  Tex. Bus. & Comm. Code § 24.005(a)(1).

First, SCB's intent to defraud the Gallery by using the $3 million to clear its old debts was proven as a matter of law by direct, overwhelming, and uncontested evidence—namely, the phone records where SCB explicitly described its plan.

Second, while the evidence of SCB's intent to defraud the Gallery was uncommonly explicit, the evidence also demonstrated that the other five payments were made with intent to

hinder, delay, or defraud SCB's creditors as a matter of law.  Under TUFTA, factors relevant to fraudulent intent include whether the debtor was insolvent at the time of the transfer, and whether the transfer occurred shortly before or after the debtor incurred a substantial debt.  TEX. BUS. & COMM. CODE § 24.005(b).  The evidence showed that SCB was not generally paying its bills as they became due and was thus presumed insolvent—a presumption that Dillon Gage did not attempt to rebut.  And all of the payments were made just days before or after SCB incurred its $3 million debt to the Gallery, which it could not repay after it used the money to clear old bills.  Dillon Gage offered no evidence to counter either of these facts or show that SCB lacked fraudulent intent, and there is insufficient evidence to sustain the verdict.

Third, once a transfer is established as fraudulent, the recipient must prove that it accepted the fraudulent transfer in good faith and for reasonably equivalent value.  TEX. BUS. & COMM. CODE § 24.009(a).  Because the uncontested evidence shows that Dillon Gage knew about SCB's insolvency and its plan to defraud the Gallery, and Dillon Gage used that knowledge to limit its exposure at the expense of other creditors, Dillon Gage lacked good faith as a matter of law.

**1.  The evidence is conclusive that SCB made the $3 million payment with actual fraudulent intent.**

The Fifth Circuit recently wrote that "[f]raudulent transfer laws like TUFTA were enacted to protect creditors against depletion of the debtor's estate."  *Janvey v. Golf Channel, Inc.*, No. 13-11305, 2015 WL 3972216, at *3 (5th Cir. June 30, 2015).  It made clear that, while a debtor has the right to prefer his obligation to one creditor over another, "the right to prefer does not extend to transfers made in fraud of the rights of the other creditors."  *Id.* at *3 (alteration omitted) (quoting *Englert v. Englert*, 881 S.W.2d 517, 518 (Tex. App.—Amarillo 1994, no writ)).  Because SCB defrauded the Gallery when it used the money from the gold bar

order to clear its old debts—when it had no other way to satisfy the Gallery's order—that transfer was not a mere preference of one creditor over another.  It was a wrongful fraudulent transfer as a matter of law.

In addition to specifically defrauding the Gallery on the $3 million transfer, SCB was also not generally paying its debts as they became due and was presumptively insolvent.  Its transfers to Dillon Gage allowed SCB to maintain a facade of solvency, to the detriment of creditors like the Gallery.  The transfers hindered, delayed, and defrauded SCB's creditors, and were all fraudulent under TUFTA.

### a.  SCB intended to—and did—hinder, delay, and defraud the Gallery.

The only rational conclusion based on the evidence is that SCB intended to defraud the Gallery when it transferred the $3 million to Dillon Gage on February 2, 2009.  The Gallery did not send that money to SCB as a loan; it was pre-paying for an order of 101 gold bars.  SCB took that money as a prepayment from the Gallery and then diverted it for SCB's own benefit without authorization.  This evidence establishes fraudulent intent as a matter of law.

SCB's actions meet all the common law elements of fraud:

> There are four elements to a fraud claim: (1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation; and (4) the plaintiff suffered an injury by actively and justifiably relying on that representation.

*Sheets v. Wells Fargo Bank, N.A.*, No. 3:12-cv-4534-N, 2013 WL 5914404, at *5 (N.D. Tex. Sept. 11, 2013) (Godbey, J.).  Here, SCB made a material misrepresentation (it led the Gallery to think that its money would go to purchase gold bars, not pay SCB's old debts).  SCB knew that representation was false (it was already making plans to misapply the money).  SCB plainly

intended for the Gallery to rely on its representation.  And the Gallery was harmed by relying on SCB's representation (it ended up with no gold bars and no money).

Likewise, SCB made a "partial disclosure and convey[ed] a false impression" to the Gallery, which gave rise to a duty to fully disclose the facts needed to correct the misunderstanding.  *See Baker v. Great N. Energy, Inc.,* 64 F. Supp. 3d 965, 975 (N.D. Tex. 2014) (Boyle, J.).  SCB's actions met the definition of fraud by nondisclosure:

> The elements of a claim for fraud by nondisclosure are that: (1) a party conceals or fails to disclose a material fact within the knowledge of that party; (2) the party knows the other party is ignorant of the fact and does not have an equal opportunity to discover the truth; (3) the party intends to induce the other party to take some action by concealing or failing to disclose the fact; and (4) the other party suffers injury as a result of acting without knowledge of the undisclosed fact.

*CDI Corp. v. GT Solar Inc.*, No. H-11-3487, 2013 WL 873785, at *2 (S.D. Tex. Mar. 7, 2013). SCB never told the Gallery—and the Gallery plainly did not know—that SCB planned to use the gold bar order money to clear old debts, and the Gallery was harmed as a result.

Everyone at trial agreed with the common sense conclusion that the Gallery would never have sent any money if it knew the whole picture.  Mr. Terry testified that the Gallery would not have sent its money to SCB if it knew that SCB planned to use that money to pay off its old debts with Dillon Gage.  Trial Tr. 3 at 13 (App. 15).  He also agreed that telling the Gallery about how its money was going to be used was an "important fact" that "ma[d]e a difference to whether they sent the money or not."  *Id.* at 14 (App. 16).  Mr. Hanlon agreed that the Gallery would never have sent its money to SCB if it knew that SCB planned to take that money and use it to wipe out SCB's old debts.  Trial Tr. 4 at 151 (App. 60).  And Mr. Fritz testified that, if one of his suppliers told him it was going to use his money to pay to fulfill other orders, he wouldn't trust them with his purchase.  Trial Tr. 4 at 42 (App. 55).

- 11 -

The evidence of SCB's intent to hinder, delay, and defraud the Gallery is crystalized in the January 22, 2009 phone call between Mr. Hanlon and Mr. Terry. *See* PX 160 (App. 65). Mr. Terry admitted on the call that SCB didn't have cash to pay its bills, was diverting customer money from orders, had lost access to its cash and credit from Stanford, and was wholesaling inventory to raise funds. *Id.* SCB told Dillon Gage it planned to "buy some time" by collecting money from the pre-paid "crazy deal" and use that cash to pay off its debts. *Id.* at 3 (App. 67). Mr. Terry's admission that SCB planned to "buy some time" with the Gallery's money unquestionably shows an intent to *delay* the Gallery's claim by its very terms, as well as intent to defraud. SCB was well aware that it would still owe money to fulfill that order when the time came. *Id.* at 9-10 (App. 73-74).

The undisputed facts at trial were that SCB had no cash to fulfill the Gallery's order once it used the $3 million to clear its old debts. *See* Trial Tr. 3 at 60-61 (App. 23-24) (Terry Test.); Trial Tr. 3 at 95 (App. 28) (Van Tassel Test.). This is why it was fraudulent for SCB to "play the float" with the Gallery's money—because it had no reserves to replace that money when the time came. *See* Trial Tr. 4 at 209 (App. 61) (Van Tassel Test.).

While "proof of 'actual intent to hinder, delay, or defraud' creditors may rarely be accomplished by direct proof," the jury here *did* have direct proof, through SCB's recorded telephone calls. *See Tow v. Amegy Bank, N.A.*, 505 B.R. 455, 462 (S.D. Tex. 2014); *see also In re SMTC Mfg. of Tex.*, 421 B.R. 251, 299 (Bankr. W.D. Tex. 2009) (writing that a claimant "may prove intent through either direct evidence or circumstantial evidence"). Dillon Gage itself produced those calls and backed them up with testimony that SCB's instructions were to apply the gold bar proceeds to SCB's old debts. *See* Trial Tr. 4 at 15 (App. 47) (Fritz Test.). This record cannot support a verdict that SCB did not intend to hinder, delay, or defraud the Gallery.

**b.  There was insufficient evidence to support a verdict that the $3 million payment was a mere "preference"—direct evidence showed that it defrauded the Gallery.**

SCB's payment of the $3 million to Dillon Gage was not a mere "preference" of one creditor over another.  Rather, it was a payment to Dillon Gage that was intended to and did hinder, delay, and defraud the Gallery.  The Court instructed the jury that "preferring one creditor over another does not indicate fraudulent intent, provided that the creditor does not receive more than is reasonably necessary to pay its debts." (*See* Doc. 224 at 10.)  Here, it is undisputed that the $3 million was far in excess of what SCB owed Dillon Gage in old debts, as the payment resulted in a credit in SCB's account of over $1 million.

Moreover, the Court's instruction cannot insulate Dillon Gage from liability because, as the Fifth Circuit has ruled, "the right to prefer does not extend to transfers made in fraud of the rights of the other creditors." *Golf Channel*, 2015 WL 3972216, at *3 (alteration omitted).  "A debtor in Texas has the right to prefer an obligation to one creditor over an obligation to another creditor, as long as the debtor's preference is devoid of fraudulent intent." *Geneva Corp. Fin., Inc. v. Waddell*, 251 F.3d 157, at *2 (5th Cir. 2001) (per curiam) (emphasis added).  The Receiver objected to the Court's instruction concerning preference because, as given, it was "a misstatement of the law, prejudicial, and potentially confusing to the jury." (*See* Doc. 219 at 8.)  As written, the instruction suggests that a debtor who prefers one creditor over another can never be found to have fraudulent intent, which is directly contrary to Fifth Circuit law.  Including the Court's preference instruction without the limiting language from *Golf Channel* and *Geneva Corporate Finance, Inc.* likely confused the jury into believing it had no choice but to find that no fraudulent transfers occurred.

The undisputed evidence proved that SCB did have fraudulent intent when it sent the $3 million to Dillon Gage.  There is no legal basis to sanitize that transfer by deeming it a "mere

- 13 -

preference."   Dillon Gage offered no evidence to show that the Gallery was somehow *not* defrauded when SCB used the gold bar order money to clear its old debts (at a time when SCB didn't have any other money).   There is not sufficient evidence to support a verdict that the $3 million payment was a mere preference, and the Receiver is entitled to judgment as a matter of law.

## 2.  SCB's other payments to Dillon Gage also hindered, delayed, and defrauded its creditors.

The evidence of fraudulent intent is unusually explicit with regard to the $3 million payment on February 2, particularly in light of the January 22, 2009, telephone recording.   But there is an overwhelming inference of fraudulent intent as to all six payments based on other evidence.   The jury's verdict to the contrary is not supported by sufficient evidence.

All of the payments were made after January 22, 2009.   PX 137 (App. 132-36).   As of that date:   SCB was millions of dollars behind on payments to Dillon Gage, had lost access to cash and credit from Stanford's bank that it relied on to pay its bills, was wholesaling inventory to raise cash, was diverting money from customers' orders to other purposes, and was planning to use new customer payments to pay down old debts.   *See* PX 160 (App. 65-85); Trial Tr. 3 at 122-124 (App. 32-34) (Van Tassel Test.); Trial Tr. 4 at 21-25 (App. 50-54) (Fritz Test.).   Dillon Gage, knowing all this, cut off additional shipments and credit to SCB.   *See* PX 136 (App. 130).

SCB was presumed insolvent within the meaning of TUFTA when it made all six transfers.   "A debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent," and insolvency is one of the badges of fraud under TUFTA.   *See* TEX. BUS. & COMM. CODE §§ 24.003(b), 24.005(b)(9).   The evidence at trial showed that SCB was not paying its bills as they became due.   *See* Trial Tr. 2 at 270-71 (App. 6-7) (Van Tassel Test.); Trial Tr. 3 at 89-91 (App. 25-27) (Van Tassel Test.).   SCB was unquestionably not paying its

bills as they became due to Dillon Gage, its largest supplier.  *See, e.g.*, Trial Tr. 4 at 18 (App. 48) (Fritz Test.).  At the time of the transfers, SCB had millions of dollars in unpaid bills to other creditors.  *See* Trial Tr. 2 at 54 (App. 5) (Receiver Test.).  SCB was not making a profit during this time and was dependent on money from other parts of the Stanford Ponzi scheme to stay afloat.  *See* Trial Tr. 3 at 116-17 (App. 29-30) (Van Tassel Test.).  SCB's inability to pay its debts as they became due was made worse by the fact that the Ponzi scheme money was cut off shortly before the transfers to Dillon Gage were made.  *See* Trial Tr. 3 at 32 (App. 20) (Terry Test.); Trial Tr. 3 at 119 (App. 31) (Van Tassel Test.); PX 104 (App. 138).

Dillon Gage did not put on any evidence that SCB *was* solvent or *was* paying its debts as they became due at the time of the transfers.   Where there is evidence of a debtor's failure to pay its debts as they became due, insolvency is presumed unless sufficient evidence is presented to rebut the presumption.  *See, e.g.*, *U.S. v. Fritz*, No. SA-12-CA-550, 2014 WL 5514381, at *6 (W.D. Tex. Sept. 10, 2014) (recommending court grant summary judgment where evidence showed debtor repeatedly failed to pay tax bills and was therefore presumed insolvent); *In re Cowin*, No. 13-30984, 2014 WL 1168714, at *29 (Bankr. S.D. Tex. Mar. 21, 2014) (applying the presumption, finding that the debtor "failed to rebut the presumption," and therefore finding that the debtor was insolvent); *Reed v. Griggs* (*In re Cash Rewards, Inc.*), No. 10-3212, 2012 WL 967862, at *10 (Bankr. N.D. Tex. Mar. 21, 2012) (Hale, J.) (applying presumption of insolvency under TUFTA where the evidence of failure to pay debts "was not refuted by Defendants at trial"); *Osherow v. Hensley* (*In re Pace*), 456 B.R. 253, 273 (Bankr. N.D. Tex. 2011) (Clark, J.) (finding insolvency where defendant "did not present any evidence to rebut this presumption").  Because Dillon Gage did not even attempt to offer evidence to rebut the presumption, SCB was

insolvent as a matter of law.  (*See* Jury Instructions, Doc. 224 at 9 (discussing presumption of insolvency)).

Moreover, all six transfers from SCB came shortly before or shortly after SCB incurred a $3 million obligation to the Gallery.  Because SCB had no ability to satisfy this $3 million obligation, this is evidence of another badge of fraud under TUFTA.  *See* TEX. BUS & COMM. CODE § 24.005(b)(10).  SCB only made 1% profit on the Gallery's sale, but it used the majority of the $3 million payment to clear up old debts, resulting in other unpaid bills down the road. *See* Trial Tr. 3 at 123 (App. 33) (Van Tassel Test.).  SCB and Dillon Gage both recognized that SCB would still owe the money for the gold bars—before they could be shipped—once it misapplied the funds to cover other debts.  *See* PX 160 at 10 (App. 74).  And SCB had no cash reserves to use to make that payment, and no clear idea of where it would get such money when the time came.

The only evidence before the jury was that SCB was insolvent; Dillon Gage offered no evidence of solvency whatsoever.  The overwhelming inference from the uncontradicted evidence is that SCB's payments to Dillon Gage hindered, delayed, or defrauded other creditors of SCB.  Certainly none of SCB's customers would have sent their money to SCB had they known of these facts.  The jury's verdict is not supported by sufficient evidence and should be set aside.

**3.  Dillon Gage did not have good faith:  it knew SCB was insolvent and making transfers with fraudulent intent, and then used its leverage to extract payments to the detriment of other SCB creditors.**

Dillon Gage lacked good faith because SCB told it, explicitly, about its dire financial situation and its plan to use the Gallery sale to pay off old debts.  Dillon Gage also knew from its own experience that SCB was not generally paying its debts as they became due.  And Dillon Gage used its inside knowledge to extract payments from SCB, despite knowing that those

payments defrauded other creditors like the Gallery.   As an affirmative defense, it was Dillon Gage's burden to prove that it took the transfers in good faith.   (*See* Doc. 224 at 11.)   The jury did not reach the question of good faith in its verdict.   But no rational jury could find good faith based on the record at trial, and judgment as a matter of law for the Receiver is warranted.

"To establish that it acted in good faith, [Dillon Gage] must prove by a preponderance of the evidence that it lacked actual or constructive knowledge of [SCB's] fraud." *GE Capital Commercial, Inc. v. Worthington Nat'l Bank*, 754 F.3d 297, 301 (5th Cir. 2014) (affirming verdict of no good faith).   Dillon Gage lacked good faith if it took the payments "with knowledge of such facts as would excite the suspicions of a person of ordinary prudence and put him on inquiry of the fraudulent nature of an alleged transfer." *Citizens Nat'l Bank of Tex. v. NXS Const., Inc.*, 387 S.W.3d 74, 85 (Tex. App.—Houston [14th Dist] 2012, no pet.).   A recipient of a fraudulent transfer is not allowed to merely "look the other way" or exercise "willful blindness." *GE Capital Comm.*, 754 F.3d at 312.

Moreover, "[t]he Fifth Circuit has implied that knowledge of the debtor's insolvency at the time the transfer was received may be sufficient to preclude a finding of 'good faith'" *Smith v. Suarez* (*In re IFS Fin. Corp.*), 417 B.R. 419, 442 (Bankr. S.D. Tex. 2009) (citing *In re Hannover Corp.*, 310 F.3d 796, 799-801 (5th Cir. 2002)); *see also In re Grueneich*, 400 B.R. 688, 694 (B.A.P. 8th Cir. 2009) (affirming judgment that recipients lacked good faith because they "know or should have known that the Debtor was insolvent at the time of the transfer").   Applying parallel sections of the Bankruptcy Code, the Fifth Circuit recently wrote that "[t]he first question posed [in the good faith test] is whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose." *Templeton v. O'Cheskey* (*In re Am. Housing Foundation*), 785 F.3d 143,

- 17 -

164 (5th Cir. 2015).  Here, Dillon Gage had direct knowledge of both insolvency and fraudulent purpose.

Dillon Gage's good faith argument fails due to the same evidence discussed above that demonstrates SCB's fraudulent intent.  Dillon Gage's witness testified that they knew all along about SCB's deteriorating finances and its plan to use the $3 million to clear SCB's old debts.  *See, e.g.*, Trial Tr. 3 at 247 (App. 36), 283 (App. 38) (Fritz Test.).  Indeed, the clearest evidence of SCB's plan to defraud the Gallery, and the underlying money problems that necessitated that plan, is likely the phone transcripts between SCB and Dillon Gage.  *See* PX 160 (App. 65-85).  Dillon Gage did not—and could not—dispute that it knew SCB had lost access to cash and credit from Stanford, was millions of dollars in debt, didn't have cash to pay its bills, and was misapplying customer order proceeds.  *See id.*

Dillon Gage also knew that SCB intended to use the Gallery payment to pay its bills.  Mr. Hanlon confirmed this when a Gallery representative called to find out the location of its pre-paid gold bars'.  *See* PX 174 at 9-10 (App. 114-115); Trial Tr. 4 at 129-30 (App. 57-58) (Hanlon Test.).  He admitted that SCB used money from the Gallery's order to clear SCB's other debts.  PX 174 at 9 (App. 114).  But Mr. Hanlon never told the Gallery that Dillon Gage knew all about the plan ahead of time.  Trial Tr. 4 at 130 (App. 58).  Likewise, he told the Gallery that SCB was a credit customer of Dillon Gage, but not that Dillon Gage cut off that credit weeks before (and before the Gallery made the $3 million payment).  *Id.* at 128.

Dillon Gage went on to use its knowledge and its leverage as SCB's primary supplier to extract payments.  Dillon Gage told SCB on January 22—after learning of its insolvency and plan to misapply the Gallery money—"not to create a hardship for you, but you obviously know I can't keep sending inventory."  PX 160 at 19 (App. 83).  Dillon Gage followed through and cut

off additional shipments, which meant that SCB couldn't deliver the product to its customers.  *Id.* at 18.  Dillon Gage only resumed shipments after the $3 million—proceeds of the Gallery's payment—was sent to clear SCB's old debts.  *See* PX 149 (App. 140).  Courts recognize that "insistence on . . . payment in view of [a debtor's] imminent insolvency is further support of [a defendant's] bad faith."  *See Hayes v. Palm Seedling Partners* (*In re Agric. Research & Tech. Grp., Inc.*), 916 F.2d 528, 540 (9th Cir. 1990).  It would be impossible for a rational jury to find that Dillon Gage accepted the transfers in good faith given this evidence.

Because there was not sufficient evidence to support a verdict of good faith, judgment as a matter of law for the Receiver is appropriate.

**4.   The Court should deny Dillon Gage's motion for entry of final judgment.**

The Receiver opposes Defendants' motion for entry of final judgment.  (*See* Doc. 228.) Because there is insufficient evidence to support the jury's verdict, there is no basis to enter Defendants' proposed final judgment.  The Receiver requests that the Court grant his Rule 50(b) motion, enter judgment as a matter of law in favor of the Receiver, and deny Defendants' motion.

## CONCLUSION

For the foregoing reasons, the Receiver requests that the Court set aside the jury's verdict and enter judgment as a matter of law in favor of the Receiver on his fraudulent transfer claim and Dillon Gage's affirmative defense of good faith.  The Receiver requests that the Court deny Dillon Gage's motion for entry of final judgment for the reasons set forth above.

Dated:  August 7, 2015

Respectfully submitted,

**BAKER BOTTS L.L.P.**

By: */s/ Kevin M. Sadler*

Kevin M. Sadler
Texas Bar No. 17512450
kevin.sadler@bakerbotts.com
David T. Arlington
Texas Bar No. 00790238
david.arlington@bakerbotts.com
Brendan A. Day
Texas Bar No. 24052298
brendan.day@bakerbotts.com
1500 San Jacinto Center
98 San Jacinto Blvd.
Austin, Texas 78701-4039
(512) 322-2500
(512) 322-2501 (Facsimile)

Timothy S. Durst
Texas Bar No. 00786924
tim.durst@bakerbotts.com
Christopher Norfleet
Texas Bar No. 24070338
christopher.norfleet@bakerbotts.com
2001 Ross Avenue
Dallas, Texas 75201
(214) 953-6500
(214) 953-6503 (Facsimile)

**ATTORNEYS FOR RECEIVER RALPH S. JANVEY**

## CERTIFICATE OF SERVICE

On August 7, 2015, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.  I hereby certify that I will serve all counsel of record electronically or by other means authorized by the Court or the Federal Rules of Civil Procedure.

*/s/ Kevin M. Sadler*
Kevin M. Sadler